UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>(1) STRYKER BIOTECH, LLC,<br>(2) MARK PHILIP,<br>(3) WILLIAM HEPPNER,<br>(4) DAVID ARD and<br>(5) JEFFREY WHITAKER,<br><br>Defendants. | Criminal No: 09-CR-10330-GAO |

### MOTION TO COMPEL DISCLOSURE OF EXCULPATORY INFORMATION RELATING TO THE GOVERNMENT'S FOUR COOPERATING WITNESSES

Defendants Stryker Biotech ("Biotech"), Mark Philip, William Heppner, David Ard, and Jeffrey Whitaker (collectively, "Defendants") hereby move for an order directing the Government to produce exculpatory and impeachment information as described herein. The memorandum of law supporting this motion is incorporated herein.

For the last two years, attorneys for Defendants have engaged in a continuing dialogue with the U.S. Attorney's Office ("USAO" or "Government"), seeking the disclosure of exculpatory information related to the pre-plea communications between the Government and former Biotech employees Christopher Ring, Justin Demming, Shane Doyle, and Darnell Martin (collectively, the "Pleaders"). Each of the Pleaders agreed to plead guilty to a single count of felony misbranding in violation of the Food, Drug and Cosmetic Act ("FDCA") and to testify against the Defendants in exchange for (1) a § 5K motion for a reduced sentence; (2) the

Government's agreement not to pursue other potential charges against him; and (3) reduced loss amounts for Guidelines purposes.[1]

The Pleaders' conduct constitutes the heart of the Government's case against the Defendants, and the jury's assessment of their testimony and credibility will be critical. The Pleaders pled guilty to violating 21 U.S.C. §§ 331 and 333(a)(2)—misbranding with the "intent to defraud or mislead"—the very same statutory provisions with which Biotech has been charged in Counts 7-12 of the Superseding Indictment. Moreover, the specific acts underlying these guilty pleas are incorporated into the Superseding Indictment as Counts 10 and 12 and as overt acts to the wire fraud conspiracy. Nonetheless, the basic contours of the criminal conduct to which these individuals pled guilty remain unclear. Defendants cannot locate anywhere among the Government's disclosures a statement from any of the Pleaders, made prior to the entry of the plea, indicating that he acted with the "intent to defraud or mislead." Indeed, it appears from the Government's disclosures to date that the first time the Pleaders acknowledged the requisite mental state of "intent to defraud or mislead" was in their plea agreements.

Despite repeated requests, the Government has not provided core impeachment and other potential *Brady* information on this critical issue. Having failed in their effort to obtain this discovery without this Court's intervention, Defendants now move for an Order compelling production of any drafts of Statements of Facts exchanged between the Government and the Pleaders; information conveyed in proffers by the Pleaders or their attorneys; and information relating to how the loss amounts reflected in the Pleaders' plea agreements were determined. Production of all this information is mandated by *Brady*, *Giglio*, and this Court's Local Rules;

---

[1] Martin also pled guilty to one count of falsifying IRB approvals.

and, contrary to the Government's contention, none of it is protected from disclosure simply by characterizing the information as "plea negotiations."

## BACKGROUND

Since shortly after the October 2009 Indictment in this matter, Defendants have sought from the Government disclosure of "information revealing the process by which a witness and the Government reached a leniency agreement, immunity agreement, charging decision (including a decision not to charge) or plea agreement."[2] The Government, however, has categorically refused to produce evidence relating to the Pleaders' negotiations with the Government, maintaining the position that its disclosures already "far exceed the requirements of the case law and Local Rules."[3] In November 2009, at the time of automatic discovery, the Government produced to the Defendants grand jury transcripts, exhibits, and interview reports of various individuals, including the Pleaders. In that same production, the Government also provided copies of immunity letters and proffer agreements of potential witnesses, as well as the Pleaders' plea agreements.[4] Those materials, however, failed to illuminate the key issues relating to the Pleaders' credibility and the bargains they reached with the Government. Subsequently, after repeated requests from the Defendants for information regarding the plea process, the Government on March 31, 2010 provided short statements identifying the other potential criminal charges that the Pleaders faced, but which the Government agreed not to pursue in light of the Pleaders' misbranding pleas. Defendants continued to pursue details of the plea process in letters dated April 9, 2010; July 15, 2011; and August 26, 2011; and in surrounding conversations, but the Government refused to disclose any additional information.

---

[2] *United States v. Stryker Biotech et al*, 09-CR-10330, Letter from Defendants to USAO, Dkt. #36 (Feb. 4, 2010) (citing *United States v. Sudikoff*, 36 F. Supp. 2d 1196, 1203 (C.D. Cal. 1999)).
[3] *Id.*, Letter from USAO to Defendants, Dkt. #40, (Feb. 18, 2010).
[4] November 25, 2009 Letter from USAO to Defendants.

To date, the only information the Government has provided on this issue was its March 31, 2010 letter informing the Defendants that, at some undisclosed date, the Government "informed counsel" for each of the Pleaders that their clients "had potential exposure" to various charges, including falsification of IRB approvals,[5] aggravated identity theft, and in the case of Martin, mortgage fraud. The Government also "informed counsel" for the Pleaders that it would not pursue these charges against the Pleaders if they agreed to plead guilty to misbranding under the FDCA.

The other primary set of materials made available to Defendants on this critical issue of the Pleaders' credibility consists of the final Plea Agreements and written Statements of Facts—in essence, the end-result of any plea negotiations—that were filed with the District Court in connection with the Pleaders' individual cases.[6] In those Statements of Facts, the Pleaders respectively admitted that they had supposedly "acted with an intent to defraud or mislead," because they promoted mixing of OP-1 and Calstrux at the same time that they knew (1) that neither Calstrux nor OP-1 was approved by the FDA for combined use; (2) that there was no clinical data to support combined use; and (3) that there had been adverse events associated with the combination. Demming also admitted that he took steps to ensure that mixing instructions he provided were kept confidential. The Plea Agreements further indicate that the Government calculated the losses stemming from Martin's, Doyle's and Ring's misbranding conduct as

---

[5] Before surgeons can use a medical device that the FDA has approved under a Humanitarian Device Exemption ("HDE"), they must first obtain authorization from their hospital's Institutional Review Board ("IRB"). Biotech sales representatives assisted in preparing paperwork for these approvals. Each of the Pleaders was terminated for falsifying IRB documents.

[6] *United States v. Demming*, 08-CR-10379, Plea Agreement, Dkt. #4 (Feb. 6, 2009) and Statement of Facts, Dkt. #7 (Feb. 11, 2009); *United States v. Doyle*, 09-CR-10035, Plea Agreement, Dkt. #5 (Feb. 23, 2009) and Statement of Facts, Dkt. #7 (March 16, 2009); *United States v. Martin*, 08-CR-10338, Plea Agreement, Dkt. #2 (Nov. 14, 2008) and Statement of Facts, Dkt. #4 (Nov. 19, 2008); *United States v. Ring*, 09-CR-10096, Plea Agreement, Dkt. #5 (April 13, 2009). No Statement of Facts appears on Ring's case docket, although his plea colloquy shows that he admitted to substantially the same fraud allegations as the other Pleaders. *See id.*, Change of Plea, Transcript at Dkt. #25 at pp.26-27 (May 7, 2009).

between $10,000 and $30,000, while the loss from Demming's misbranding conduct was set between $30,000 and $70,000.[7] Despite Defendants' requests, the Government has provided no explanation of how it determined these loss figures, which are very low compared to the total sales generated by these individuals, nor has it provided any information regarding the content of the initial loss discussions with Pleaders' counsel. Information about how significant a concession the Government made on loss is a core "promise, reward, or inducement." *See* L.R. 116.2(B)(1)(c).

The Defendants have virtually no information about how these final plea agreements were arrived upon. While each of the Pleaders sat for interviews with the Government, wherein they related their versions of facts, all but two of the interviews for which the Government has provided memoranda took place *after* the signing of the plea agreements—at which point the Pleaders *already* had received cooperation agreements from the Government.[8] Furthermore, the two pre-plea interviews which were provided focused almost entirely on falsification of IRB approvals; there was little or no discussion of the felony FDCA charges that are the subject of the plea agreements or of the Pleaders' all-important mental state when engaging in these supposed violations of the FDCA.[9] That additional discussions between the Government and the Pleaders or their attorneys took place prior to their plea agreements is beyond dispute, notwithstanding the fact that information about such discussions has not been produced. For instance, Doyle's

---

[7] Martin's additional loss calculation of between $120,000 and $200,000 is based on his falsification of IRB approvals. *United States v. Martin*, 08 CR 10338, Agreed Statement of Facts, p.4 (Nov., 18, 2008) (calculated at 26 deliveries of OP-1 under false IRBs at $5,000 each).

[8] For example, the Government provided Defendants with memoranda for three proffer sessions and interviews with Demming that took place on February 11, 2009, June 30, 2009, and July 30, 2009. All three of these interviews occurred *after* Demming's February 6, 2009 plea agreement. Similarly, the Government provided memoranda for interviews with Doyle on March 10, 2009, May 14, 2009, June 18, 2009, and January 19, 2010, all of which took place *after* Doyle's plea agreement on February 23, 2009.

[9] Martin and Ring were interviewed on August 14 and September 24, 2008, respectively, prior to signing their plea agreements. Martin's interview focused exclusively on his falsification of IRB approvals. Ring's interview also focused on his IRB-related conduct, but contained several statements related to selling OP-1 and Calstrux together.

Sentencing Memorandum notes that Doyle instructed his counsel to meet with the Government in September 2008 to "share information related to the offense."[10] The Memorandum further states that "Mr. Doyle has been interviewed by the U.S. Attorney's Office on multiple occasions, *both before and after his guilty plea was entered . . .*"[11] When the Defendants noted this gap in the Government's disclosure, the Government acknowledged that a September 2008 meeting with Doyle's counsel did indeed take place, but stated that all the *documents* conveyed to the Government in that meeting had been produced in discovery.[12] Of course, Defendants are not interested merely in what *documents* Doyle's counsel provided to the Government; they are interested in the factual representations that Doyle's counsel made on Doyle's behalf.

The crux of this motion is to obtain all available information concerning all statements made by the Pleaders or their attorneys about the crucial issue of the Pleaders' purported intent to defraud in connection with these FDCA offenses. Conspicuously, the Government does not indicate whether its initial discussions with Pleaders' counsel ever focused on misdemeanor FDCA charges, which would not require the intent to defraud that is necessary for a felony conviction.[13] By the time of the final entry of guilty pleas, however, the Pleaders had each agreed, in essentially boilerplate fashion, that they had intended to defraud in a manner that parallels the Government's novel fraud by omission theory in this Indictment. The Government has provided no information whatsoever that would allow Defendants to meaningfully assess (1) which party first put the central issue of this prosecution—fraud—on the table during plea negotiations; (2) what discussions occurred between counsel for the Pleaders and the

---

[10] *United States v. Doyle*, 09-CR-10035, Sentencing Memorandum, Dkt. #20 at p.6 (Dec. 24, 2009).
[11] *Id.* at p.7 (emphasis added).
[12] July 15, 2010 Letter from Defendants to USAO; August 2, 2010 Letter from USAO to Defendants.
[13] The Government's March 31, 2010 letter merely refers to charges of "misbranding," without signifying whether these are felonies or misdemeanors.

Government over this core issue; and (3) whether or not Pleaders' ultimate agreement to plead to felony FDCA violations (including the purported fraud by omission theory) was motivated by any promise, reward, or inducement from the Government.

For the Court's benefit, the summary of the communications between the Government and the Defendants over this issue is as follows:[14]

- **February 4, 2010 – Letter from Defendants to USAO (Dkt. #36), p.6:** Under the heading "Impeachment Information As To Government Witnesses," Defendants sought disclosure of "[i]nformation revealing the process by which a witness and the government reached a leniency agreement, immunity agreement, charging decision (including a decision not to charge) or plea agreement. *See United States v. Sudikoff*, 36 F. Supp. 2d 1196, 1203 (C.D. Cal. 1999)."

- **February 18, 2010 – Letter from USAO to Defendants, p.5:** The Government denied the requested disclosure, stating, "To the extent you seek information about negotiations with counsel for witnesses regarding a possible plea, we decline to produce that information because it is not the promise, reward or inducement provided to the witness." It further stated that "[t]o the extent that you seek our internal government memoranda regarding our deliberations in connection with proffer and immunity agreements, plea agreements, or prosecution decisions, we decline to produce the requested information on the basis that it is not discoverable under Fed. R. Crim. P. 16(a)(2)." Regarding witness interviews, the Government stated that such information had been produced through interview reports and grand jury testimony transcripts.

- **March 8, 2010 – Letter from USAO to Defendants, p.2:** After the Rule 7.1 pre-trial conference, the Government agreed to provide to Defendants "information about plea negotiations in the following particulars: (a) potential charges outlined by the government to counsel for a witness and not brought, if any; (b) loss/sentencing calculations described by the government to counsel for a witness if different from what was reflected in the plea agreement, if any; (c) factual information provided by attorneys for the witnesses about what the witnesses might say where we can fairly reconstruct such statements, if any." The Government also agreed to provide "information provided by counsel for witnesses about what their clients might say, where we can fairly reconstruct such statements, whether described as hypothetical or not."

- **March 31, 2010 – Letter from USAO to Defendants:** For each of the Pleaders, the Government stated the charges with which they could have potentially been charged and the charges with which they were ultimately charged. It did not provide any information of promises, rewards, or inducements relating to the loss determinations or any factual information conveyed in attorney proffers.

---

[14] Defendants will make available copies of these correspondences upon the Court's request.

- **April 9, 2010 - Letter from Defendants to USAO, p.4:** The Defendants requested disclosure of information showing whether the USAO "agreed to a loss amount lower than what it initially sought, asserted was appropriate, or believed was appropriate pursuant to policy or otherwise, [as] that agreement constitutes an inducement, reward, or promise that must be disclosed under *Brady*."

- **April 12, 2010 - Letter from USAO to Defendants:** The Government restated verbatim the information provided in its letter of March 31, 2010.

- **July 15, 2011 - Letter from Defendants to USAO, pp.1-2:** Following a series of telephone conversations, Defendants reiterated their request for pre-plea "agent notes or other memorializations of contacts with Demming, Doyle, Martin and Ring or their counsel during which they conveyed information related to their conduct." Defendants pointed out statements in Doyle's Sentencing Memorandum referring to a September 2008 meeting with the Government, and requested information related to that meeting, which the Government had not disclosed.

- **August 2, 2011 - Letter from USAO to Defendants:** The Government responded, "[W]e did not interview any of these individuals (Martin, Demming, Doyle or Ring) until after they entered into their plea agreements."

- **August 26, 2011 – Letter from Defendants to USAO:** Defendants requested clarification from the Government regarding what communications occurred prior to the plea agreements. Defendants requested any "attorney proffers," defined as "all statements made by the attorney that explicitly or implicitly constituted representations of fact by his or her client regarding the alleged offense, regardless of whether those statements were made during the course of 'plea negotiations' or not." Defendants continued, "We would like to know whether there were, in fact, drafts of the Agreed Statements of Facts exchanged with counsel for any of the Sales Rep Pleaders, and which drafts, if any, were prepared by counsel for the Sales Rep Pleaders. If the government has chosen not to disclose whether or not such drafts exist, please confirm that the government has not disclosed these facts because it believes any drafts of the Agreed Statements of Facts are not discoverable." In addition, Defendants requested information showing "whether any client admitted or denied an intention to defraud anyone in the course of any such discussion or other dealing, and, if any client admitted an intention to defraud, in what manner that client sought to do so."

- **September 12, 2011 – Letter from USAO to Defendants**: The Government's response, in its entirety, consisted of the single phrase, "In response to Mr. Levy's letter dated August 26, 2011, we are aware of our discovery obligations and have complied with those obligations, including in regard to possible witnesses Shane Doyle, Chris Ring, Darnell Martin and Justin Demming." In a subsequent telephone call on September 15, the Government informed counsel that drafts of the Statements of Facts were exchanged in some form, and that there were no "in-depth" discussions of the facts with counsel for the Pleaders. The Government refused to turn over the draft Statements of Facts, contending that the requested changes were minor.

y
z

The Government's refusal to provide the information requested above denies the Defendants access to *Brady* information that is central to their defense, namely the promises, rewards, or inducements surrounding the ultimate agreement by the four Pleaders to admit that they "acted with the intent to defraud or mislead" when they disseminated written mixing instructions to health care providers.

## ARGUMENT

### I. THE SCOPE OF THE GOVERNMENT'S EXCULPATORY INFORMATION DISCLOSURE OBLIGATIONS IS BROAD

In *Brady v. Maryland*, the Supreme Court held that the government denies a defendant due process by failing to disclose evidence favorable to the defendant that is material either to guilt or to punishment. 373 U.S. 83 (1963). Later, in *Giglio v. United States*, the Supreme Court expanded the *Brady* principle to include evidence that could be used to impeach a witness. 405 U.S. 150 (1972); *see also United States v. Jones*, 620 F. Supp. 2d 163, 168 (D. Mass. 2009) ("It has been long and clearly established that exculpatory evidence includes information that is potentially useful in impeaching government witnesses."). In addition, the District of Massachusetts promulgated Local Rule 116.2 in an effort to both codify and clarify the Government's disclosure obligations under the *Brady* line of cases. *See United States v. Diabate*, 90 F. Supp. 2d 140, 144 (D. Mass. 2000); *Jones*, 620 F. Supp. 2d at 168 (stating that the Local Rules "essentially codified the requirements of *Brady*, *Giglio*, and their progeny"). The information sought by the Defendants falls squarely within the disclosure obligations set forth by *Brady*, *Giglio*, and the Local Rules.

    A.   <u>*Brady* Requires Pre-Trial Discovery of All Information that May Be Favorable to the Defense</u>

In the pre-trial context, the standard for what information qualifies as *Brady* material is quite broad. Courts have uniformly held that the standard for disclosure is lower at this stage,

w

because there is no need for the defendant to demonstrate how the lack of disclosure would have affected the trial. As the court stated in *United States v. Safavian*, "[t]he prosecutor cannot be permitted to look at the case pretrial through the end of the telescope an appellate court would use post-trial." 233 F.R.D. 12, 16 (D. D.C. 2005). Rather, the measure for disclosure at this point is simply "whether the evidence at issue may be 'favorable to the accused.'" *Id.*[15] According to *Safavian*, the *Brady* principle covers "any information in the possession of the government . . . that relates to guilt or punishment and that tends to help the defense by either bolstering the defense case or impeaching potential prosecution witnesses." *Id*. If such information exists, "it must be disclosed without regard to whether the failure to disclose it likely would affect the outcome of the upcoming trial." *Id*. The District of Massachusetts has expressly adopted *Safavian*'s reasoning. *See United States v. Pesaturo*, 519 F. Supp. 2d 177, 189 n.7 (D. Mass. 2007).[16]

      B.     <u>The Local Rules of this District Adopt Similarly Broad Standards</u>

The United States District Court Local Rules for the District of Massachusetts take a similarly inclusive approach. Local Rule 116.2 broadly defines exculpatory information as "all information that is material and favorable to the accused because it tends to . . . [c]ast doubt on the credibility or accuracy of any evidence that the government anticipates offering in its case-in-chief." The Local Rules mandate disclosure of "any promise, reward, or inducement [that] has been given to any witness whom the government anticipates calling in its case-in-chief." L.R.

---

[15] On appeal, a conviction will only be vacated based on a *Brady* violation if the evidence not disclosed was "material," meaning that, had the evidence been disclosed, there is a reasonable probability that the result of the proceeding would have been different. *United States v. Bagley*, 475 U.S. 667, 676 (1985).

[16] The United States Attorney's Manual notes that "prosecutors generally must take a broad view of materiality," but maintains that disclosure is only required "when there is a reasonable probability that effective use of the evidence will result in an acquittal." USAM § 9-5.001(B)(1). It goes on to recognize, *as a matter of policy*, that "a fair trial will often include examination of relevant exculpatory or impeachment information" that may not "make the difference between guilt and innocence." USAM § 9-5.001(C).

116.2(B)(1)(c). In addition, the Rules require disclosure not later than 21 days before trial of any "information that tends to cast doubt on the credibility or accuracy of any witness," "[a]ny inconsistent statement . . . by any witness," and most broadly, "[a]ny statement or a description of such a statement . . . that is inconsistent with any statement made orally or in writing by any witness the government anticipates calling in its case-in-chief." L.R. 116.2(B)(2)(a), (b), and (c). According to a report by the American College of Trial Lawyers, these Rules represent "the most extensive local criminal discovery rules in the nation." *See Jones*, 620 F. Supp. 2d at 170.

      C.      <u>The Substance of Plea Negotiations Must Be Disclosed</u>

Under the plain reading of these Rules and the language found in *Brady* and its progeny, the Government in this case is obligated to disclose to Defendants any material statements that the Pleaders, either personally or through their counsel, made to the Government during the course of plea negotiations. This principle is well-established in the case law, with courts recognizing that information relating the process of plea negotiations, and not simply the result of those discussions, is an important component of the government's disclosure obligations.

In *United States v. Sudikoff*, 36 F. Supp. 2d 1196 (C.D. Cal 1999), the defense moved to compel disclosure of all notes or information regarding proffer sessions between the government and the defendant's accomplice (or the accomplice's attorney), who was offered immunity in exchange for his testimony. *Id*. at 1197. The court granted the motion, holding that "proffers of an accomplice witness that led to a leniency agreement and *information that reveals the negotiation pursuant to which that agreement was reached* might reasonably be considered favorable to the defendant's case." *Id*. at 1201 (emphasis added). The court explained:

> [T]o the extent the proffers and other information reveal that the witness's proposed testimony may have varied over time, they may reveal inconsistencies relevant to the accomplice witness's credibility and within the scope of *Brady* . . . [and] to the extent the proffers and other information reveal the accomplice

>witness's motives and desire to seek an immunity agreement, they are relevant to
>the witness's credibility and within the scope of *Giglio*.

*Id.* at 1201-02. The court stated that this principle applied even to the most abbreviated negotiations. *Id*. at 1203 ("Even if the witness made only one proffer of proposed testimony and the government immediately made an offer of leniency that was immediately accepted, such a proffer is the motivating force behind the leniency agreement and as such can reveal what the witness was willing to do in return for leniency.").

Information revealing inconsistencies and variations between the admissions made by the Pleaders in connection with their pleas and other communications with the Government is squarely within the *Brady* requirements. *See United States v. Acosta*, 357 F. Supp. 2d 1228, 1244 (D. Nev. 2005) ("[I]f the cooperator makes inconsistent statements during the proffer process, those inconsistent statements *must* be regarded as exculpatory *Brady* material . . .") (emphasis added). This principle has been adopted by the Department of Justice in its 2010 guidance to all federal prosecutors, where it noted that "inconsistent attorney proffers" are potential *Giglio* information. DOJ Guidance for Prosecutors Regarding Criminal Discovery, Jan. 4, 2010, (available at http://www.justice.gov/dag/discovery-guidance.html).

This District has adopted similar logic, requiring disclosure of not just an executed plea agreement, but the exchange of all promises, rewards, and inducements occurring in the negotiations leading up to the final agreement. In *United States v. Delgado*, Magistrate Judge Neiman recognized that a plea agreement is only the final product of a long process, and would not standing alone contain all the information required to be disclosed. No. 03-CR-30008, 2004 WL 1406097, *1 (D. Mass. June 17, 2004). Accordingly, the court compelled disclosure of proffers, as well as "any material in the Government's possession that indicates any variations in any accomplice witness's proposed testimony." *Id*. at *2. Magistrate Judge Neiman recognized

that "the burden on the Government is significant," requiring it to "cull the evidence—particularly the proffer evidence which Defendant seeks—to ensure that exculpatory or impeachment materials are discovered and produced." *Id*. Nonetheless, the court determined that the imposition of such a burden was both necessary and appropriate. The same holds true in the instant case.

        D.      Any Doubts About Whether Information Qualifies as *Brady/Giglio* Material Should be Resolved in Favor of Disclosure

To the extent that the materiality of certain information is in doubt, courts have directed the government to err on the side of disclosure. *United States v. Van Brandy*, 726 F.2d 548, 552 (9th Cir. 1984) ("The government, where doubt exists as to the usefulness of evidence, should resolve such doubts in favor of full disclosure . . ."); *United States v. Snell*, 899 F. Supp. 17, 22 n.11 (D. Mass. 1995) ("[S]ince the *Brady* obligation is a constitutional one, the Government should err on the side of disclosure to the defense or laying out before the Court their considered and important reasons for nondisclosure."); *Sudikoff*, 36 F. Supp. 2d at 1203 ("There is no requirement that the exculpatory nature of *Brady* material be indisputable."); *see also* United States Attorney's Manual § 9-5.001(F) ("Where it is unclear whether evidence or information should be disclosed, prosecutors are encouraged to reveal such information to defendants or to the court for inspection in camera.").

**II.    THERE IS NO "PLEA NEGOTIATIONS" EXCEPTION TO THE *BRADY* AND *GIGLIO* REQUIREMENTS**

The Government has refused to turn over certain requested information to the Defendants on the ground that discovery of "plea negotiations" is not permitted. No such "plea negotiations" exception to the *Brady/Giglio* requirements is recognized in the case law, and no material should be withheld from Defendants on that basis.

A.   There is No Blanket Privilege for Plea Negotiations

As an initial matter, the Government cannot simply claim that plea negotiations are categorically protected from discovery. Defendants have identified no cases discussing *Brady* obligations treating factual statements made by a cooperating witness differently from the plea negotiations bearing on those factual issues. Indeed, the impracticality of drawing such a fine line was expressly pointed out in *Sudikoff*, which made clear that the plea negotiation process for a cooperating witness receives no special protection. The *Sudikoff* court acknowledged that many factual variations or inconsistencies in various proffers "probably do result only from the [give-and-take] nature of the process"; the court recognized nevertheless that all negotiation materials must be disclosed because "[i]nformation that illuminates the process leading up to the agreement may 'cast a shadow' on an accomplice witness's credibility in a manner that disclosure of only the agreement itself would not accomplish." *Sudikoff*, 36 F. Supp. 2d at 1202-03; *see also Delgado*, 2004 WL 1406097, *1 ("[A] plea agreement will not necessarily contain the information sought, for example, a promise made to a co-defendant during a proffer session only."). *Sudikoff*'s requirement that the government produce material revealing the negotiation process extended to all information in the government's possession, including "materials authored by a witness, a witness's lawyer, or the government." *Sudikoff*, 36 F. Supp. 2d at 1206.

The broad language of the Local Rules dictates a similar approach. Rule 116.2 does not simply require disclosure of facts, but disclosure of "information." Moreover, this information need not have been memorialized, as the Rules require disclosure of "any statement *or a description of such a statement, made orally or in writing*" that is inconsistent with a witness's proposed testimony. L.R. 116.2(B)(2)(c) (emphasis added).

B.  There is No Evidentiary Privilege for Plea Negotiations Involving Trial Witnesses

The plain language of Fed. R. Evid. 410 makes clear that information concerning plea negotiations is not shielded from disclosure when it is sought in connection with a prosecution of a defendant who was not party to the negotiations. First of all, Rule 410 only governs the admissibility of evidence; it has no bearing on whether such evidence is discoverable under *Brady* or *Giglio*. *See United States v. Gil*, 297 F.3d 93, 104 (2d Cir. 2002) (noting that *Brady* material need not be admissible if it "could lead to admissible evidence" or "would be an effective tool in disciplining witnesses during cross-examination by refreshment of recollection or otherwise"). Second, under Rule 410, "any statement made in the course of plea discussions with an attorney for the prosecuting authority" is not admissible "*against the defendant who made the plea or was a participant in the plea discussions.*" Fed. R. Evid. 410 (emphasis added). Courts have interpreted Rule 410 to allow the introduction of statements made during plea discussions against a defendant other than the one who entered that plea. *See, e.g.*, *United States v. Testa*, 33 F.3d 747, 751 (7th Cir. 1994) (Rules 11 and 410 "do not preclude use of statements made in connection with guilty plea from being used for purposes of impeachment in the trial of another"); *United States v. Mathis*, 550 F.2d 180, 182 (4th Cir. 1976) (Rule 410 and Rule 11(e)(6) "only prohibit statements made in conjunction with a guilty plea from being used (1) against the person who made the plea, and (2) when that person has withdrawn the guilty plea.").

C.  Rule 16 Does Not Shield the Material Sought

In its letter dated February 18, 2010, the Government asserted that it would not disclose "internal government memoranda regarding [its] deliberations in connection with proffer and immunity agreements, plea agreements, or prosecution decisions," because such information was protected under Fed. R. Crim. P. 16(a)(2), which states, "[T]his rule does not authorize the

discovery or inspection of reports, memoranda, or other internal government documents made by an attorney for the government . . ." The Government's objection is misplaced for two reasons.

First of all, Defendants do not seek "internal government memoranda." Rather, Defendants only seek relevant statements made by the Pleaders or their attorneys, or proposed stipulated Statements of Facts that the Government sent to the Pleaders for their review. As explained in Defendants' August 26, 2011 letter, Defendants seek disclosure of attorney proffers that "explicitly or implicitly constituted representations of fact by his or her client regarding the alleged offense, regardless of whether those statements were made during the course of 'plea negotiations' or not." In that same letter, Defendants also requested factual confirmation, "whether there were, in fact, drafts of the Agreed Statements of Facts exchanged with counsel for any of the Sales Rep Pleaders, and which drafts, if any, were prepared by counsel for the Sales Rep Pleaders." None of this constitutes "internal government memoranda."[17]

Second, exculpatory material under *Brady* must be disclosed *even if* it falls within Rule 16(a)(2)'s narrow restriction. Indeed, the language of Rule 16(a)(2) only states that such materials are not discoverable "under this rule," leaving open the possibility that the information may be discoverable under other rules. Moreover, courts have held that, when the constitutional mandates of *Brady* conflict with an evidentiary or statutory principle, the government's *Brady* obligations take precedence. *Safavian*, 233 F.R.D. at 16 ("*Brady* always trumps both [the] Jencks [Act] and Rule 16.") (citing *United States v. Tarantino*, 846 F.2d 1384, 1414 n.11 (D.C. Cir. 1988)); *see also Snell*, 899 F. Supp. at 21 ("It is inconceivable that a statutory obligation

---

[17] To the extent that information required to be disclosed under *Brady* and Local Rule 116.2 is only memorialized in documents characterized as "internal government memoranda," and in no other location, Defendants would accept having this information conveyed via a letter from the Government or in some other form.

should supersede a constitutional one, especially where even the statutory obligations has a constitutional Due Process basis.").

## CONCLUSION

For the reasons stated above, Defendants respectfully request that this Court order the Government to disclose the following:

1) The drafts of the Statements of Facts executed by Pleaders or exchanged between the Government and the Pleaders or their attorneys;

2) Any information conveyed in proffers by the Pleaders or their attorneys. In making this request, the Defendants, as they did for the Government, explain that "attorney proffers" here include information pertaining to the following: all statements made by the attorney that explicitly or implicitly constituted representations of fact by his or her client regarding the alleged offense, regardless of whether or not those statements were made during the course of "plea negotiations;"

3) Any information demonstrating whether any of the Pleaders or their attorneys admitted or denied an intention to defraud any healthcare professional in the course of any discussion with the Government, and, if any of the Pleaders admitted an intention to defraud, in what manner that individual sought to do so; and

4) Any information relating to discussions between the Government and the Pleaders or their attorneys demonstrating whether the Government agreed to a loss amount lower than what it initially sought, asserted was appropriate, or believed was appropriate pursuant to policy or otherwise, and the details concerning any such agreement or concession.

## ORAL ARGUMENT REQUESTED

Defendants submit that oral argument may assist the Court in deciding the within Motion and thus respectfully request, under L.R. 7.1(D), to be heard on the matter at the next Interim Status Conference, which has not yet been scheduled.

-18-

Respectfully submitted,

| STRYKER BIOTECH, LLC | MARK PHILIP, |
|---|---|
| */s/ Brien T. O'Connor*<br>By: Brien T. O'Connor (BBO #546767)<br>   Joshua S. Levy (BBO #563017)<br>   Ropes & Gray LLP<br>   Prudential Tower<br>   800 Boylston Street<br>   Boston, MA  02199-3600<br>   617-951-7000<br>   Brien.O'Connor@ropesgray.com<br>   Joshua.Levy@ropesgray.com | */s/ Stephen G. Huggard*<br>By: Stephen G. Huggard (BBO #622699)<br>   Edwards Wildman Palmer LLP<br>   111 Huntington Avenue<br>   Boston, MA  02199<br>   617-239-0769<br>   shuggard@edwardswildman.com |
| WILLIAM HEPPNER, | DAVID ARD, |
| */s/ Robert L. Ullmann*<br>By: Robert L. Ullmann (BBO #551044)<br>   Nutter McClennen & Fish, LLP<br>   155 Seaport Blvd.<br>   Boston, MA  02210<br>   617-439-2262<br>   rullmann@nutter.com | */s/ Brent Gurney*<br>By:  Brent Gurney (*pro hac vice* admission)<br>   Wilmer Cutler Pickering Hale &<br>   Dorr, LLP<br>   1875 Pennsylvania Ave.<br>   Washington, D.C.  20006<br>   202-663-6000<br>   Brent.Gurney@wilmerhale.com |
| JEFFREY WHITAKER, | |
| */s/ Frank A. Libby, Jr.*<br>By: Frank A. Libby, Jr. (BBO #299100)<br>   LibbyHoopes<br>   175 Federal Street<br>   Boston, MA  02110<br>   617-338-9300<br>   falibby@libbyhoopes.com | |

October 21, 2011

## LOCAL RULE 7.1(A)(2) CERTIFICATION

I, Joshua S. Levy, hereby certify pursuant to Local Rule 7.1(A)(2) that on October 20, 2011, counsel for the Defendants conferred with Assistant United States Attorneys Susan Winkler and Jeremy Sternberg, in a good faith attempt to resolve or narrow the issues raised by the above motion.

>                          */s/ Joshua S. Levy*
>                          Joshua S. Levy

## CERTIFICATE OF SERVICE

I, Joshua S. Levy, certify that the Defendants' Motion to Compel Disclosure of Exculpatory Information Relating to the Government's Four Cooperating Witnesses was electronically filed on October 21, 2011 and thereby delivered by electronic means to all registered participants as identified on the Notice of Electronic Filing ("NEF") and that paper copies will be sent to those indicated as non-registered participants on October 21, 2011.

>                          */s/ Joshua S. Levy*
>                          Joshua S. Levy