UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


)
UNITED STATES OF AMERICA, )
)
     Plaintiff, )
) Criminal Action
v. ) No. 09-10330-GAO
)
STRYKER BIOTECH, LLC, )
et al., )
)
     Defendants. )
)


BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE



**DAY FOUR**
**JURY TRIAL**



John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Thursday, January 12, 2012
9:07 a.m.


Marcia G. Patrisso, RMR, CRR
Official Court Reporter
Kimberly A. Smith, RDR, CRR
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

```
 1    APPEARANCES:

 2         OFFICE OF THE UNITED STATES ATTORNEY
           By: Jeremy M. Sternberg, Susan B. Winkler, and
 3              Gregory F. Noonan, Assistant U.S. Attorneys
           John Joseph Moakley Federal Courthouse
 4         Suite 9200
           Boston, Massachusetts  02210
 5         On Behalf of the Government

 6         ROPES & GRAY
           By: Brien T. O'Connor, Esq.
 7             Joshua S. Levy, Esq.
               Aaron M. Katz, Esq.
 8             Cori A. Lable, Esq.
           Prudential Tower
 9         800 Boylston Street
           Boston, Massachusetts  02199-3600
10         On Behalf of the Defendant Stryker Biotech, LLC

11         NUTTER, McCLENNEN & FISH, LLP
           By: Robert L. Ullmann, Esq.
12             Maya L. Sethi, Esq.
           Seaport West
13         155 Seaport Boulevard
           Boston, Massachusetts  02210-2604
14         On Behalf of the Defendant William Heppner

15         WILMER CUTLER PICKERING HALE & DORR, LLP
           By: Brent J. Gurney, Esq.
16             Miranda Hooker, Esq.
           1875 Pennsylvania Avenue
17         Washington, D.C.  20006
           On Behalf of the Defendant David Ard
18
           LIBBY HOOPES, P.C.
19         By: Frank A. Libby, Jr.
               Alathea E. Porter, Esq.
20         175 Federal Street
           Boston, Massachusetts  02110
21         On Behalf of the Defendant Jeffrey Whitaker

22

23

24

25
```

1                          I N D E X

2

3    OPENING ARGUMENT BY MS. WINKLER.......................PAGE 24

4    OPENING ARGUMENT BY MR. O'CONNOR.....................PAGE 55

5    OPENING ARGUMENT BY MR. ULLMANN......................PAGE 102

6    OPENING ARGUMENT BY MR. GURNEY.......................PAGE 117

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            (The following proceedings were held in open court

2    before the Honorable George A. O'Toole, Jr., United States

3    District Judge, United States District Court, District of

4    Massachusetts, at the John J. Moakley United States Courthouse,

5    One Courthouse Way, Boston, Massachusetts, on January 12, 2012.

6            The defendants, William Heppner, David Ard and Jeffrey

7    Whitaker, are present with counsel.  Assistant U.S. Attorneys

8    Jeremy Sternberg, Susan Winkler and Gregory Noonan are

9    present.)

10            THE CLERK:  All rise.

11            (The Court enters the courtroom at 9:07 a.m.)

12            THE CLERK:  For a continuation of the Stryker Biotech

13    trial.  Please be seated.

14            THE COURT:  Good morning.  The clerk said Mr. Ullmann

15    had something before we call up the jury.

16            MR. ULLMANN:  Yes.  Very briefly, your Honor.  We're

17    not asking for a ruling at the time, but the defendants are

18    intending to file a motion to exclude the testimony of newly

19    identified IRB witnesses, representatives of institutional

20    review boards, including two who are on the government's

21    witness list.  These were identified for the first time in late

22    December.  They represent a dramatic shift in the government's

23    theory of items case.  Suddenly, IRBs were alleged to be

24    victims of the conspiracy, not just surgeons and the FDA.

25            And for that reason, if the government mentions any

1  IRB witness in its opening, it does so at its peril.

2          THE COURT:  Okay.  Ms. Winkler?

3          MS. WINKLER:  Your Honor, I don't think we'll have an

4  issue.  But one thing I would like to raise is we have an

5  objection to one of the demonstrative exhibits the Defendant

6  Ard intends to use because it's post-conspiracy.  It includes

7  data from the summary exhibit.  And we could deal with it later

8  if you would like.

9          THE COURT:  Well, is it going to be used in the

10  opening?

11          MR. GURNEY:  Yes, your Honor.

12          THE COURT:  Then I don't think we should deal with it

13  later.

14          MS. WINKLER:  The problem with the exhibit is it deals

15  with data from '04 to '09, post-conspiracy, and discusses --

16  you know, it includes underlying data that is beyond the data

17  of the conspiracy and sales data beyond the date of conspiracy;

18  and in line with some of the discussions and positions taken by

19  the defense with regard to the government's evidence, we think

20  it's unfair that they be able to go beyond conspiracy if the

21  government's not allowed to.

22          THE COURT:  Whose exhibit is it, yours, Mr. Gurney?

23          MR. GURNEY:  It's my exhibit, your Honor.

24          Your Honor, the chart is a chart of adverse event

25  data.  We wanted to be complete so we're not accused of

1    cherry-picking.  So it includes all data that is available.

2    Although some of the reports actually happened outside the

3    conspiracy, most of the actual events happened inside the

4    conspiracy period just so they get reported later.  But for

5    purposes of talking about what is the adverse event rate on the

6    products, we wanted to be complete so the government doesn't

7    turn around and say we have selectively presented the data with

8    respect to the percentage of adverse events.

9              THE COURT:  May I see the exhibit?

10             MR. O'CONNOR:  Your Honor, if I may add one thing to

11   that.  We have said several times what the incidence of adverse

12   events was and how many surgeries there were, and the

13   government has not objected.  We've been putting in -- 63, I

14   think, is what we said out of 10,000.  They haven't objected.

15             THE COURT:  This reflects those numbers?

16             MR. O'CONNOR:  This reflects that.

17             THE COURT:  And what's the underlying source of the

18   data?

19             MR. O'CONNOR:  Your Honor, it's company records.  It's

20   information that's going to be introduced.

21             And with respect to the number, just to be clear, you

22   know, it is -- it does include all adverse events that were

23   reported by the 2009 year.  Virtually all of the 63 happened,

24   you know, within the -- by '08.  I can't tell you right now

25   because we've been very precise about how many, but we did go

```
 1    beyond the conspiracy period for some.  But we've been saying
 2    to them all along, and they have not objected, in our very
 3    important adverse event motion to you, 63 out of 10,000.  And
 4    that's what's in our opening as well as in that.  So I just
 5    want to be very clear about that.
 6              THE COURT:  There was another rate.
 7              MR. O'CONNOR:  Yup.
 8              THE COURT:  That was adverse events from something
 9    else, Calstrux alone or something like that?
10              MR. O'CONNOR:  No, your Honor.
11              THE COURT:  That was 12 per 15,000 or something like
12    that?
13              MR. O'CONNOR:  Somewhere we have mentioned, you know,
14    is the incidence of adverse events greater with Calstrux when
15    it's not with OP-1 as compared to the incidence of adverse
16    events with the combination?  So it may be that is the first
17    point you're thinking about.  We don't intend to mention that.
18              THE COURT:  There was a different sum of uses.  I
19    think it was around 15,000.  And I don't remember the numbers
20    precisely but --
21              MR. O'CONNOR:  Ms. Lable has it.
22              THE COURT:  -- my point is that to the extent there
23    is -- that might be a point the government might want to make,
24    I'm not sure, but my question really was about this current
25    controversy, whether if there are other numbers supporting
```

```
1    other rates of other uses, do they likewise cover the same

2    period?  That was my question.

3              MR. O'CONNOR:  That's a good question.  We're not

4    going to mention --

5              THE COURT:  No, but they might.

6              MR. O'CONNOR:  Well, at least in our opening,

7    any -- we're not going to do a comparative.  We're just going

8    to say the incidence of adverse events is 63 out of 10,000.  I

9    was going to say that's about one half of 1 percent, just so

10   the Court knows.  I'm not going to compare it to anything else.

11   And I don't think Mr. Ard's counsel, Mr. Gurney, is intending

12   on doing that either.

13             MR. GURNEY:  No.  That's correct.

14             THE COURT:  Ms. Winkler?

15             MS. WINKLER:  Your Honor, it's true they've mentioned

16   these numbers.  We've viewed it as an evidentiary issue that

17   would come up during trial, obviously.  But the data that has

18   been provided, some of it does go beyond -- I mean, some of the

19   adverse events were post conspiracy that they've included in

20   this data.  I don't see how -- and the reason that those MDRs

21   were filed at the time they were is because the FDA went in,

22   found out in the 483 they didn't want us to talk about

23   yesterday -- found out they hadn't filed them and told them to

24   file them, which is why they came in later.

25             THE COURT:  Well, I guess I think this:  If the data
```

1   is -- of course, the reliability of the underlying data is fair

2   game for questioning on cross-examination.  So assuming for a

3   moment reliability, as a counting matter, the rate is perhaps

4   informative about qualities of the combination more than it is

5   about the actions of the defendants; that is, if it's accurate,

6   it's arguably objective as opposed to characterizing behavior

7   as lawful or unlawful.  Therefore, I don't think the

8   overlap -- exceeding the scope of the behavioral allegations of

9   the indictment matters that much.

10          So I guess I would permit it on my current limited

11   understanding of what this is, and it's subject to attack and

12   criticism in the course, okay?

13          MR. O'CONNOR:  Thank you.

14          THE COURT:  All right.  So if we're ready for the

15   jury, we'll bring them out and swear them, of course.  I will

16   have some introductory instructions which will take a few

17   minutes.  Then we'll have the government.  We'll see how time

18   goes on this.

19          If it's the government for about an hour and then

20   Stryker for about an hour or a little more, we're going to be

21   projecting more towards 11:30 for a time of a break, but I'd

22   rather not interrupt anybody.  So unless the government is

23   going to be --

24          MS. WINKLER:  I think ours may be a little bit

25   shorter.

```
 1              MR. O'CONNOR:  As I said, outside 75 minutes but --
 2              THE COURT:  All right.  We'll see how it goes.  So
 3     we'll probably take a break after Stryker.  And the order for
 4     the others were?
 5              MR. ULLMANN:  Mr. Heppner will go next.
 6              THE COURT:  Heppner, Ard and then Whitaker.  Is that
 7     it?
 8              Okay.  Let's get the jury.
 9              THE CLERK:  Yes, sir.
10              THE COURT:  Now, I understand also at least some of
11     you are going to be using the electronic presentation devices
12     during openings.  Is that correct or not?
13              MS. WINKLER:  Not the government, your Honor.
14              THE COURT:  The government is not.
15              MR. O'CONNOR:  I'm sorry.  I missed the question, your
16     Honor.
17              THE COURT:  Whether you're using the electronic
18     presentation.
19              MR. O'CONNOR:  Yes, your Honor.  And we're also going
20     to put a board up here briefly.
21              THE COURT:  I want to make sure the feed is active
22     when you need it, that's all.
23              MR. O'CONNOR:  Yes.
24              THE COURT:  It will be through a computer?
25              MR. O'CONNOR:  Yeah.  I'll be looking here and -- yes.
```

1          THE COURT:  And I understand I can leave it on one

2   setting and it will be toggled between government and defense,

3   or is it all one database?

4          MS. WINKLER:  It's all for the defendants today.  It

5   will be toggled, but we don't need it.

6          THE COURT:  But when it happens it will be toggled,

7   is that it?  Because normally -- normally -- in the past I've

8   had to switch back and forth between feeds.  But I can just

9   leave it set on one feed, is that it?  Okay.

10         (Pause.)

11         THE CLERK:  All rise for the jury.

12         (The jury enters the courtroom at 9:18 a.m.)

13         THE CLERK:  Will the jurors remain standing; everyone

14   else be seated, please.

15         (The jury is duly sworn.)

16         THE CLERK:  Please be seated.

17         THE COURT:  Good morning, jurors.

18         THE JURORS:  Good morning.

19         THE COURT:  With the administration of the oath of

20   office as jurors, you're now officially a jury and the trial

21   has officially begun.  We were working towards this moment the

22   first part of the week.  We appreciate your patience again, and

23   we're ready to present the trial and its evidence to you for

24   your judgment.

25         Let me just make a few introductory remarks about how

1    we're going to proceed, what the trial will look like in terms

2    of procedure and form and so on, and then we'll hear from the

3    lawyers to begin presenting the case.

4            As I'm sure you can appreciate, of course, this is a

5    very important occasion for the parties to this trial.  For

6    both sides.  For both the government and for the defendants.

7    This is something they've been anticipating for some time and

8    working toward and preparing for.  And it is a very important

9    event for all involved, and we're sure you will treat it with

10   that sense of importance and significance.

11           A trial is also a very formal matter.  We proceed in

12   accordance with rules of procedure that have been established

13   for these purposes.  Some of the rules are rather ancient, some

14   are relatively new, but they govern the manner in which the

15   case will be presented to you.  And the reason we follow rules

16   of procedure like this is not just because that's what lawyers

17   do, but because it is the judgment of experience that following

18   these procedures will help to present the evidence fairly so

19   that you can make a sensible and fair judgment on the evidence.

20           A consequence of formality is that sometimes things

21   will be a little bit stiff, perhaps even somewhat inefficient

22   at times.  We will do our best to be as efficient as we

23   possibly can, but efficiency is a secondary goal to doing

24   justice.  And we hope you understand that.  So it may be

25   necessary, for example -- it's common in trials like this --

1    for us to take out some time for the lawyers and I to resolve

2    some legal issues or procedural matters.  And we'll have to ask

3    you to stand aside while we do that.  Please understand that

4    all of that is working towards completion of the trial.  And as

5    I say, we'll try to do it as efficiently as possible, but

6    sometimes it will be necessary to make some interruptions.

7          Another part of the formality is we have a set

8    sequence of events that make up the parts of the trial.  When I

9    finish this brief introduction we'll have the first part, and

10   that's the lawyers' opportunity to make what we call "opening

11   statements."  The lawyers get to address you -- and you'll see

12   there's a little stand right in front of you here where they'll

13   stand in front of you -- and present what they expect you will

14   hear in the course of the presentation of the evidence.  In

15   other words, lawyers for all the parties get a chance to

16   summarize what they think the evidence is going to show as you

17   hear it over the course of the trial.

18         The opening statements themselves are not part of the

19   evidence; they're a summary of what is expected.  And what

20   actually is admitted may coincide exactly with what's predicted

21   or may vary in various respects.  The evidence you'll hear, of

22   course, will be what's presented by the witnesses and not by

23   the lawyers and their statements.  But the statements are

24   useful because they will introduce you to the issues in the

25   case and prepare you to hear the evidence so that you're not

 1    just hearing it cold, as it were.  You'll be able to follow the

 2    presentation of the evidence a little bit more if you've heard

 3    an overview summary.

 4         I like to tell jurors you can think of it like the

 5    picture on the outside of the jigsaw puzzle box.  They get to

 6    tell you what it's supposed to look like from their point of

 7    view when all the pieces have been put together.  I expect

 8    you'll hear very different pictures because that's customary.

 9    That's why we have a controversy.  It will be up to you to put

10    the pieces together at the end of the case and see what picture

11    emerges or doesn't emerge from that.  But the opening

12    statements may be useful for that.

13         That's likely to take the bulk of today, to have the

14    opening statements.  So as a strict matter, you will not,

15    probably, get any evidence today because the lawyers'

16    statements are not, strictly speaking, evidence, but you will

17    hear an introduction which will give you some context and

18    appreciation of what you're going to hear over the next several

19    days, perhaps weeks, as the evidence is presented.

20         Now, then, I expect tomorrow we'll begin the formal

21    presentation of the evidence.  And as I'm sure you realize, the

22    evidence will come largely through the testimony of witnesses

23    who will come into the courtroom, swear to tell the truth, and

24    then answer questions that are put to them by the lawyers, each

25    lawyer for each party having an opportunity to question each

1   witness.  The witnesses will sit in the witness box right

2   across from you and, as I say, will answer questions.

3         The question-and-answer format is another part of the

4   formality of the trial.  We don't just have people come in, sit

5   there and talk to you and tell you what they think you ought to

6   know; rather, their testimony is guided, in a sense, by the

7   questions that are put to them by the lawyers.  And because

8   every lawyer from whatever perspective gets to ask questions,

9   hopefully we get the full perspective brought out through the

10  series of questioning.  It's important to remember that it is

11  the witnesses' answers to questions that constitute the

12  evidence.  Sometimes questions can be themselves suggestive,

13  but unless the witness says so, you don't have any evidence of

14  that fact.

15        Another reason for the question-and-answer format, in

16  addition to directing the testimony and, therefore, by the way,

17  making it more efficient because the witnesses won't stray

18  off -- the lawyers will guide them to what's important --

19  another reason is that in addition to procedural rules, we

20  follow what we call "rules of evidence."  And the rules of

21  evidence are a body of legal principles to be applied in cases

22  like this that govern in a general sense the quality of

23  information that is properly the basis for the important

24  judgment that you people will make.

25        The law makes some usually categorical judgments about

1    kind of evidence, some being thought more reliable as a general

2    matter, some being thought less reliable as a general matter.

3    And the rules of evidence sort of police those principles and

4    allow in reliable evidence for your consideration and exclude

5    evidence that's thought to be inefficiently reliable as a

6    general matter.

7            Now, that's not something for you to worry about.  You

8    will consider whatever evidence is admitted and you'll decide

9    how reliable it is at the end of the case.  But part of the

10   presentation -- you'll see the application of the rules of

11   evidence because the lawyers may ask me for rulings from time

12   to time about whether evidence should be allowed in or not.

13           You've probably seen this happen.  If the lawyer

14   thinks a question calls for evidence that shouldn't be

15   admitted, the lawyer will object to the witness answering the

16   question.  I'll then make a ruling as to whether the objection

17   is sound or unsound.  If I agree with the objection, I will say

18   something like "sustained" -- I sustained the objection -- and

19   the witness won't answer the question.

20           If that's the case, don't try to answer the question

21   yourselves.  Don't guess at what the answer might have been if

22   the witness had been permitted.  Just take it for whatever

23   reason that answer isn't going to be given.  The question gives

24   you no evidence.  Wait for the next question and the answer

25   given to that.

1        On the other hand, I might overrule the objection,

2   disagree with it, and the witness will be allowed to go ahead

3   and answer the question.  That answer then comes into evidence

4   like all the other answers are given.  It doesn't have any

5   special significance because it follows an objection.  An

6   objection isn't a hint or a clue that this has got to be

7   important because they wouldn't be objecting otherwise.  That's

8   not true for a number of reasons, perhaps the principal one

9   being that the principles that we'll be applying, the lawyers

10  and I, in applying the rules of evidence have nothing to do

11  with the merits of this case.  They're just simply entirely

12  separate and general principles, and there's no meaning to be

13  found in a ruling of evidence one way or another for any of the

14  issues in the case.  So don't look for any because it's simply

15  not there.  If the evidence is given, you'll consider it.  If

16  it's not given, you don't have it and you can't consider it.

17        Most typically I'll understand the nature of the

18  objection from context and make a ruling right away.  It may be

19  necessary on occasion for us to allow the lawyers to make a

20  little argument before I rule one way or the other.  If that

21  happens we'll go over to the sidebar and I will allow the

22  lawyers to do that.  We do it out of your hearing because if

23  you're not going to hear the evidence, we don't want you to

24  have heard the discussion about it before it's ruled on.

25        Because the acoustics in this room are so good, we

1    don't want you to be listening in on what we're saying because

2    the point is to do it out of your hearing, and so we will mask,

3    we hope, our conversations by playing a little music.  There

4    are speakers behind you.  And we hope it's pleasant enough.

5           (Laughter.)

6           THE COURT:  But if you find that I'm hitting the CD

7    button, don't be surprised.  That may happen.

8           So that's the way that the evidence will be presented

9    through the witnesses.  There will not only be testimony of

10   witnesses, there will be exhibits.  We have a system now that

11   permits the digitizing of exhibits, and so you will be able to

12   see them on the screens in front of you.  And you see in the

13   front row you have monitors?  There are monitors in the back

14   row for jurors.  There's a console between every other seat or

15   so, and if you lift up the top, you can rotate out the monitor.

16          You don't have to do it right now.  I think it will be

17   used at some point in the morning.  If you want to do it now,

18   it's fair enough.  The on-off button is in the lower right-hand

19   side.  And ultimately, you'll have a system in the jury room

20   where you've seen the monitor on the wall.  You'll be able to

21   access all the exhibits through that system.

22          So the bulk of the time of the case will be the

23   presentation of the evidence.  When that's been completed,

24   we'll move to the latter stages.  At the end of the case the

25   lawyers will have another opportunity now not to predict what

1    the evidence will be but to sum it up for you, to try to recall

2    for you what the evidence has been and, of course, ask you

3    respectively to find the evidence in their favor.  That's part

4    of their responsibility to their clients.

5            I'll have some instructions then to tell you about the

6    principles of law that pertain to the charges that are made

7    here about which you'll have to make a judgment, and then

8    you'll conduct your deliberations and render a verdict in the

9    case.  So that's the outline we'll follow.

10           So let me -- before we hear from the lawyers, let me

11   set the stage by reminding you -- I spoke briefly about the

12   nature of the charges that are made by the indictment.  Let me

13   outline them again for you so you'll have an understanding of

14   what it is that this indictment charges these particular

15   defendants with having done.

16           An indictment is the document or the means of making a

17   criminal charge.  It's presented by a grand jury.  A grand jury

18   is very different from a trial jury.  A grand jury doesn't

19   consider guilt or innocence; it considers the adequacy of

20   evidence to think whether it's even plausible that a charge

21   should be made or not.  If the grand jury approves of them, the

22   charge can be made.  So an indictment is no evidence that

23   anybody has done anything; it simply is the charge itself and

24   proposes the question that will be presented by the evidence at

25   trial.

1           So in this case the indictment alleges several crimes.

2   I think I told you that there are separate counts in an

3   indictment.  Each count alleges a separate offense.  So there

4   are a total of 12 counts that will be considered by you

5   ultimately at the end of the case.

6           The first count is a charge of conspiracy, criminal

7   conspiracy.  A statute of the United States, Section 371 of

8   Title 18, provides as follows:  "If two or more persons

9   conspire either to commit any offense against the United States

10  or to defraud the United States or any agency thereof in any

11  manner for any purpose, and one or more of such persons do any

12  act to effect the object of the conspiracy" -- that's the end

13  of the quote -- then such persons are guilty of the crime of

14  criminal conspiracy.

15          Count 1 of this indictment charges that beginning no

16  later than February 2006 and continuing thereafter until in or

17  about February 2008 in the District of Massachusetts and

18  elsewhere, the several defendants knowingly and willfully did

19  combine, conspire, confederate and agree with each other and

20  others known and unknown to the grand jury to defraud the

21  United States and its agency, the Food and Drug Administration,

22  by impeding, impairing, obstructing and defeating through

23  craft, trickery, deceit and dishonest means the lawful function

24  of the FDA to protect the health and safety of the public by

25  ensuring that medical devices marketed and distributed in the

1    United States were safe and effective for their intended uses.

2    And the indictment further charges that the defendants further

3    conspired to commit wire fraud in violation of another statute

4    of the United States.

5         The indictment further charges that the objective of

6    the conspiracy was to evade and frustrate efforts by the FDA to

7    regulate the safety and efficacy of Stryker Biotech medical

8    devices, this objective to be achieved through the deliberate

9    manipulation of physicians into using an unapproved and

10   untested mixture of products you will hear about known as OP-1

11   and Calstrux.  You'll hear a good bit about those names.  The

12   indictment charges that the deliberate manipulation of

13   physicians was accomplished through illegal promotion of those

14   products.

15        One of the objectives, as I've just told you, that is

16   alleged to have been an objective of the conspiracy alleged in

17   Count 1 is to commit the crime of wire fraud.  Another statute

18   of the United States, Section 1343 of Title 18, provides in

19   relevant part as follows:  Whoever having devised or intending

20   to devise any scheme or artifice to defraud, or for obtaining

21   money or property by means of false or fraudulent pretenses,

22   representations or promises -- whoever has done that --

23   transmits or causes to be transmitted by means of wire, radio

24   or television communication in interstate or foreign commerce

25   any writings, signs, signals, pictures or sounds for the

1    purpose of executing such scheme or artifice to defraud,

2    commits an offense.  So as I said earlier, it prohibits the use

3    of interstate wire communications facilities in execution of an

4    intentional scheme to defraud, in summary.

5         So Counts 2 through 6 of the indictment allege that

6    beginning on a date unknown, but no later than in or about

7    February 2006, and continuing until at least in or about

8    February 2008, in the District of Massachusetts and elsewhere,

9    the defendants, the company and the several individuals,

10   devised and intended to devise a scheme and artifice to defraud

11   physicians and hospitals, and to obtain money by means of false

12   and fraudulent pretenses, representations and promises

13   concerning material facts and by concealing material facts.

14        The defendant *[sic]* alleges that the purpose of the

15   scheme or artifice to defraud was for Stryker Biotech to obtain

16   millions of dollars in sales from OP-1 and Calstrux, and to

17   enrich the individual defendants through additional

18   compensation from Stryker Biotech all through the deliberate

19   manipulation of healthcare professionals with false, deceptive,

20   incomplete and misleading information, into using OP-1 in

21   unapproved and untested ways including in a mixture with

22   Calstrux.  Each of Counts 2 through 6 alleges a separate

23   particular email, that is, interstate -- alleged to be an

24   interstate wire communication, as constituting the forbidden

25   use of the interstate communications facilities.

1          Counts 7 through 12 allege what we might, in

2    shorthand, refer to the offense of misbranding a medical

3    device.  The Federal Food, Drug and Cosmetic Act includes,

4    among other things, the following relevant provisions:  First,

5    the act provides that a drug or medical device subject to

6    regulation by the FDA shall be deemed to be misbranded unless

7    its labeling bears adequate directions for use and adequate

8    warnings against uses that may be dangerous to health.

9          Second, the act prohibits the alteration, mutilation,

10   destruction, obliteration or removal of the whole or any part

11   of the labeling of a drug or device, or the doing of any other

12   act with respect to a drug or device, if such act is done while

13   the article is held for sale after shipment in interstate

14   commerce and results in such article being misbranded in the

15   sense that I previously mentioned.

16         And third, the act makes it a crime for a person to

17   violate that prohibition against misbranding with an intent to

18   defraud or to mislead.

19         Counts 7 through 12 of the indictment allege that the

20   company, Stryker Biotech, committed this misbranding offense.

21   Counts 7 through 12 are not addressed to the individual

22   defendants in the case; they are not defendants in those

23   counts.

24         With respect to the company, the indictment charges

25   that in the District of Massachusetts and elsewhere, Stryker

```
 1   Biotech, LLC, did, while quantities of OP-1 were held for sale
 2   after such devices were shipped in interstate commerce, and
 3   with the intent to defraud and mislead, cause written
 4   instructions to be provided for administration and use of a
 5   mixture of OP-1 and Calstrux which was not included in the
 6   FDA-approved labeling for OP-1, which acts resulted in OP-1
 7   being misbranded.  Each of Counts 7 through 12 alleges a
 8   separate instance of the provision of unapproved mixing
 9   instructions to a physician or a hospital.
10         Those are the allegations that are made by the
11   indictment.  Whether they are true or not is up to you to
12   decide on the evidence in the case.  The defendants, as I've
13   said, are presumed to be not guilty of these charges unless the
14   government proves otherwise by the evidence and proves it
15   beyond a reasonable doubt.
16         So with that stage set, we'll ask the parties now to
17   start with the opening statements.  The order will be the
18   government will go first and then we'll hear from each of the
19   defendants in turn.
20         Ms. Winkler for the government?
21         MS. WINKLER:  Thank you, your Honor.
22         Good morning.  May it please the Court and counsel,
23   ladies and gentlemen of the jury, you're going to hear evidence
24   over the course of the next few weeks, and it's a story about
25   failed expectations.  The --
```

1          THE COURT:  Excuse me, Ms. Winkler.  It would just

2     help us all to try to get that mic to you.

3          Sorry to interrupt.

4          (There is an interruption in the proceedings.)

5          MS. WINKLER:  So the story is about failed hopes and

6     expectations.  Stryker Biotech, LLC -- that's a limited

7     liability company -- was a small company that was set up in

8     Hopkinton.  And it was set up by Stryker Corporation, which is

9     a big multinational corporation.  The reason they set up

10    Stryker Biotech was to bring to market a product called OP-1.

11    And you'll see OP-1 in the course of this trial.  This is it.

12    This is OP-1.  It's that little bit of powder in that bottom of

13    that jar, all right?

14         The powder is a protein.  It's designed to be used

15    during surgeries to stimulate bone growth; to help bones

16    generate more bone, if you will.  And this powder, if they had

17    been able to prove it was effective, had lots of potential

18    applications.  It could be used in spine surgeries.  It could

19    be used for disk disease.  You'll hear evidence in this trial

20    that the market -- the potential market -- and the applications

21    for this product were over a billion dollars.  That's what

22    Stryker Biotech was reaching to get.

23         Now, in the United States we have the Federal Food and

24    Drug Administration, the FDA.  And the FDA's job is to look at

25    the evidence with regard to medical devices to see if they are

1    safe and effective before they are sold for use in the American

2    public.  And the FDA requires reliable evidence, they require

3    studies, that actually show that a product works and that it's

4    safe.

5          You're going to learn that Stryker Biotech failed to

6    get the full premarket approval that they wanted for this

7    product.  Their studies were not adequate.  The FDA did not

8    give them -- and this was like 12 years ago.  They did not give

9    them the PMA that they were first looking to get.

10         So what did they do instead?  They went back to the

11   FDA and they asked for two very limited, narrow exemptions to

12   the requirement to get that full approval, premarket approval,

13   and the FDA granted that.  And those very narrow restrictions

14   we will talk about later, I'll tell you a little more about.

15   But the reason they got those, it's to market to a small number

16   of patients.  And so they had at least an ability now to go out

17   and talk to doctors.  And they did.

18         And they reached another problem.  Doctors took a look

19   at this and they had complaints about it.  It handled poorly,

20   like wet sand; it didn't have enough volume for the doctors,

21   for using during surgery; and it was too expensive.  This is

22   $5,000 worth of this particular powder.

23         So what did Stryker Biotech do?  They developed

24   another product: Calstrux.  This is Calstrux.  Calstrux is

25   also in powder form but it's mixed with a saline or other

1    product.  You'll hear different mixing instructions.  But when

2    it's mixed, it turns into a ball that's like Play-Doh or some

3    other malleable -- you know, you can move it, you can push it.

4    And so what they did at that point was promote to doctors

5    mixing this powder in with this powder and making a bigger ball

6    of stuff, a bigger ball that the doctor could use.

7            So now they had something that the sales force could

8    sell.  It handled better; it was less expensive, because at

9    that point they told the doctors you could use one of them

10   instead of the two that were required on the label.  And then

11   they were able to together mix those two and convince doctors

12   that it was something they should buy.

13           Now, the evidence that you're going to hear is that

14   all of these defendants knew that promoting the mixture of OP-1

15   and Calstrux to doctors was illegal.  That mixture was not

16   approved by the FDA.  That mixture was never tested, studied

17   clinically, by Stryker Biotech, LLC.  They did not know if it

18   worked, they did not know if it was safe, and they marketed it

19   anyway to doctors in the United States.  It's the patients who

20   were put at risk by that sort of promotion, the patients who

21   don't know they're guinea pigs for this unapproved mixture of

22   OP-1 and Calstrux.

23           Some of the patients suffered adverse events.  Some of

24   those adverse events were serious:  There was infection; there

25   was wound drainage.  And you'll also hear some stories about

1     product -- it migrated.  It moved away from where it was put in

2     the spine.  It moved away from the spine and patients would

3     have problems.  And when doctors would go back in, they would

4     find the product in other places where it didn't belong.  And

5     sometimes it even grew bone in places where it wasn't supposed

6     to, requiring a second surgery to come in and fix it.

7           As you'll learn, Stryker Biotech did not know whether

8     that mixture was causing the adverse events or not.  They never

9     studied the product.  They couldn't tell whether it did or it

10    didn't.  But did that stop them?  No.  They continued to sell

11    this mixture because it made them money.  It made them look

12    successful.  For the individual defendants, it put money in

13    their pockets.  For the corporation, it let them tread water

14    while they were trying to get the full premarket approval --

15    try to go back to the FDA to get that approval they didn't get.

16          Let me reintroduce myself.  My name is Susan Winkler.

17    I'm an assistant U.S. attorney here in the District of

18    Massachusetts.  Trying this case -- or prosecuting this case

19    with me are Jeremy Sternberg and Greg Noonan.  They are also

20    assistant U.S. attorneys.  It is our privilege to represent the

21    people of the United States.

22          Let me now tell you a little bit about how we're going

23    to proceed.  I'm going to organize this because this may go for

24    about 45 minutes or so.  I'm first going to tell you a little

25    bit about the defendants and some of the background, about how

1    we're going to prove the case; then I'm going to tell you a

2    little bit about more general background:  the products, the

3    approvals; and finally, how these devices are sold.

4            The third section will be a bit of a timeline.  So as

5    you hear the evidence at trial, you can sort of put it in

6    place -- witnesses know different things about different times,

7    and it will just help you put it in place.  And finally, I'll

8    talk to you just briefly about the indictment that Judge

9    O'Toole just explained to you.

10           So let me start with the defendants.  Who are the

11   defendants in this trial?  Stryker Biotech, LLC, the

12   corporation, is one of the defendants in the trial.  It's

13   located in Hopkinton.  It had a few hundred people there.  It

14   had a manufacturing plant up in New Hampshire -- Lebanon, New

15   Hampshire -- and it had a sales force of about 30 people that

16   were spread out around the country.  The company is a defendant

17   in this trial because corporations are responsible for what

18   their employees do that's in the scope of their duties and if

19   it's, in part, to benefit the corporation.

20           One of the people you're going to hear evidence about

21   during this trial is Mark Philip, the president of Stryker

22   Biotech.  You'll hear how he set budgets and quotas that

23   ultimately required the sales force to sell the mixture of OP-1

24   and Calstrux to hit their numbers.  You'll hear how he was told

25   to have the stock and the efforts they took were ineffective.

1          Mr. Heppner, William Heppner, is another defendant in

2    this trial.  This man was the national sales director for

3    Stryker Biotech.  He was the one in charge of the sales force

4    during the time period of the crimes charged.  It was his job

5    to make sure the sales force performed, that they hit those

6    numbers that were in the budgets, that they made their quotas.

7    That was his job.

8          The evidence will be that he knew the sales force was

9    promoting the mixture of OP-1 and Calstrux; that he knew the

10   promotion of that mixture was illegal; and that he essentially

11   made clear to them that they had to do what had to be done.  If

12   they didn't make their numbers, they were put on performance

13   plans; if they didn't make their performance plans, they were

14   fired.

15         The other two defendants are regional sales managers

16   of Stryker Biotech.  The sales force had Mr. Heppner at the

17   top, and then they had four regional sales managers:  one in

18   the northeast, one central, one west, and one in the southeast.

19   Two of those individuals are defendants in this trial.  One is

20   Mr. David Ard.  He was the regional sales manager for the west.

21   Another is Mr. Jeffrey Whitaker.  He was the sales manager for

22   the southeast.

23         Those two individuals each had a number of sales

24   representatives reporting to them.  They also knew that

25   promoting the mixture of Calstrux and OP-1 to doctors was

1    illegal.  They knew it was not approved, they knew it hadn't

2    been tested, and they knew their sales force was doing it.  In

3    fact, they discussed it with their sales force.  And you'll

4    hear evidence of that during trial.  You'll hear about how they

5    helped their sales force come up with instructions on how to

6    mix this product, instructions that were never run by anyone,

7    never tested.  They weren't approved.  They weren't reliable.

8    They were just their best idea on how to do it.

9           In short, the evidence is going to be that these three

10   men and the corporation knew that doctors had been misled into

11   thinking this product was all OP-1, that they didn't even

12   realize in many cases that Calstrux was involved, and that they

13   would convince doctors to buy it on that basis.  And why did

14   they do it?  You'll hear evidence that these defendants, the

15   individual defendants, put hundreds of thousands of dollars in

16   their own pockets based on making these numbers, and that the

17   company made additional millions from the sales of -- that were

18   attributable to the mixture.

19          So how are we going to prove this case?  It will

20   basically be through witnesses and documents, like the judge

21   just instructed you.  The witnesses will include the sales

22   force.  You'll hear from a number of people in the sales force

23   who reported to these individuals and were colleagues of

24   theirs.  Some of those sales representatives pled guilty to

25   their own criminal conduct and are cooperating with the

1    government.  You will hear from them.

2          You'll also hear from doctors and surgeons, some of

3    whom consulted with Stryker Biotech during the time period of

4    the conspiracy, told them at different points that the mixture

5    was ineffective, told them that the mixture came with an excess

6    number of adverse events.  You'll also hear from some people

7    from headquarters in Hopkinton, people who were involved in

8    trying to get the sales practices stopped.

9          And you'll also see a lot of documents in the case.

10   There are a number of documents.  You'll see emails between

11   these individuals.  You'll see PowerPoint presentations where

12   they were actually trained that it was illegal and they should

13   stop.  You'll see some exhibits like these, the Calstrux and

14   the OP-1, and you'll see other presentations that they gave at

15   their sales meetings and communications that they had amongst

16   each other.

17         Now let me tell you just a little bit about the

18   products themselves.  OP-1 is this powder that we were just

19   looking at.  And there were two kinds.  It was sold two

20   different ways by Stryker.  One was OP-1 Implant which was

21   just -- these are the same.  This is what it's packaged in,

22   this OP-1 Implant.  And this is the powder here.  But it's the

23   same powder, it's just one's a brown bottle and one's a white

24   bottle.

25         The Implant was used for long-bone breaks, things like

1    arms and legs.  Think ski accidents, auto accidents, things

2    where people break their big bones.  And it was only as a last

3    resort, if someone had already had surgery and tried to get it

4    fixed and they had to go back in again.  The narrow approval

5    they got was for that.

6          OP-1 Putty was the other application they had, which

7    was the same powder combined with a tiny little bit of powder

8    in another vial.  That's how it was approved to be used.  And

9    it was for use in the spine and spinal surgeries.  And again,

10   it was a last resort.  It was after other surgeries had failed

11   and they had to go back in to try again.

12         Now, Calstrux is nothing but a bone void filler.  This

13   powder does not grow bone.  This is like spackle that you put

14   in your walls to cover up holes, okay?  That's what this is.

15   And there are a number of these bone void fillers on the

16   market, so this was not their flagship product.  Their flagship

17   product was OP-1.

18         Now let me tell you a bit about the approvals that

19   they got.  The FDA, as I mentioned earlier, is an agency that's

20   responsible for protecting the American public.  They are

21   supposed to assess medical devices before they are sold to

22   doctors or hospitals for use in patients and to make sure

23   they're safe and effective.  That's the FDA's job.

24         And for medical device companies like Stryker Biotech,

25   there are various ways to get those approvals.  One of them,

1    and the one they wanted, was the premarket approval.  That's

2    the big approval.  That's the approval that for whatever use

3    they get it approved for, it's the one the companies want.

4    It's what Stryker wanted back about 12 years ago and they

5    didn't get, and they tried again later, and during the course

6    of this conspiracy and they didn't get.  But that's the way

7    that companies want to get their devices approved.

8            There's a second way, which is a clearance.  And a

9    clearance is what Calstrux got.  And for those, if you can show

10   that your device is substantially similar to other devices on

11   the market, you get that clearance.  And that's what Calstrux

12   got because there were other bone void fillers on the market,

13   and so it just was clear to be used.  It doesn't require the

14   same studies and testing because somebody else has already done

15   those studies and testing.  But that's not for OP-1, because

16   OP-1 was a device that had to have studies.  It had to

17   be -- because it was going to be used during surgeries, inside

18   us, they had to know that it was safe and effective.

19           So what did they get instead?  They got what's called

20   a humanitarian device exemption to the premarket approval.  A

21   humanitarian device exemption is essentially for orphan

22   conditions, conditions that affect very few people in the

23   United States.  So less than 4,000.  And in their application,

24   Stryker Biotech had to explain how the condition impacted less

25   than 4,000 people in the United States.  That's a requirement

1  for this narrow exemption.  That's all they were supposed to be

2  treating, is up to that number.

3          So they got two of those exemptions:  one for OP-1

4  Implant and one for OP-1 Putty.  Those approvals come with some

5  very important restrictions.  The first one is they can't make

6  a profit.  They can't make a profit because there is a -- I'm

7  sorry.  I got distracted by that phone -- there is

8  a -- Congress imposed this restriction to protect patients.

9  It's incentive to get medical device manufacturers to do

10  products for people who really need them.  And so they can

11  recover the cost of their research and they can recover the

12  cost of fabricating the device, but they can't make a profit.

13  So that's why they really wanted the big, full market approval,

14  the premarket approval, because they couldn't.

15          And the second restriction on this very narrow

16  humanitarian device exemption they got was they had to show

17  that it impacted only 4,000 patients.  That was not the big

18  market they were hoping to get that was in excess of a billion

19  dollars; it was only 4,000 patients.  So they couldn't make

20  more than, you know, 40 or 50 million dollars, depending on how

21  many units were used, for patients in the United States.  And

22  you'll hear some evidence about that during the course of this

23  trial.

24          If you got the full premarket approval, you did not

25  need to show that there was such a limited number of patients,

1    and you didn't have to report back to the FDA about how many

2    units you sold or that there were still only 4,000 patients.

3    With this exemption, you did.

4         And the third restriction which you'll hear about in

5    this case is you could not sell these products to a hospital

6    unless that hospital had something called an independent review

7    board.  Now, what's that?  It's an independent body at the

8    hospital made up of medical people, science people, non-science

9    people.  And their job is to protect patients.  They are

10   supposed to watch over the use of experimental devices at a

11   hospital.  And humanitarian device exemptions are exempt from

12   showing effectiveness -- that's how they get approved.  They

13   haven't had to prove it -- so one of the requirements in the

14   statute, in the restriction, is that the hospital -- their

15   independent review board -- has to approve the use of this

16   device before a doctor can use it at the hospital -- they're

17   supposed to.

18        And those approvals are different for different

19   hospitals.  They might approve it for one doctor, they might

20   approve it for a bunch, they might approve it for just what's

21   on the label, they might approve it broader, but the doctor has

22   to use it in accord -- or is supposed to use it in accord with

23   what the approval is in the hospital, and the manufacturer

24   cannot sell to that hospital until that approval is in place.

25        Now, if you get the full premarket approval, you don't

1    need to go to the institutional -- the institutional review

2    board first.  The institutional review board does not have a

3    say about -- you don't have to get that approval before you can

4    sell.  Okay.  Enough about those restrictions.  But that's why

5    it was so restricted and why they really wanted to get the

6    full -- big full-market approval.

7            So now let me tell you about how medical

8    devices -- the evidence you're going to hear about how medical

9    devices are sold to hospitals and doctors.  You're going to

10   hear from a number of salespeople in this company.  And we

11   suspect they're going to tell you about a number of things.

12   They're going to tell you there was a lot of pressure on the

13   sales force.  They were expected to make sales.  They had

14   quotas.  If they didn't meet those quotas they were put on

15   performance plans.  If they didn't succeed on their performance

16   plans, they were fired.  So making the numbers matter to the

17   sales force, in addition to the fact, if you exceeded and did

18   better, you could put, you know, extra commission in your

19   pocket.

20           You're going to hear about how closely monitored they

21   were.  They got daily score cards that showed how many units

22   they had sold of Implant, of putty, of Calstrux; how many IRB

23   approvals they had.  They kept very close track of the sales

24   force and how they were doing.

25           You're going to hear evidence that these defendants

 1    were involved in training the people who were under them.  They

 2    rode along with them to make sales calls sometimes; they

 3    evaluated them; they met with them; they had national sales

 4    meetings where all 30 or so of them would come together and

 5    talk about what they were doing.

 6            And you're going to hear evidence that they could

 7    rarely sell Calstrux, this bone void filler, by itself.  There

 8    were other bone void fillers on the market.  This was nothing

 9    special.  And you're going to hear that they just didn't sell a

10    lot of this without OP-1, all right?  That's important.  These

11    defendants knew that.  They knew it was hard to sell Calstrux

12    without OP-1.

13            So how did they sell it?  I'll come back to why that's

14    important in a minute.  Let me just tell you how they sold it.

15    The first thing a sales representative had to do was figure out

16    which doctors might use this product.  And there were two kinds

17    of doctors, trauma surgeons and spine surgeons, that they had

18    to find.  But they had to find surgeons who worked at hospitals

19    who had institutional review boards because, remember, they had

20    to have that approval.

21            Next, they had to go in to see the surgeon.  And those

22    surgeons are pretty busy.  And they had to get time with the

23    surgeon.  And then they had to convince the surgeon to use this

24    product rather than some other.  And that is where you're going

25    to hear in the evidence that some of the false and misleading

1    statements to doctors were made, is in those meetings, those

2    one-on-ones between the sales representative and the doctor.

3           And what were some of the false statements that were

4    made?  Among others, you're going to hear that the sales force

5    would hand -- a salesperson would hand a ball of Calstrux that

6    they had mixed up so it was like the Play-Doh ball.  They would

7    hand it to the doctor and they would say, "This is what OP-1 is

8    going to feel like in surgery."  And the doctor would sit there

9    and play with the ball.

10          They wouldn't tell the doctor that it was a separate

11   product, that it was Calstrux as opposed to OP-1.  And the

12   doctor assumed wrongly that it was OP-1, the product that had

13   some approval, as opposed to a mixture of OP-1 and Calstrux

14   which had no approval at all, which had no testing at all, and

15   which they didn't know was safe or effective.

16          Another dishonest thing that would happen in those

17   meetings is that a salesperson would tell doctors, "This

18   Calstrux, this is our carrier, or extender, for OP-1."

19   Remember I told you doctors were complaining that that handled

20   like wet sand and it didn't have any volume and it was too

21   expensive?  So they would say -- because they were supposed to

22   use two of these if they were doing spine surgery.  Two.

23   That's over $10,000 by the time they pay for it.

24          So the sales reps would say, "Use this.  Mix this

25   Calstrux together with OP-1.  You'll get much more volume, it

1    will be less in price because you'll only have to use one, and

2    it's going to handle better because it's going to be like

3    Play-Doh instead of like wet sand."

4          Well, the doctors thought when they said "this was

5    Stryker's carrier," Stryker, a big multinational corporation,

6    that they had some -- and it was Stryker Biotech's, but they

7    knew they were connected.  They thought there was something

8    behind this.  They thought there was some study behind it.

9    They thought there was some basis for the sales force to say

10   this was a carrier for OP-1.  There was none.  It had never

11   been studied.  They had no idea.  That's another way they

12   misled doctors.

13         A third way they misled doctors:  When they complained

14   it was too expensive and they said use one, you don't have to

15   use two, and when the FDA approved it, even with the exemption

16   for showing it was effective, they said you had to use two.

17   They were supposed to promote it in accord with the label, and

18   they were telling doctors it was okay to use one.  Again,

19   doctors assumed there was something behind that.  They must

20   have some testing or they must have some approvals for that.

21   They had none.  There were other misrepresentations that you'll

22   hear about during the course of this trial but those are some

23   of them.

24         Now, if the doctor decided after this meeting with the

25   sales rep he wanted to try it, he had to go get IRB approval.

1    And you'll hear that's something the doctor has to do, but the

2    Stryker sales reps helped out.  They did the paperwork; they

3    ran it back and forth, did whatever it took.  If they got

4    approval at the hospital, then the sales force had to get the

5    product stocked at the hospital.  So they would take -- and

6    frequently they would do it on what's called consignment.  They

7    would take these boxes, and they would put some in the hospital

8    supply area in the refrigerator, wherever it had to go.  And it

9    would sit there until it was used.  Most of this OP-1 was sold

10   that way, on consignment.  It sat in the hospital and it was

11   held for sale at the hospital until the doctor needed it.  And

12   then during surgery the surgical staff would go get it, bring

13   it to the surgery, and they would do what they had to do.

14        Back surgeries are very long surgeries.  The Stryker

15   sales representatives were expected to be there.  And why?  So

16   they could help the doctor as needed.  And one of the things

17   they were expected to do, you're going to hear, is to provide

18   the doctors instructions on how to mix Calstrux and OP-1, the

19   mixture that had no approval and had never been tested.

20        And in some cases they had great big territories --

21   there were only 30 of them for the whole country -- they

22   couldn't be there.  So they would send written instructions to

23   the doctor or to the doctor's staff to tell them how to mix it

24   because they couldn't be there to point it out and say, Take

25   this and take that and put them in the cup and stir them up

1    together.  They weren't there to do that.  So sometimes they

2    wrote them down.  Sometimes they left them pasted on

3    refrigerators in the OR.

4        After the surgery you'll hear that the -- oh, this was

5    another place -- it was during surgery where misrepresentations

6    were made leading up to -- when they gave them instructions,

7    those instructions implied that they had some basis for it.

8    You know, they were on Stryker letterhead.  They looked like

9    instructions; they were all printed up.  But they didn't have

10   any approvals.  They had never tested it.  They didn't know

11   what worked.

12       And worse, they had 30 different sales reps, as they

13   told management, doing 30 different things because nobody knew

14   what worked.  So the sales reps were putting together these

15   recipes.  These weren't recipes that came from any study or

16   test; the sales representatives were doing it, telling doctors

17   how to mix two products to be used on patients with absolutely

18   no basis for it.

19       So after the surgery was done, the -- you'll see at

20   some point they had -- inside each of these boxes they have

21   labels.  And these labels come with stickies.  And there would

22   be a delivered goods receipt.  And they would peel these off

23   and they would put them on there so they knew exactly what had

24   been used:  which box of OP-1, which Calstrux.  And the reason

25   they did that is so they could send the product -- I mean, send

1    the receipt back to Stryker and then Stryker could do the bill.

2    That's when the billing happened.

3            Now I'm to the third part.  This is the chronology.

4    Let me tell you a little bit about how things developed in this

5    company.  The Calstrux was available to them and they got a

6    clearance from the FDA in about 2004, and they launched it in

7    about 2005.  And adverse events started to happen in 2005.

8    They started to have problems with the mixture of OP-1 and

9    Calstrux.  And so in September of 2005 they sent a letter to

10   physicians, and they told physicians that they had had some

11   adverse events with the mixture -- with mixtures with Calstrux.

12   But, note, they didn't mention OP-1, their flagship product.

13   And the evidence you will hear at trial will show you why.

14           They then, during the fall of '05, started to do a

15   study on the mixture of OP-1 and Calstrux.  You'll hear that it

16   never got off the ground.  It never got FDA approval -- which

17   you have to have to do a study of a new investigational

18   device -- and the doctor pulled out.  So they never did the

19   study.  So the adverse events were continuing.

20           And by January 2006 you're going to hear that the vice

21   president of regulatory at Hopkinton started to get concerned.

22   The adverse events were continuing.  So she went to the

23   national sales meeting, and at the national sales meeting where

24   all these defendants and other people that you're going to hear

25   from were present, she learned for the first time that

1    representatives were promoting the mixture of OP-1 and Calstrux

2    in physician offices; that representatives were present in the

3    OR, the operating room, and directing the doctors how to mix

4    the two; and that they were promoting all kinds of different

5    recipes, none, of course, which had been approved or tested --

6    some would say mix with blood or saline, some would say use

7    different amounts of liquid, some would say roll it in

8    different ways:  some would say cigars, some would say Tootsie

9    Rolls and some would say bricks -- and she got very concerned.

10        She met, you will hear, with Mr. Philip, the

11   president, and Defendant Heppner, and she told them it was

12   illegal, that it had to stop, that they needed to tell doctors

13   about the adverse events, and that they needed to make sure

14   that the sales force was trained to stop doing the illegal

15   promotion of that mixture.

16        Well, what happened then?  There was a large objection

17   to going forward in that way by the sales force.  And at trial

18   you'll hear the words of these own defendants because you'll

19   get to see the emails between them.  And when the sales force

20   learned that this letter was going to go out -- and the letter

21   that they drafted actually said there are adverse events

22   associated with the mixture of OP-1 and Calstrux.

23        And so, for example, Mr. Whitaker writes to Mr. Ard

24   and to Mr. Heppner and others expressing his concerns about it.

25   And some of the things he said are a lot of potential surgeon

1    questions.  He said, "Potential surgeon questions:  Well, what

2    are the adverse events?"  And he goes on to say, "Is this all

3    the product I get?" seeing the volume of just OP-1 Putty.  And

4    "Why should I use OP-1 now that you don't have a big advantage

5    in handling?"  And then he wrote some -- he said -- he goes on

6    to say with his -- the surgeon questions that he expected,

7    "This stuff doesn't hold together very well and has very little

8    volume.  What else can I mix it with, if OP-1 Putty?  This

9    stuff is it like wet sand.  What can I mix it with if

10   implanted?"  "Do I need to look back at all of the patients

11   I've done?  I've used a lot of this TCP" -- "TCP" was the name

12   for Calstrux when it first came out -- "and not had any

13   problems," with most surgeons.  "Should I stop using it?"  He

14   was concerned if that letter went out surgeons would stop using

15   it.

16        Then he had representative questions that he thought

17   they would get if they told the representatives about this

18   adverse -- this letter to doctors warning them about adverse

19   events.  "How many surgeon complaints, adverse events, have

20   been reported?"  "Do you know what this is going to do to our

21   OP-1 sales?"  "Do you know what this is going to do to our

22   Calstrux sales?"  "All my big users mix OP-1 with Calstrux and

23   that's why they use OP-1."  "How do I keep their business?"

24   "If I'm in a case tomorrow with a new or current user, do I

25   need to tell the surgeon not to mix OP-1 and Calstrux?"  "Are

1    we sending out this letter just based on anecdotal complaints

2    from reps where we may not know if TCP was the reason?"  "How

3    am I supposed to sell Calstrux after the second letter goes

4    out?"  "Have we determined whether there's another ideal

5    carrier for OP-1 that is out there?"  "How can we even sell

6    Calstrux at all if we're sending out letters saying it has

7    problems and needs to be researched further?"  "Are you going

8    to reduce or eliminate my quota?"

9           And he concludes his email to the other defendants and

10   others saying, "Many surgeons are just handed the product prior

11   to implantation and they think it's all OP-1."  They knew, the

12   evidence will be, that the surgeons had been misled and thought

13   it was all OP-1.

14          In response, they were going to send this letter both

15   to surgeons and to the hospital institutional review boards.

16   And Defendant Heppner wrote an email.  He was very worried

17   about the institutional review boards.  He noted in his email

18   to -- and this email went to the other defendants, David Ard

19   and Mr. Whitaker, and it also went to the president, Mark

20   Philip.  And he said that "all of these missions are to protect

21   patients.  A letter like this will be cause for swift action."

22          And what were some of the things he said he was

23   worried about?  He says, "I strongly advise that we do not send

24   this letter to IRBs."  And his concern:  "They will cease all

25   OP-1 usage in the hospital immediately until this action is

1    clarified with Stryker and the FDA."  He was concerned that

2    PIs -- those are principal investigators, the doctors who

3    supported that approval at the IRB -- will be notified to

4    provide a list of all patients treated with OP-1 with charts,

5    adverse events, outcomes, et cetera.  "This opens Pandora's box

6    on other users that" -- this PI doctor -- "may not have known

7    about, him potentially getting in trouble with the hospital as

8    he has used OP-1 in primary fusions in a large number of cases

9    and other off-label usages of OP-1, et cetera."  The day after

10   he sent that email, you will hear that the decision was made

11   not to send the letter to warn institutional review boards at

12   hospitals about those adverse events.

13          Now, one of the things I told you was that the

14   regulatory vice president wanted training, and they did that

15   training on March 1st.  And you will see evidence at trial

16   where they were told:  "Do not promote off-label.  Do not mix

17   Calstrux and OP-1 Implant.  Do not share recipes.  Do not

18   recommend the use of Calstrux and OP-1 Implant.  Do not give

19   directions for mixing Calstrux and OP-1 Implant.  No off-label

20   promotion or off-label activities will be tolerated."  They

21   were also told that it was illegal, that it was criminal, and

22   that it was a serious offense if they did those things.  That

23   training was given to them on March 1st in a big conference, a

24   nationwide teleconference, in which these three men

25   participated.

1          Now, as part of that conference they also talked about

2     the letter.  And the sales force had a lot to say about it.

3     And you'll hear about some of those things.  They were very

4     concerned that sending out that letter would cease all sales.

5     They would lose.  They would stop.  "If they send out this

6     letter," the quote is, "they will kill all OP-1."  That was

7     what we believe the evidence will be when you hear it.  And

8     after that teleconference and some more discussion, they

9     decided not to send the letter at all.

10          So what happened at Stryker Biotech with the sales

11     force after this training was given?  The evidence will be that

12     nothing changed.  Why not?  Stryker Biotech did not change the

13     budgets.  They did not change the quotas.  The sales reps still

14     had to sell OP-1 and Calstrux to keep their job.  They got

15     bonuses if they sold more.  They didn't make the changes to let

16     the sales force stop selling the mixture of OP-1 and Calstrux.

17          One of the things you will hear is that some

18     evidence -- obviously, Defendant Heppner told the sales force

19     to go back and get the written mixing instructions they had

20     left in hospitals.  Pick them up and bring them back.  Don't

21     leave them lying around.  And you'll hear some of the sales

22     force understood that to mean:  "Don't leave evidence where we

23     can get caught."  But they fully understood they had to

24     continue to explain to doctors how to do this mixing, and that

25     that was something they would have to do to sell the product.

1    That's why ultimately the training was ineffective, because

2    nothing else changed for these salespeople.

3            And even those salespeople who tried to stop mixing,

4    who tried to stop selling the Calstrux, they got in trouble.

5    You'll see evidence at this trial that Heppner -- Defendant

6    Heppner sent an email in May of 2006, right after this

7    training, telling those that were -- "If you're getting this

8    email, unfortunately, your Calstrux numbers fell below ten

9    units last month."  In other words, if you don't make your

10   sales, you've got problems at this company.  And Mr. Heppner

11   goes on to say, "The issues we had in the past have been put to

12   bed and substantial dollars are there to be made."  He was

13   pushing the sales force to do -- we believe the evidence will

14   come out to you in trial that he is pushing them to make their

15   sales.

16           So the sales continued.  The sales of the mixture of

17   OP-1 and Calstrux.  They continued to promote it to doctors.

18   They continued to give discounted proposals to hospitals where

19   they could buy the two together cheaper if they got them.  So

20   they did try to deal with the adverse events at least in some

21   ways.  And why?  Because by -- in part, because in the middle

22   of the summer the FDA saw some instances of these adverse

23   events and -- between the mixture of OP-1 and Calstrux, and

24   they decided to send out a letter to re-label Calstrux.  And in

25   that letter they told doctors that they should not be mixed.

1    What they said, though, was Calstrux should not be used in

2    combination with other products, that adverse events include

3    localized induration, swelling, inflammation, wound drainage,

4    infection and device migration.  That's where it moves out of

5    the place where it was set.

6          And they also noted that "Stryker has identified an

7    increased trend in adverse events associated with the

8    combination use of Calstrux."  Seven of the events required

9    surgical intervention.  You'll see this evidence during trial.

10   But they were concerned about it and they sent the letter.

11   You'll notice what the letter never mentioned:  OP-1.  And the

12   evidence at trial will tell you why.

13         They also, during the course of this time frame, asked

14   doctors to go back -- some of their doctors that they worked

15   with a lot -- and to analyze their own experiences.  And one of

16   their doctors told them in February 2006 that the adverse event

17   rate was higher than the norm, and by later that year, he told

18   them the mixture of Calstrux and OP-1 was ineffective.  Nothing

19   changed.

20         They went to another doctor who they went to to try to

21   figure out a technique that might work better to stop the

22   migration and some of the adverse events.  And he used a brick.

23   And so they were telling the salespeople about this brick and

24   that maybe that was a better way to do it:  make it dryer, make

25   it so it doesn't move out of the surgical site as much.

1          That doctor ultimately told them about a year later,

2    in early '07, that the -- that it should be used -- the product

3    should be used according to the label:  two vials -- two

4    units -- of OP-1 as originally supposed to be constituted,

5    what's in this box; that they should not use it with Calstrux.

6    That that wasn't the best way to do it.

7          But nothing changed.  The quotas were made the same.

8    The budgets continued to go up.  They were expected to hit

9    those sales.  They didn't have an option.  The sales force was

10   out promoting this mixture of OP-1 and Calstrux even though

11   they knew it was illegal.  They had no basis for the

12   instructions.  They had no basis to promote the mixture.  It

13   had never been tested.  It had never been approved.

14         Let me now briefly turn to the indictment.  The judge

15   told you about the indictment, what's actually charged in the

16   12 different counts.  A couple of things I want to note for you

17   by way of evidence in that connection.  The first charge is a

18   conspiracy -- that all of the defendants are charged in a

19   conspiracy.  And we believe the evidence will show beyond a

20   reasonable doubt that they did conspire to defraud the FDA by

21   using deceit and dishonest means to frustrate the FDA's lawful

22   function of ensuring the health and safety of the public by

23   making sure that medical devices that are marketed and

24   distributed in the United States were safe and effective for

25   their intended uses.

1         And we've talked about some of those dishonest ways

2    they did that, one of them being that they handed the ball to

3    the doctor.  And the doctor assumed it was OP-1, which is

4    misleading because he doesn't know it's a mixture.  And they

5    handed other physicians -- and to some physicians they just

6    affirmatively misrepresented this is what OP-1 will be and did

7    not tell them.  So that was affirmatively misrepresenting what

8    it was.

9         They knew about the adverse experiences with OP-1 and

10   Calstrux.  They didn't tell the doctors.  They knew about the

11   adverse events, that it was material information to IRBs.

12   Defendant Heppner says he's worried they're going to cease all

13   usage immediately if they don't -- if they get information

14   about that -- those adverse events.

15        They misrepresented to physicians that Calstrux was a

16   carrier for OP-1, that it was somehow developed for that

17   purpose, when it had never been tested that way.  And they

18   suggested mixing instructions as if there were some sort of

19   approved way to do it when all it was was a bunch of different

20   ways by a bunch of different salespeople on how they thought

21   maybe it could be mixed up.  And that's what was used in

22   patients.

23        Now, we also have to show at least one overt act

24   happened in the Commonwealth of Massachusetts.  We think you'll

25   see several of those during the course of this trial, including

1    some that we've talked about today, setting those quotas that

2    required them to make the sales and the decisions not to send

3    out the "dear-doctor" letter.

4         The wire fraud count, as your Honor explained, was

5    about the emails.  And some of those emails that are the

6    subject of those counts I've talked to you about already.

7    Mr. Whitaker's email where he worries about that the doctors

8    have been -- they all think it's OP-1 and where he worries

9    about what surgeons are going to say, and stop using it, and

10   the sales reps about the fact that quotas aren't changing,

11   that's Count 2.

12        Count 3 is Mr. Heppner's email which deals with the

13   IRBs and the fact that they'll stop usage if they get the

14   information.  Count 4 is Mr. Heppner's email to the laggers who

15   aren't making enough Calstrux sales.  Count 5 involves Mr. Ard

16   where, in October of 2006 -- and you'll see this during

17   trial -- he sends one of his sales representatives not only

18   some paperwork, invoices and the like, he sends them mixing

19   instructions after they've all been trained that this is

20   illegal.  And Count 6 involves an email from President

21   Philip -- Mark Philip, the president of Stryker Biotech -- who

22   was sending out increased quotas for the sales force, which

23   they could not meet, the evidence will be, without selling this

24   mixture.  Those are Counts 2 through 6.  There was a scheme to

25   use those false and deceptive things we were talking about

1    earlier to defraud hospitals and doctors, and they used the

2    wires to do it.

3            And finally, the misbranding counts which are only

4    against the corporation, those are Counts 7 through 12.  And we

5    believe the evidence will show beyond a reasonable doubt that

6    those products were held for sale on consignment at the

7    hospitals, and while they were there employees of Stryker

8    Biotech sent out mixing instructions, all different kinds, and

9    that that was an act -- those instructions were not part of the

10   label, they did not have adequate directions for use, they were

11   sent to doctors, and they misbranded -- that's the legal

12   term -- the medical device that was being sold by the

13   corporation, and it was done with an intent to defraud and

14   mislead both the FDA -- because the FDA knew nothing about

15   these mixing instructions or that they were out there promoting

16   this mixture, that's what this evidence will be -- and

17   doctors -- by misleading doctors about the nature of the

18   approvals and the nature of the device.

19           All of these crimes were done to evade the FDA's

20   regulatory authority, to approve devices before they're sold

21   for the use in the American public.  And it was done to put

22   money in their own pockets, it was done to make the subsidiary

23   look good to the corporation, to keep them treading water while

24   they tried to get that full premarket approval that they were

25   never able to get because they never had the studies to show

1    that OP-1 worked.

2            In summary, Mr. Sternberg will talk to you at the end

3    of this case.  He's going to ask you to use your common sense

4    to understand the evidence, to find that the government has

5    proved beyond a reasonable doubt that these defendants

6    committed the crimes with which they are charged, and he's

7    going to ask you to return a verdict of guilty.

8            Thank you.

9        MR. O'CONNOR:  If it please the Court, good morning,

10   ladies and gentlemen.  My name is Brien O'Connor.  And I also

11   want to introduce my partner, Josh Levy -- and Cori Lable and

12   Aaron Katz -- if you would stand, please -- who are going to be

13   assisting us throughout the trial.

14           It is my privilege to stand before you and to

15   represent Stryker Biotech in this case.  On behalf of all of

16   the defendants, first, I want to thank you for your jury

17   service.  We all know that serving as a juror is not only a big

18   time commitment, but also requires hard work and consistent

19   attention to the evidence, especially in as long a case as this

20   promises to be.  We all recognize that jury service, especially

21   in a complex criminal case, is an incredibly important civic

22   duty and contribution.

23           This, ladies and gentlemen, is a criminal case.  Over

24   my more than 25 years as a lawyer, more than a decade in each

25   of the public and private sectors, I've learned that criminal

1   cases are different and more important than regulatory actions,

2   commercial litigation, and every other type of case.  Criminal

3   cases involve the most serious kind of government action and

4   core individual rights and liberties.  There's just more at

5   stake, ladies and gentlemen, in a criminal case, so the process

6   is really important.

7        So what kind of case have the prosecutors brought?

8   Ms. Winkler speaks softly, but let me tell you:  This is a

9   federal felony criminal case.  Not a civil enforcement action,

10  not a regulatory action and not even a misdemeanor criminal

11  case.  In the spectrum of legal proceedings, a federal felony

12  criminal case is up here, and everything else is somewhere down

13  here.

14       The prosecutors have told you that our clients,

15  Stryker Biotech, Bill Heppner, Dave Ard and Jeff Whitaker,

16  engaged in criminal fraud.  They say that Biotech, Heppner, Ard

17  and Whitaker manipulated, lied to, cheated and deceived

18  brilliant and experienced neurosurgeons and spinal surgeons

19  into using Biotech's OP-1 and Calstrux together.  They also say

20  that the defendants engaged in a criminal conspiracy to defraud

21  the FDA, mainly by tricking those surgeons.  Finally, they say

22  that the defendants intentionally violated the criminal law for

23  money, for money they had no right to receive.

24       The evidence in this case, ladies and gentlemen, from

25  the witnesses and the documents, will prove no such thing.

1    Instead, it will show that the government's claims are wrong.

2    What the evidence will show is that this case is a terribly

3    misguided prosecution and a gross injustice to Stryker Biotech

4    and these men.  Surgeons were not tricked into using the

5    OP-1/Calstrux combination; they chose to use it because it

6    worked.

7            On the subject of money, let me just say at this point

8    that the claim that these defendants, these men, would engage

9    in intentional criminal conduct against surgeons they valued

10   and respected highly, and against the government agency that

11   was critical to their future, the FDA, all to make short-term

12   money makes no sense and did not happen.

13           Now, I want to say just a few words about each of the

14   individual defendants.  Bill Heppner came to Stryker Biotech in

15   2002 with eight years of experience selling medical devices.

16   While at Biotech, Bill earned the respect of his surgeon

17   clients and his peers alike.  He became known as a positive

18   motivator, a leader, and a champion of the sales team.

19           Dave Ard joined Biotech in August of 2005 as the

20   western regional sales director.  Dave joined Biotech because

21   he, like many others, was very excited about the healing powers

22   of OP-1.  Dave had a strong reputation already in the industry

23   and with surgeons in his territory for being a

24   straight-shooter.

25           Jeff Whitaker, like his two codefendants, is a family

1  man.  He has a beautiful family.  He came to Biotech with more

2  than 15 years of experience in the medical field.  Jeff was a

3  hard-working sales rep first who fostered long-term

4  relationships with surgeons.  Biotech named Jeff its southeast

5  regional sales director in 2005.

6       Let me say this about Bill, Dave and Jeff:  Never in a

7  million years did any of them consider even remotely possible

8  that anyone would point the finger at them and tell them they

9  were criminals, accuse them of lying to or cheating the very

10 surgeons they were trying most to help.

11      Before I go any further, I do need to say something

12 about adverse events.  Ms. Winkler's presentation is

13 misleading.  The evidence in this case will show that the rate

14 of adverse events in surgeries involving the OP-1/Calstrux

15 combination was only one half of 1 percent.  That is 63 adverse

16 events out of over 10,000 surgeries.  Also, the term "adverse

17 event," it's a specialized medical term that refers to anything

18 that goes wrong in a surgery no matter how minor and not

19 because the surgeon thinks the device has anything at all to do

20 with the event, all right?

21      So on that point, the adverse events that surgeons

22 reported to Biotech were the kinds of events common to all

23 trauma and spine surgeries.  Many of the events were minor,

24 things like fever or swelling, issues that resolved quickly and

25 don't cause permanent harm.  When you see photos of these

 1  surgeries -- and there won't be many, thankfully -- you'll

 2  understand why these surgeries result in some adverse events:

 3  63 out of 10,000.  Also, importantly, the prosecutors have

 4  conceded in this case that they can't prove that the

 5  combination of the OP-1 products with Calstrux caused any of

 6  the adverse events.

 7       Now, you may be wondering how this case got started.

 8  Why are we here for so long, right?  Was it triggered by these

 9  adverse events or patient deaths?  No, not at all.  You heard

10  from Ms. Winkler that hospital IRB committees had to approve

11  the use -- and IRBs are institutional review boards, not

12  independent review boards, institutional -- had to approve the

13  use of OP-1 in hospitals because of the nature of the HDE

14  approval.

15       Well, in 2007, right in the middle of the conspiracy,

16  as the Court said -- during the supposed conspiracy against

17  surgeons and the FDA -- Biotech discovered that one of its

18  sales representatives, a man named Don Allard who's now

19  deceased, had violated company policy by forging an IRB

20  approval form.  The company immediately terminated Mr. Allard,

21  and its legal and compliance people began an intensive

22  investigation, including these managers, by the way, to

23  determine whether there was a broader problem.  Ultimately, the

24  company identified a few of Allard's colleagues who also had

25  violated company policy by forging at least one IRB approval.

1    The company promptly terminated those employees too.

2         Beginning in September of 2007, the company also made

3    four voluntary written reports about the IRB misconduct to the

4    FDA, to the regulator.  So the point is the case didn't begin

5    with surgeon or patient complaints or adverse events.  But

6    also, think about this for a minute.  Think about Biotech's

7    disclosure of the IRB misconduct in the middle of the supposed

8    conspiracy to target and defeat the FDA.  The notion that at

9    the same time the company was reporting violations of its

10   policies to the FDA it was also participating in a criminal

11   conspiracy against the FDA makes no sense at all.

12        Now, what do the prosecutors say the defendants did to

13   warrant being here, being charged with serious criminal

14   felonies?  The indictment -- I think you've got a sense of

15   it -- recites a grab bag of unclear scattered complaints about

16   the company's marketing practices.  The prosecutors throw up

17   against the wall vague and inconsistent allegations hoping

18   something will stick.  The bottom line on these allegations is

19   that they don't stick.  Not one of them proves intentional

20   wrongdoing of any kind and definitely not criminal fraud.

21        Before going through some of the specific complaints,

22   I do want to talk with you about the patient conditions, how

23   surgeons historically have tried to fix those conditions and

24   the formation of my client, Stryker Biotech.

25        This case involves two extremely difficult procedures

1   that trauma and spine surgeons perform.  First, they surgically

2   repair long-bone non-union fractures, really bad breaks, in the

3   tibia and fibula and the femur and the humerus, breaks that

4   haven't healed after first-line treatments and other surgeries

5   have failed.

6         You may also have heard about slipped disks and

7   ruptured disks in the lower back which can cause intense nerve

8   pain in the back and the legs.  When surgeons remove the

9   bulging parts or the ruptured parts of those disks, they need

10  to fuse the vertebrae around them.

11        We have brought a little model.  And for those of you

12  who can see, the dark area here, those are the disks.  And when

13  they rupture -- here's the lumbar, here's the cervical up here,

14  here's the back of the skull, here are the hips, which I'll

15  mention in a moment -- but what happens is, the surgeons go in

16  and they put in the OP-1 and the Calstrux together to hold

17  together, you know, two or more vertebrae, to fuse it, to

18  stabilize the spine.  So that's how it works.

19        Now, I am going to ask you to pull out your monitors,

20  please, for a moment -- I'm sorry for those in the back.  I

21  should have said it at the outset -- because I do want you all

22  to see -- all right.  Over the past two years in this case I've

23  had the privilege of learning about growing bone.  I know

24  that -- I know now that growing bone requires three basic

25  elements:  First, you've got to have live cells.  And live

1   cells you get by scraping the bone, or debriding the bone, so

2   that they're exposed and so they can help the growth.  Second,

3   you need stimulation, stimulation of the bone-growing cells.

4   Third, you need some kind of structure, or matrix, for the bone

5   to grow on.  So when we're trying to fuse a spine -- or

6   surgeons are -- they're trying to grow bone across a structure.

7        Before OP-1 -- and its only competitor, InFuse made by

8   Medtronic -- you may have heard of Medtronic.  They had another

9   stimulator, agent.  Before they were approved the only way

10  surgeons could stimulate bone-growing cells was to use iliac

11  crest bone.  That's in the hip bone.  That requires an extra

12  surgery on the hip and the removal of bone and bone marrow so

13  that it could then be transported, or moved, into the surgical

14  site in the back or wherever the long-bone fracture is.

15       So the problem was there were real problems with iliac

16  crest grafts.  What are they?  Well, hip surgery is very

17  painful.  Also, there's a limited amount of bone to use, so if

18  you need more stimulator than the hip affords, you need it from

19  somewhere else.  Third, a lot of patients just aren't eligible

20  because they're smokers or diabetics or have vascular disease,

21  they're osteoporotics, elderly.  They can't use an iliac crest

22  graft.  But also, two incisions, more time in the operating

23  room, more chance for infection when you've got two surgical

24  sites instead of one.  So those problems led scientists to

25  research whether bone morphogenetic proteins could be used to

1    create an alternative stimulator graft material.

2           So let's briefly talk about the discovery of one of

3    those stimulators in the formation of the company.  Bone

4    morphogenetic proteins exist naturally in the body.  They were

5    first discovered and named BMPs, or bone morphogenetic

6    proteins, in the 1960s by Dr. Marshall Urist, a brilliant

7    scientist at UCLA who trained right here at Mass. General.  In

8    fact, Dr. Urist was later nominated for a Noble Prize in

9    medicine for his research on bone physiology and bone

10   morphogenetic proteins.

11          Urist's discovery of BMPs led to 30 years of

12   scientific research to identify BMPs that could have

13   therapeutic benefits to patients.  In the 1980s a group of

14   Tufts scientists over in Medford began developing the BMP7

15   molecule.  In 1985 those scientists formed a Hopkinton,

16   Massachusetts-based start-up small company to develop BMP7.

17   That start-up merged into Michigan-based Stryker Corporation,

18   my client Biotech's parent company.

19          Stryker Corporation was founded in 1941 in Kalamazoo,

20   Michigan, by a Midwestern surgeon named Dr. Homer Stryker.  For

21   the past 70 years, building on Dr. Stryker's hard work,

22   creative genius, Stryker Corp. has been an inventor of a lot of

23   medical devices:  joint replacements, hips and knees; surgical

24   tools; diagnostic machines used to detect cancer and other

25   serious health conditions; spinal implants.  You may have seen

1   their hospital beds and stretchers.  Stryker Corporation

2   employs over 11,000 people in this country and over 20,000

3   people around the world.  Big company?  It's big.  It's not

4   giant; it's big.  And it's good.

5           Now, at this point, it's high time, I want to

6   introduce Stryker Biotech's corporate representative, Beth

7   Staub.  I'll ask Beth to stand.  Beth has been at Stryker

8   Corporation for over 20 years.  Since 2005, she's been the vice

9   president of regulatory affairs and quality assurance.  Beth

10  chairs a steering committee of the regulatory leaders of all

11  the Stryker businesses which oversee Stryker's compliance with

12  FDA rules.

13          In 1991 Stryker Corporation formed Stryker Biotech.

14  Why?  Well, to continue the research of those Tufts scientists.

15  Stryker Biotech spent the next 20 years developing BMP7 for

16  bone growth, and also for cartilage, disk, kidney and heart

17  tissue regeneration.

18          So what is OP-1?  First of all, it's a funny name.

19  Its real tradename is osteogenic protein, but you're going to

20  hear all of the witnesses talk about "OP-1" which is why we do

21  it.  OP-1 is derived from BMP7.  OP-1 actively recruits live

22  bone cells and helps patients' own bodies grow bone.  OP-1

23  Implant and OP-1 Putty were never sold directly to the public

24  but were marketed only to surgeons and were sold only for use

25  in the operating room.  So first:  Implant.  That was the first

1    of the two approved, and it was approved in 2001.  And it was

2    approved for use in these long-bone non-unions:  for use in

3    trauma patients, terrible long-bone breaks, hadn't worked,

4    hadn't been cured by other surgeries, the patients had run out

5    of options.

6         Putty:  approved in 2004 for use in the spinal fusion,

7    for patients who had previous low-back spinal surgeries that

8    failed.  Now, what kind of patients?  What kind of patients?

9    Really sick ones on the OP-1 Putty, all right?  Patients with

10   really weak bones.  And you're going to see it when some of the

11   experts testify:  smokers, diabetics, people with vascular

12   disease, with lots of prior surgeries.

13        Let me talk briefly too about the FDA approval status

14   of the OP-1 devices.  First of all, Ms. Winkler says in '01 the

15   FDA said no to OP-1 approval.  Well, that's true with respect

16   to Implant.  They said not enough patients, not enough data.

17   So they suggested what is coming, which is the humanitarian

18   device exempt request and then approval, okay?  So both of

19   these products were approved under a so-called HDE, or

20   humanitarian device exemption.

21        HDE approval is designed by the government to

22   encourage good design -- discovery of devices to treat patients

23   with rare and serious conditions.  HDE products had been

24   designed to treat 4,000 or fewer patients annually.  There's no

25   limit or cap, but they have to be designed for that.

1          Hospital IRBs, the institutional review boards, have

2     to approve the use of HDE products in the hospitals.  They also

3     have to approve PMA-approved products, by the way.

4     Manufacturers of HDE products are not allowed to make any

5     profit -- no profit -- on sales of HDE products.

6          Before the FDA can approve a humanitarian device, it

7     must find two things.  This goes to safety and effectiveness,

8     right?  That there's no unreasonable or significant risk of

9     illness or injury, in other words, it's safe; second, that the

10    probable benefit of the product to health outweighs the risk of

11    illness or injury.  So it's a real approved product and for a

12    good reason.  Those two reasons.

13         But the most important point now in this case is that

14    throughout the relevant period both OP-1 products had legal FDA

15    approvals and the two products were legally available for

16    surgeons to use.  So how did surgeons use OP-1?  Let me just

17    hold up -- and I will.  This is not an empty bottle; it's a

18    full bottle -- it's a full bottle of OP-1.  And on your screens

19    you see a graphic of it that the company has used.

20         Now, OP-1 was an amazingly powerful stimulator, much

21    more than bone marrow that you can get in the iliac crest

22    surgery.  But you will hear that in some situations when there

23    are large voids in a spinal column -- you can see how large

24    these voids can be -- surgeons saw a need -- wanted filler, you

25    know, other material for more volume.  Remember, BMPs, like

 1   OP-1, provide only stimulation but not the structure for the

 2   bone to grow on.  Think of the structure as scaffolding like at

 3   a construction site or other types of scaffolding for the new

 4   bone growth.  Different surgeons had different preferences as

 5   to which scaffold material, or structure material, they'd use

 6   in what proportions when used with OP-1.

 7        So what's Calstrux?  Please take a look at your

 8   monitor.  It is a BVF, or bone void filler, with tricalcium

 9   phosphate that exists naturally in our bodies and is in the

10   outer layers of our bones.  Tricalcium phosphate is an

11   ingredient in milk, in cheese, in toothpaste, even in Gerber

12   baby food.  So we've got some bananas, we've got some apples,

13   we've got tricalcium phosphate right here.  In other words,

14   it's a generally safe substance.

15        Calstrux was created by Biotech in 2004 and got a

16   so-called 510(k) approval from the FDA.  What does that mean?

17   That means when there are other products already on the market

18   that your product is substantially equivalent to, the

19   government will say, "We don't need the clinical trials."  You

20   can have it approved just as long as you're going to use it in

21   the same way that those previously approved products that your

22   product is substantially equivalent to, you know, that those

23   labels are followed.

24        Surgeons chose to use Calstrux like they used other

25   bone void fillers for years before for that scaffold to grow

1    bone across and for volume to fill voids during spine fusions.

2    Unlike OP-1 which stimulates the bone cells, Calstrux is an

3    inactive product.  Sometimes Calstrux would be used alone as a

4    bone void filler, like where there's a trauma and a divot in a

5    bone, or a surgery that creates a divot in a bone, it would be

6    used -- and usually and oftentimes with patients who heal fast,

7    children and the like.

8         But more often, surgeons chose to combine Calstrux

9    with other graft materials in bone grafts including OP-1.  Now,

10   importantly, experts will be in here to testify that mixing a

11   product like Calstrux with OP-1 Implant or putty doesn't change

12   how OP-1 works.  It doesn't change it.  It doesn't create a

13   new, what they call, mechanism of action, and it does not cause

14   a chemical change in OP-1.

15        The evidence will show that OP-1 produced phenomenal

16   results for patients, many of whom were on the verge of losing

17   limbs or afraid they'd never live again without pain.  You're

18   going to hear about Bryon Friedman of the U.S. National Ski

19   Team who shattered his lower leg in 2001 at the World Cup in

20   France.  We will show you his high-speed downhill crash on

21   tape.  Bryon suffered horrible compound fractures of his tibia

22   and fibula.  The picture that you have here is after the

23   surgeries where they tried to fix it.

24        Bryon was afraid that he'd never walk again without

25   pain until he was treated with OP-1.  You're going to see how

1   that leg changes with another graphic we'll show you later.

2   Bryon ultimately returned to the U.S. National Ski Team and

3   skied again in the World Cup.

4        You're going to hear about a local probation officer

5   named Rachel Joyce, who shattered her tibia in multiple places.

6   Rachel endured numerous failed surgeries over 22 months, lost

7   work, and was faced with the prospect of amputation.  You will

8   hear that OP-1 saved Rachel's leg, changed her life, and

9   allowed her to realize her dream of dancing at her daughter's

10  wedding.

11       These success stories go all the way back to 1991, the

12  same year that Biotech was founded.  You're going to hear that

13  ten years before OP-1 Implant was approved -- remember in

14  '01 -- a man named Aaron Weston from Louisiana had over 17

15  surgeries to repair a leg that was shattered in a car accident.

16  On the very day that his leg was scheduled to be amputated,

17  Aaron's surgeon told him about a clinical trial that was

18  testing a potentially revolutionary new cure called OP-1.

19  Aaron became the first person treated with OP-1.  Within a

20  month his X-rays showed that his leg had begun to heal.  Today,

21  over 20 years later, the bone is strong and he has his leg.

22  OP-1 saved Aaron's leg and changed his life.

23       You're going to hear that these patients came to

24  Biotech sales meetings and told their personal stories of how

25  OP-1 changed their lives.  The men and women who worked at

1    Biotech, including the individual defendants here, had reason

2    to know that OP-1 was a game-changer.  Biotech's dreams for the

3    product and the dreams of these sales managers were vivid and

4    real.  Biotech did not develop OP-1 to make a short-term

5    profit; Biotech's commitment to OP-1 was long term and

6    expensive.

7           You heard a lot about sales goals and money from

8    Ms. Winkler.  Quietly, but you heard it.  The indictment claims

9    that the goal of the criminal conspiracy was to make millions

10   of dollars through fraud.  On that subject, I'm just going to

11   say that Biotech, like every other business in America, did pay

12   attention to sales and revenue, and it rewarded hard-working,

13   successful and compliant sales reps with commission payments.

14   It also established sales quotas for field sales

15   representatives.

16          Biotech's parent, Stryker Biotech, is a public company

17   with shareholders to represent and employees to pay.  But none

18   of that is criminal.  It's not even unusual.  Ms. Winkler

19   unfairly ignores that Biotech's primary mission during the

20   supposed conspiracy was not to make quick money; it was to

21   complete clinical trials with OP-1 and secure premarket

22   approval.  The company knew that that would take a long time

23   and come at a huge price.  In fact, during the mid to late

24   2000s, Stryker Corporation invested hundreds of millions of

25   dollars developing OP-1 and researching other products it hoped

1    to make from BMP7.  But that was okay.  Stryker had a dream and
2    was willing to wait.

3          Let's talk about the FDA for a moment.  Clearly the
4    FDA is a very important government agency to all of us.  Its
5    primary mission is to promote and protect the public health.
6    It does have responsibility to make sure that our food is safe,
7    our drugs and devices are both safe and effective.  It does
8    review and approve medical devices for manufacturers like
9    Stryker Corp. and Biotech, and it regulates how those
10   manufacturers market those devices.  I will tell you that while
11   the FDA's a government agency and the Stryker company's a
12   business, they share a common goal of helping patients.  In
13   short, Stryker Biotech -- and I would add, these men -- have
14   enormous and genuine respect for the role the FDA plays in this
15   country.

16         But I'll also tell you that while the FDA plays that
17   very important role -- and this is the law -- it has no
18   authority over how any physician practices medicine or over how
19   surgeons choose to use FDA drugs and devices.  The reason for
20   that is because doctors have to be able to use drugs and
21   devices in ways they believe will benefit their patients
22   because medical science on devices moves much faster than the
23   FDA does.

24         Surgeons will see how a device works to treat one
25   condition, and a drug as well, and that experience leads the

1    surgeon to believe that it might also just work on another

2    condition, very often a condition not covered by the device's

3    label.  So off-label use by surgeons is not only legal but it's

4    essential to their ability to effectively treat their patients.

5    I don't expect you're going to hear anything different on that

6    from the FDA or even the prosecutors.

7           One off-label use we're all familiar with is baby

8    aspirin for stroke or heart attack prevention.  That's just one

9    of many off-label uses of drugs and devices we see in everyday

10   life.  In some areas, off-label use by doctors is the norm with

11   cancer treatments, mental illness medications.  A very high

12   overall percentage of treatment is off-label.

13          You're going to hear that off-label use of medical

14   devices, particularly in spine surgery, is also very common.

15   It's standard practice.  Not surprisingly, in spine surgery the

16   technology and surgical techniques are constantly evolving and

17   surgeons are always seeking the latest information.  They learn

18   from medical journals and from their federal -- excuse me --

19   fellow surgeons at professional conferences and continuing

20   medical education programs.

21          But another important way surgeons learn is by asking

22   sales representatives in the field what the latest information

23   on surgical techniques is and how their surgeon peers are using

24   these devices.  These discussions, ladies and gentlemen, are

25   good.  They enable surgeons to achieve better results for

1    patients.  It's really important for you to know that providing

2    information in response -- in this case in response -- to a

3    surgeon's questions, a request for information, is not

4    promotion and it's not illegal.

5        So importantly, who are these surgeons and how do they

6    make their treatment decisions?  They are neurosurgeons and

7    orthopedic spine surgeons, among the most gifted and highly

8    trained physicians in this country.  They go to college, and

9    then four years to medical school, and then to surgical

10   internships, and then to five- or six-year surgical residencies

11   in their specialty.  And even then sometimes to one or two more

12   years in advanced fellowships in spine procedures.

13       These surgeons write and edit articles for major

14   scientific journals; they perform clinical research; they hold

15   leadership positions in the American Academy of Orthopedic

16   Surgeons and the North American Spine Society; some of them

17   teach at major universities; some are in our communities,

18   they're community-based surgeons; and some are renowned

19   clinicians who have practiced for decades and perform hundreds

20   of surgeries every year.

21       These surgeons include men like Dr. William Caton.  If

22   you just look at your monitor for a second and just see, as you

23   can see -- well, let me just -- he's the former president of

24   the California Association of Neurological Surgeons.  Right now

25   he's chairman of the Department of Neuroscience at Huntington

1    Memorial Hospital, big hospital in Pasadena where the Rose Bowl

2    is, right near LA.  Dr. Caton is a nationally prominent

3    neurosurgeon who grew up in Newton, studied at MIT.  He has

4    performed over 10,000 brain and spine surgeries.

5           So what's a neurosurgeon?  Well, you hear people say,

6    "He's no brain surgeon," right?  Well, Dr. Caton is a brain

7    surgeon.  He's both a brain surgeon and a spine surgeon.  He's

8    going to come in here and testify before you about the

9    incredible results he has achieved in over 200 spine surgeries

10   on sick and elderly patients in California with the

11   OP-1/Calstrux combination.

12          These surgeons also include trauma surgeons like one

13   who's going to come in and tell you that he chose to combine

14   Calstrux and OP-1 to fill a three-inch void in his patient's

15   crushed leg because using OP-1 according to the label would not

16   have provided enough total product.  Another very impressive

17   trauma surgeon will testify that he used OP-1 off-label to heal

18   soldiers injured in Iraq and Afghanistan whose only alternative

19   was amputation.

20          Now, it is important to note that Dr. Caton and other

21   surgeons, they didn't always choose to mix OP-1 with Calstrux.

22   It wasn't reflexive; it was thoughtful.  They made the

23   decisions about what and how to mix based on their individual

24   patients' needs.  Before Calstrux was introduced in 2004, there

25   were over 100 other bone void fillers on the market.  So you

1    remember that substantially equivalent to Calstrux --

2    substantially equivalent to others -- Vitoss is one you'll hear

3    about and you'll hear about others.  Those, for years, have

4    been providing that structure, or scaffold, that the stimulator

5    product, the bone, or the OP-1 or the InFuse stimulated.

6          Even after Calstrux was on the market, over half the

7    time surgeons didn't use Calstrux with OP-1.  They made a

8    choice.  They would choose instead to combine OP-1 with other

9    things:  bone chips, bone marrow and blood, and other bone void

10   fillers like Vitoss.  It's safe to say, the point is, that

11   surgeons, they know their own minds.  They make their own

12   decisions based on what they think is best for patients.

13         So -- I'll take a quick drink.

14         What I've tried to do so far is to give you what we

15   believe to be the very important factual context for this case.

16   It will be proven by lay and expert witnesses as well as

17   documentary evidence.

18         So what is the government's case?  And you're going to

19   have the indictment back in the jury room.  What does the

20   indictment say is the prosecutor's main allegation?  The

21   prosecutors say that the defendants manipulated, lied to and

22   defrauded surgeons.  They tricked surgeons into using OP-1 and

23   Calstrux together.  The prosecutors also say that the

24   defendants formed a criminal conspiracy to target and defeat

25   their agency, the FDA, through lies, trickery and deceit.  But

1    they also say that they did it mainly by manipulating the

2    surgeons, all right?  So let's step back and ask:  Which

3    surgeons did the prosecutors Biotech, Bill, Dave and Jeff,

4    supposedly trick?  I'd like you to look at your monitor for a

5    moment.

6          The indictment specifically identifies only seven

7    surgeons:  Drs. H, P, C, D, M, I, and R.  Now, you would think

8    that before bringing these very serious criminal charges

9    bringing us all together, the prosecutors would have taken the

10   time to interview these seven surgeon victims, right?  They

11   would have wanted to confirm that the supposed victims were

12   actually victimized, right?

13         Well, apparently not.  Incredibly, before hauling

14   these defendants into court on criminal charges, the

15   prosecutors and their hefty core of investigative agents never

16   interviewed even one of these supposed victim surgeons.  They

17   never spoke with them.  They never even tried to speak with

18   them.  They took two years before this indictment to

19   investigate.  They could have taken longer.  There was no

20   deadline to meet.

21         They had the awesome power to subpoena to the grand

22   jury any person, including surgeons anywhere in the country.

23   They had the time to compel dozens of people to testify before

24   the grand jury, but not these surgeons.  They had the time to

25   pore over millions of pages of emails and other documents and

1   cherry-pick -- the ones Ms. Winkler had in her hand -- a

2   handful of emails, isolate them and present them in the most

3   negative possible light.  But apparently, they had no time to

4   ask the surgeon victims:  "Were you tricked?"

5        Ladies and gentlemen, they may not have talked to the

6   surgeons, but we did.  And because of that, you're going to get

7   to hear the surgeons' side of the story.  Let's stop and think

8   about this for a second.  The defendants in this criminal fraud

9   case who, as the Court will tell you, have no burden to do

10  anything at all and are entitled to just look the prosecutors

11  in the eye and say, "Prove it," are the ones who will bring the

12  supposed victims of this fraud here to testify.

13       Why will that testimony be important?  Well, because

14  these surgeons, whose full identities you're going to have, and

15  who are going to take that witness stand will tell you three

16  things:  The defendants did not lie to them; the defendants did

17  not deceive them; the defendants did not defraud them in any

18  way.

19       Ladies and gentlemen, the key question teed up by this

20  indictment is whether the defendants intentionally manipulated

21  and tricked surgeons into using the OP-1/Calstrux combination.

22  The answer to that is no.

23       Now, let me talk just briefly about the relationship

24  between those highly skilled and trained surgeons and medical

25  device sales reps.  You're going to hear over and over in this

1    case that the key to a sales rep's success is building a

2    relationship of trust with the surgeon.  You're going to hear

3    that from sales reps and surgeons alike.  Sales reps work hard

4    to develop trust with their surgeons.  Every interaction with a

5    surgeon's an investment in the rep's career.  A sales rep's

6    relationship with the surgeon is even more important than his

7    or her relationship with their own company, like Biotech.

8         Use your common sense.  Does it make any sense for

9    those Biotech reps to intentionally lie to or trick their

10   surgeons?  These surgeons are smart.  They are not easily

11   fooled.  They're specialized, in a small, tight-knit community.

12   They all talk to each other.  There aren't that many of them.

13   Lying to even one of them is professional suicide.

14        Also, OP-1 was a long-term play for this company.

15   Biotech fully expected to get the PMA approval Ms. Winkler

16   mentioned, and the rep's expectation was what -- they'd be

17   calling on these same surgeons for years to come.  Would they

18   put all of that at risk to make a short-term buck?  No way.

19        So apart from discussions with sales reps, how did

20   surgeons learn about the prospects for mixing OP-1 and Calstrux

21   together?  Now, the history's important.  For many years before

22   these products came on the market, surgeons were combining

23   other substances to create these bone grafts, malleable bone

24   grafts, that had each of the necessary elements:  cells,

25   stimulation, structure.  Surgeons mixed or combined natural

1  graft materials like bone chips and cadaver bone, as well as

2  synthetic materials like these bone void fillers.  So that was

3  all going on before OP-1 and before Calstrux.

4       But there also was a body of scientific literature

5  going back to the 1990s documenting and endorsing this

6  practice.  You're going to have all these articles.  These are

7  scientific articles during the 1990s and the 2000s.  In fact,

8  this document -- this document right here that you're going to

9  have.  I'll just hold it up -- shows that by 2006 there were

10 over 800 -- 800 -- peer-reviewed -- that means

11 physician-reviewed -- journal articles written by surgeons

12 featuring OP-1.

13       The articles showed that combining graft materials --

14 the combining of them, mixing them -- was the standard of care.

15 That was the surgeons' standard of care.  The article shows

16 that OP-1, and later the OP-1/Calstrux combination, produced

17 good results.  Look here.  One more.  I'll just show you

18 particularly.  Remember Dr. Urist, the scientist at UCLA?

19 Well, he wrote an article in 1983 that said that tricalcium

20 phosphate -- which Calstrux is made from.  Calstrux doesn't

21 come on the market for another, what, 21 years -- was a

22 promising delivery system for bone morphogenetic proteins like

23 OP-1.  And again, OP-1 was nowhere to be seen yet either.  Back

24 in '83 this Noble Prize person who was recommended is saying:

25 Listen, tricalcium phosphate and BMPs could work well together.

```
 1              So now let's step back.  And I'm going to get now to
 2      where -- what I call -- well, it's the government's
 3      allegations -- I see it as a grab bag of disconnected
 4      government allegations, all right?  So what is it?  We see
 5      three things:  alleged affirmative misrepresentations, supposed
 6      failures to disclose information, and then they talk about
 7      off-label promotion of misbranding.
 8              So what are some of the -- in the first category --
 9      allegations about, you know, the misrepresentations?
10      Ms. Winkler says sales representatives would hold out to these
11      surgeons a ball of either OP-1 and Calstrux, or maybe even just
12      Calstrux, and say it's all OP-1.  Do you know what's
13      interesting?  You don't have to look any further than the
14      indictment itself at another allegation.  Do you know how
15      ridiculous that is?  Probably their main off-label promotion
16      allegation is that we suggested that surgeons mix the two of
17      them.  So how can it be fraudulent, how can it be tricky, how
18      can it be intended to defraud a surgeon for someone to hold out
19      and say it's all OP-1?
20              I'm just going to show you a quick graphic on one of
21      those mixing instructions.  Look here.  This is one of the many
22      that Ms. Winkler said the company was giving out to defraud
23      surgeons.  It says right -- it shows right in there --
24      obviously, their mixing instructions.  Two products:  OP-1
25      Putty and Calstrux, okay?  So it's just entirely inconsistent.
```

1          Also, these products, they come in separate packages,

2     separate boxes, you know?  Calstrux:  It's kept in the

3     stockroom at room temperature.  OP-1:  It's kept in the

4     refrigerator.  Invoices you're going to see plainly reflect

5     that OP-1 and Calstrux are two different products, and they're

6     being identified as such on invoices going to the surgeons'

7     hospitals.  Fraud?  I don't think so.

8          Another one that she doesn't mention that's prominent

9     in the indictment is the defendants supposedly told surgeons

10    that HDE approval, which is what the OP-1 products had, were a

11    stepping stone to premarket approval.  Now, first of all, this

12    is the sticker that's on the side of the OP-1 boxes.  It shows

13    that they're humanitarian devices.  They're not PMA-approved.

14    So the surgeons had them and knew.  But also, Biotech and its

15    employees obviously did view HDE status as a stepping stone to

16    PMA and they were shooting for it.  But they did look at it as

17    one step towards it.  There's nothing fraudulent about them

18    saying that.  Now, Ms. Winkler talks about -- says it's

19    fraudulent because the company said Calstrux was an extender,

20    or a carrier, for OP-1; that Biotech was fraudulently telling

21    surgeons that Calstrux was either part of OP-1 or that there

22    was no basis for saying it.

23          I mean, clearly these are two different -- they're two

24    different products.  Surgeons understood what they were --

25    structure, scaffold, stimulation -- and what they were not.

1    They weren't deceived in any way if and when the company said,

2    "Listen:  Surgeons are using the product, Calstrux, as a

3    carrier or an extender for OP-1."

4         Now, the second type of alleged fraud that the

5    prosecutors allege is that the defendants tricked doctors by

6    what they didn't say; in other words, the defendants supposedly

7    committed fraud by failing to disclose information.  Well, what

8    information are they talking about?  The indictment talks

9    about -- says that we didn't disclose that mixing -- the

10   OP-1/Calstrux combination wasn't approved at the FDA.

11        Well, we did tell surgeons that information.  How did

12   we do it?  The FDA-approved labels -- and you're going to have

13   them in the jury room -- for OP-1 and Calstrux, they accompany

14   every box -- tells surgeons exactly what the indications are

15   and what they're not.  That's one way.

16        Another allegation:  The government says that

17   OP-1 -- that we never said that OP-1 and Calstrux has not been

18   clinically tested in humans.  Look at the OP-1 Putty label.  It

19   says that the product hadn't been clinically studied in humans

20   for its approved indication.  Also, on Calstrux, surgeons knew

21   what a 510(k) product was, a substantially equivalent product

22   to another one already on the market, and they also understood

23   that in that case there weren't clinical trials of humans that

24   went into it.  It's kind of a fast-track approval.  Surgeons

25   knew that.

1          Now, the biggest allegation about what we didn't say,

2    the government says we failed to tell surgeons about adverse

3    events including -- and you'll have it in the indictment --

4    inflammation, drainage, impaired wound healing.  Well, first,

5    the company -- and you'll see the evidence -- diligently

6    tracked adverse events.  And only 63 adverse events were

7    reported in over 10,000 total surgeries with the OP-1/Calstrux

8    combination.  In any event, the prosecutors will concede again

9    they cannot prove the combination caused any adverse events,

10   and the very definition of adverse events, it doesn't mean that

11   the surgeon says, "I think it's the product."  And it doesn't

12   have to be a serious adverse event; it could be something very

13   minor.  So that's one response.

14         But another one is we did tell surgeons over and over

15   again about the possible adverse events associated with these

16   products.  How did we tell the surgeons?  Well, again, through

17   our FDA-approved labels which were -- I'm not going to show it

18   now and slow it down, but it shows that -- it shows the

19   possible adverse events, and they're the same adverse events

20   that the government says we failed to disclose.  They're on the

21   label for the surgeon.

22         How else did we tell surgeons about the adverse

23   events?  Well, the company put out marketing materials.  And

24   those materials, like the label, clearly disclosed the same

25   types of adverse events that the prosecutors say were not

1  disclosed.  How else?  The company reported to the FDA every

2  adverse event associated with OP-1 used alone, and also

3  reported every adverse event when OP-1 was used with any other

4  product, including Calstrux.

5          Biotech sent reports which met -- what you'll

6  understand to be here MDR -- medical device reporting

7  requirements to the FDA.  That information, the information

8  from those reports, was posted on the FDA's website for

9  surgeons to read.  On other adverse events that didn't meet

10 that MDR standard, the company reported all adverse events, as

11 they were required to do, to the FDA in their annual reports.

12 You're going to have those reports to review.

13         How else did we disclose?  Well, after learning of a

14 handful of adverse events in '05 -- remember, Implant:  '01;

15 putty:  '04; Calstrux:  '04.  Well, in '05 we got a handful of

16 reports, seven, of adverse events.  Not serious adverse events.

17 And so the company decided to send out to surgeons a special

18 letter:  Forget the label.  Forget the reporting.  Let's send a

19 "dear-doctor" letter.

20         Can we see it, please?

21         And here it is:  September 7, 2005.  "Dear valued

22 customer, over the past few months we've become aware of

23 instances where Stryker TCP Putty" -- that's the early name for

24 Calstrux -- "appeared to have inappropriately migrated into

25 subcutaneous tissues.  The majority of these instances have

1   occurred when Stryker TCP Putty has been used in combination

2   with other products in distal extremities where there appears

3   to be difficulty in containment of the TCP product with

4   surrounding tissue."

5          So who did they send it to?  Well, they sent it to

6   every known user, over 700 -- every known surgical user of

7   Calstrux.  No disclosure?  Yes, disclosure.  The prosecutors

8   cry fraud -- Ms. Winkler spoke about it -- based on the

9   company's failure to send another letter in February of 2006.

10          Yes, it is true that in February 2006, just five

11   months after this letter was sent, the company considered

12   sending, but did not send, another letter to surgeons.  Why?

13   Criminal fraud?  Mr. Heppner, Mr. Whitaker, Mr. Ard engaged in

14   criminal fraud?  No, not at all.  There was a consensus

15   decision at headquarters in Hopkinton not to send a letter at

16   that time.  Why?  Well, mainly because another letter had just

17   been sent six months earlier, and Biotech had reason to believe

18   that the adverse events were caused by a few surgeons'

19   techniques.

20          Who made the decision?  Mr. Heppner?  Mr. Whitaker?

21   Mr. Ard?  Someone else who's alleged to be a criminal

22   coconspirator?  Not at all.  You're going to hear that Beth

23   Staub was involved in that decision as the head of all

24   regulatory; Bernadette Alford.  She's going to be the second

25   witness; Judith Sernatinger, VP of quality assurance; John

1    Houghton, the first witness, VP of marketing and sales; Sau Gee

2    Yung, the head of operations; Michael Silverman, VP of clinical

3    affairs; Dean Falb, VP of research and development.  The brain

4    trust at the home office made the decision:  "Not yet.  Not

5    now."

6           Now, the emails that Ms. Winkler had from the sales

7    managers, whether it be Mr. Heppner or Mr. Whitaker, they don't

8    prove fraud.  Why not?  Well, first, everyone at Stryker

9    Biotech, including these people, strongly believed in the

10   patient benefits of OP-1.  And that's important not to lose

11   sight of, okay?  Yes, Bill Heppner was outspoken and supportive

12   about the sales effort.  He's a great athlete; he's

13   competitive; he was supportive.  He was a warm-blooded

14   participant in the whole sales effort.

15          Bill fully supported sending another Calstrux letter

16   to the people who mattered, the surgeons, even then when it

17   wasn't sent, as Ms. Winkler said, but he was concerned that

18   sending a letter to institutional review boards, to

19   administrators at hospitals -- some might be surgeons but most

20   not -- that might cause an overreaction that wasn't warranted

21   given the limited adverse events that had been reported up to

22   that time.

23          But it's important to note Bill wasn't the

24   decision-maker.  None of these men were the decision-maker of

25   whether a letter would be sent to the IRBs, and he never

1    expected it to be.

2          The prosecutors harp on in the indictment --

3    Ms. Winkler read them -- Bill's emails.  But the emails don't

4    prove fraud.  What do they prove?  They show that Bill is

5    openly telling the decision-makers at headquarters in

6    Hopkinton -- Bill's up in Chicago, in the field, all right --

7    what he believed the impact on IRB administrators would be if

8    they received a letter about Calstrux.  That's not fraud.

9          Each individual in the process played his or her role

10   appropriately.  It was a robust process, as you'll see.  The

11   sales managers offered their perspective, but it was the

12   regulatory people, including the second witness -- the first

13   witness too -- and others at headquarters who are not alleged

14   to be criminal coconspirators who made that consensus decision.

15         So what was the outcome of that process?  Well, the

16   company came up with a plan to better and more fully assess the

17   adverse events.  What was the plan?  Ms. Winkler mentioned part

18   of it.  Mr. Houghton's training in the beginning of March, that

19   was part of it.  Another part was the regulatory group was to

20   conduct, and did conduct, what's known as a health hazard

21   evaluation to better understand what was happening with the

22   products.  Headquarters was going to continue to assess whether

23   another letter -- remember the September '05 one?  Whether

24   another letter to surgeons was warranted.

25         What did the company conclude after that process?

1    Well, they decided ultimately to do more than just send a

2    letter.  And you're going to hear about it.  It's incredible.

3    A criminal fraud by not sending a letter in February or March.

4    Here we are in the summer, same year.  What do they decide to

5    do?  Well, after this regulatory letter assessment, the company

6    decided, proactively, voluntarily on its own, to advise the FDA

7    of a Calstrux label change it was considering, about which it

8    wanted to send another letter to the surgeons.

9         Here's the letter that Biotech sent to over 700

10   surgeons when it followed through and changed the Calstrux

11   label.  So they complain about not sending a letter in March?

12   Well, here they are, they're changing the label and sending

13   this label to doctors, "Important safety alert:  Calstrux.

14   Calstrux should be used as directed.  Do not exceed total

15   liquid advised or overfill the defect site with Calstrux.  The

16   volume of Calstrux used should approximate the size of the

17   defect.  In addition, Calstrux should not be used in

18   combination with other products.  Adverse events, including

19   localized induration, swelling and inflammation, et cetera, are

20   possible."

21        Now, the label change, let me just tell you, that's

22   what they call a precaution.  This is a conservative step, a

23   conservative company saying:  Surgeons, you're choosing to use

24   Calstrux with OP-1.  We're going to put on that label --

25   because we have some reports, you know, not serious adverse

1    events but -- not a lot, but some.  So we're going to put a

2    precaution on the label.  The FDA edited that letter's content

3    and approved it before it went out.

4         We didn't disclose to surgeons?  Yes, we did.  Just --

5    you know, you're going to hear some evidence.  There's a phone

6    call in August.  There's ten people on the phone from the FDA

7    and one for -- excuse me -- and six from Biotech and so I just

8    want to make one note.  You know, the whole complaint here is,

9    gee, the FDA didn't know about the combination and we weren't

10   telling them enough.

11        Right on that the company volunteers, Listen:

12   Calstrux is being used 90 percent of the time with OP-1.  Yes,

13   it's a bone void filler but it's used a lot.  These surgeons

14   are using it a lot as a carrier and extender.  Is that evidence

15   of a conspiracy?  I don't think so.  They're talking to the

16   FDA.

17        These, ladies and gentlemen, were conservative steps

18   by responsible people.  Any delay from February to August was

19   not due to a regulatory person's diligence -- was due to a

20   regulatory person's diligence, not to the actions of alleged

21   coconspirators.

22        Let me put up something here that I think says, you

23   know, a lot about the government's case.  It's a little

24   crooked.  It won't be up long.

25        So listen, this is the way the indictment is

1   structured, all right?  They say that in Hopkinton, Mr. Philip,

2   Biotech, the president -- he's a defendant in the indictment.

3   He's an alleged coconspirator.  The other alleged

4   coconspirators and defendants here are Bill Heppner, Jeff

5   Whitaker and Dave Ard.

6        Bill was the national sales director back at this

7   time; Jeff and Dave, they were regional sales managers.

8   They're all out in the field, all right?  Dave is out west;

9   Jeff's southeast; Bill is heading it up and he's in Chicago.

10  This man named Peter Murphy, he's the northeast manager; Ryan

11  Denny, midwest manager, all right?  So Denny and Murphy:

12  coconspirators, says the government, not indicted.  And down

13  here lots of sales reps, criminal coconspirators, but not

14  indicted.

15       But the thing that really doesn't make sense is on a

16  case where you're saying, gee, the company failed to disclose,

17  failed to talk to surgeons, failed to tell IRBs important

18  information, it's these people who were responsible for making

19  those decisions.  They're -- as far as the government has

20  alleged, they're innocent, all right?  They haven't done

21  anything wrong.  They're not criminal coconspirators like

22  Mr. Philip and everyone down here out in the field, and yet

23  these are the people who are making the decisions about do we

24  send a letter in February or March?  You know, what do we do

25  vis-à-vis the FDA?  What do we do vis-à-vis the surgeons in

1   terms of getting them more information?  The point of this is

2   that the government's conspiracy allegations don't make any

3   sense.  And we're going to revisit this at the close of the

4   case.

5          So just a note.  I mentioned IRBs.  We didn't think it

6   was a big part of the case but, you know, I think what

7   Ms. Winkler is saying, we failed to disclose to IRBs adverse

8   event information too.  Well, we didn't fail to disclose

9   adverse event information to IRBs.  Remember, IRBs play that

10  role at the hospitals, where surgeons work.  The big thing

11  about IRBs is their main relationship, it's not with the

12  manufacturer.  These are administrators who are gatekeepers to

13  some extent, but they get to oversee what products are used at

14  the hospital.  The main relationships IRBs have are with

15  surgeons; they're not with the manufacturers.

16         The law?  What does the law say about what

17  manufacturers have to tell IRBs?  Well, the law requires that

18  companies report -- and this makes sense -- to IRBs only those

19  adverse events that happened at the IRB's hospital, all right?

20  Not every adverse event that comes in from Australia or Europe

21  or California, just those that happen at the hospital.  And do

22  you know what?  We did.  And the evidence will show we

23  disclosed to hospital IRBs every serious adverse event, which

24  is what the requirement is, that happened at their hospital.

25  Also, you know that August 2006 letter the company sent to IRBs

1     in October of '07 saying they should have the letter that shows

2     the label change on Calstrux?  Also, despite the fact that we

3     don't have a big relationship with IRBs, you're going to see

4     evidence of a lot of things we did give to -- send to -- the

5     IRBs about OP-1 and about Calstrux.

6          All right.  Just one other point about adverse events.

7     Ms. Winkler mentions you're going to see that there was even

8     excess bone growth with some patients.  Well, there were a

9     couple.  But just think about that.  That's what OP-1 does.  It

10    grows bone.  They say it doesn't work?  It works.  That's the

11    adverse event?  If that's the adverse event -- I mean, I think

12    that tells you a lot about this case.  And also, the label

13    doesn't mention that's a possible adverse event?  Yeah, it

14    does.  It mentions it as a possibility even when two units are

15    used.  And as you'll see, sometimes surgeons decided to use

16    more than two units.  Why?  They're on a big surgery where they

17    wanted more stimulation.  So if that's the adverse event

18    evidence, I think it tells you a lot.

19         So let me talk about the third category of government

20    allegations briefly.  And this is a little bit heavy but I'm

21    going to try.  In the third category, the government says the

22    company engaged -- Count 7 to 12, just against the company, as

23    Judge O'Toole said -- in off-label promotion.

24         The government here is trying to equate communications

25    by Biotech with surgeons about the OP-1/Calstrux combination

1    so-called off-label promotion with fraud.  Judge O'Toole's

2    going to instruct you that the -- he already did, actually --

3    that the misbranding charges against Biotech require that

4    prosecutors prove not only misbranding on Counts 7 to 12, but

5    also, that the company intended to defraud -- same theme --

6    surgeons or the FDA.

7            As you'll hear during the trial, the defendants

8    provided information in response to physician requests.  Again,

9    no -- FDA:  No oversight over the surgeons.  Surgeons can ask

10   questions; manufacturers can answer them.  That's not off-label

11   promotion.

12           But even when off-label promotion does occur -- in

13   other words, you don't wait for the question or you think

14   there's a question, but the prosecutors or the FDA might

15   disagree -- that's not felony misbranding, which the

16   prosecutors have charged here.  7 to 12, felony misbranding.

17   Not down here, okay?  So it's not felony misbranding unless

18   they also show that the company intended to lie to or deceive

19   surgeons.

20           All right.  On this subject, Ms. Winkler held up a

21   couple of slides.  And I don't know if they're still over here

22   but I would be happy to hold them up again.  You're going to

23   see them with the first witness, John Houghton.  And I think

24   that their presentation on this is misleading.

25           Now, in March 1, as you'll hear, 2006 -- remember when

1    the letter didn't go out and they decided to do some training

2    and the health hazard evaluation, et cetera -- John Horton, who

3    is going to be the first witness, conducted a very conservative

4    training of the sales force as part of Biotech's effort to

5    address the fact that a few surgeons had reported adverse

6    events in surgeries involving the combination.

7            On that first slide that Ms. Winkler kind of held up,

8    it says on it:  Do not promote off-label, do not do this, do

9    not do that, do not do the next thing.  That slide -- all our

10   view -- just -- and we'll get to the witnesses -- proves only

11   that Biotech was responding conservatively, responsibly to the

12   reports of adverse events by telling reps:  Don't engage in

13   off-label promotion.

14           Again, off-label promotion is just a regulatory

15   promotion.  It can be a misdemeanor, criminal violation.  It's

16   not what's charged here.  What's charged here is misbranding

17   with an intent to defraud, to deceive surgeons.

18           The second slide she held up, it says on them, the top

19   of it -- you'll have it tomorrow -- "Consequences of off-label

20   promotion."  It probably was not created by John Houghton,

21   someone else who worked on the slide deck with him.  It's

22   unclear, at least to us, who drafted it.  Probably somebody in

23   regulatory at Biotech in Hopkinton, but definitely not a

24   lawyer.

25           Now, as Ms. Winkler says, it uses some big words about

1    consequences, right?  The slide says, "Criminal misbranding

2    prosecution is a possible consequence of off-label promotion."

3    Now, it's not clear what the person who drafted the slide

4    intended to convey, but off-label promotion alone is only a

5    regulatory violation.  At most, a misdemeanor.  We don't have

6    any of those charged here.  It's not what's charged in 7 to 12

7    in the indictment, the felony misbranding.

8            As Judge O'Toole will tell you at the end of the

9    case -- and he already did mention it -- to prove felony

10   misbranding the prosecutors have to prove beyond a reasonable

11   doubt that Biotech acted with an intent to defraud or they're

12   to be found not guilty.  The evidence will show in this case

13   that Biotech never acted with that criminal intent, and for

14   that reason alone we're going to ask you on Count 7 to 12 to

15   find the company not guilty.

16           Now, on this subject of supposed off-label promotion,

17   they've got a laundry list of allegations.  Again, vague,

18   sometimes inconsistent allegations.  But they don't -- they

19   don't even prove simple regulatory violations much less

20   criminal fraud.  Let's just review a few of them.  Let me just

21   see the ones that she mentioned.  I think Ms. Winkler mentioned

22   Biotech trained the representatives how to mix the combination.

23   There will be evidence that there was training and

24   demonstration, or showing reps what surgeons were doing.

25           Now, our answer to that is it would have been

1    irresponsible for the company to put its reps out in the field

2    when the standard of care was mixing without telling them that,

3    without people talking about the obvious fact that surgeons

4    were choosing to mix OP-1 and Calstrux.  But in any event,

5    mixing, or talking about mixing, doesn't equate with fraud and

6    doesn't prove Count 7 to 12, which is felony misbranding.

7            Also, Ms. Winkler talks about, Oh, gee, they've got

8    commission-based pay and quotas.  Well, as many of you might

9    know, commissions are standard in a lot of sales industries,

10   and quite standard in the medical device industry.  Paying a

11   sales rep on a commission basis is not criminal.  It tells you

12   a lot about these allegations.  Giving sales reps quotas,

13   that's not criminal either.

14           Ms. Winkler mentions, Oh, the company -- even though

15   the label said "two units per patient," the company promoted

16   one unit to surgeons instead of two units.  Well, the first

17   response:  It's ironic to me that the prosecutors would suggest

18   that this company that was trying to make gazillions of dollars

19   tried to sell fewer units per patient and make less money.

20           But the big answer is:  It's the surgeons who were

21   using to use one unit when the size of the void calls for it.

22   Dr. Caton will tell you:  "If I have a big void that needs to

23   be filled, I'm going to use two.  If you've got less, I'm going

24   to use one."  It's the surgeons.  That's why surgeons get to do

25   what they want; why the FDA doesn't regulate them.

1          Ms. Winkler mentions discounted pricing like it's a

2     bad thing, all right?  She says the products were tied together

3     and discounted.  First, they weren't tied together.  But the

4     company did give discounts to hospitals they were working with

5     for a long time.  Hospitals were trying to lower the cost of

6     healthcare, and Stryker was going along.  That doesn't show

7     off-label promotion.

8          Let's talk about the mixing instructions.  And there

9     were a lot.  So the company's response on that is surgeons

10    wanted to know what is another surgeon doing?  What is making

11    sense?  What is working?  And that question is out there.  It's

12    out there throughout the conspiracy.  So the company at times

13    did give mixing instructions.

14         Now, were those fraudulent?  Were those intended to

15    trick the surgeons to harm the patients?  No, definitely not.

16    Those were the reps' best efforts to convey information about

17    what was working, what wasn't, what proportion do you use the

18    OP-1 and the Calstrux in?  Do you mix in blood?  Do you mix in

19    saline?  Do you mix in bone chips?  What do you do?  What makes

20    sense?  Is that fraud?  No.  It's an effort to help the

21    surgeons help the patients.

22         Now, fraud on the FDA.  The government says -- well,

23    how do they say we perpetrated a fraud on the FDA?  Well, they

24    say that we conspired to target the FDA for defeat, lies,

25    trickery and deceit.  But what they then break it down into

1    saying is that -- they say that the FDA conspiracy claim rises

2    or falls on whether the evidence supports a criminal fraud

3    scheme against the surgeons.

4         I've already addressed that.  There was no fraud on

5    the surgeons.  But also, use your common sense.  The defendants

6    had no reason to lie to the FDA.  Biotech wanted to have, and

7    needed to have, a good relationship with the FDA because that

8    was important to its effort to get PMA approval for OP-1.

9         But, you know, I do have to -- you know, the

10   indictment says, and Ms. Winkler touched on it -- do you know

11   what one of their big allegations is?  In terms of this fraud,

12   they say in August when we did that label change on Calstrux,

13   the precaution, and sent out the letter to surgeons --

14   remember, they said, Oh, you're terrible for not sending a

15   letter in February and March?  Well, now in August we send one

16   and we tell about the label change.

17        Do you know what they say?  "Fraudulent lulling of the

18   FDA into not investigating you."  Fraudulent lulling.  They say

19   we knew surgeons don't look at labels.  Surgeons don't read

20   "dear-doctor" letters.  It is ridiculous.  It is ridiculous.

21   That is what the FDA conspiracy is.  The government says we

22   didn't do enough in March by not sending a letter; we send one

23   in August, fraudulent lulling.  It's ridiculous.

24        Remember I told you how this case got started, when

25   Stryker Biotech went to the FDA during the height of the

1     supposed conspiracy and said, "We have a problem we want to

2     report to you"?  If the company really was defrauding the FDA,

3     why would it make reports about its own employees' IRB

4     misconduct?  Why would a guilty, criminal-minded company invite

5     the FDA into its own house in Hopkinton?  A company trying to

6     defeat the lawful functions of the FDA would never do that.

7             In addition to the FDA disclosures, in early 2008

8     Biotech gave statements it took from employees about their IRB

9     forgeries to these prosecutors.  The prosecutors had suggested

10    to the company that they wanted the statements and that it

11    would help the company to give them.  Shortly thereafter, the

12    prosecutors threatened the former employees -- the ones we

13    reported, or the conduct of whom we reported to the FDA -- with

14    criminal charges.  Ultimately, you're going to hear --

15            MS. WINKLER:  Objection, your Honor.

16            MR. O'CONNOR:  -- those former employees.

17            THE COURT:  Excuse me.  I'm sorry.  There is an

18    objection.

19            MS. WINKLER:  To the "threatened."

20            THE COURT:  Well, no.  Go ahead.

21            But as long as we paused, Mr. O'Connor, let me remind

22    you of the time.

23            MR. O'CONNOR:  Yes.  I'm just about done, your Honor.

24    Thank you.  I appreciate it.

25            THE COURT:  All right.

1          MR. O'CONNOR:  Ultimately, the former employees cut

2     deals with the prosecutors, agreeing to plead guilty to

3     criminal charges and cooperate against the company.  Under

4     their plea agreements, the former employees are now hoping,

5     you're going to hear, to escape prison terms and financial

6     penalties, not to mention a trial like this one, in exchange

7     for their testimony in this case.

8          When they cut their deals, these former employees knew

9     that they would get no credit for talking about misconduct the

10    prosecutors already knew about from our client, from Biotech,

11    forging of IRB signatures.  They knew they had to help the

12    prosecutors make a new case, so here we are.

13         You will hear and see these former employees whose

14    sentencings the prosecutors have asked to be delayed --

15    delayed -- until after this trial, do their best to earn the

16    prosecutors' recommendations that they not go to jail.

17         Obviously, part of your job will be assessing the

18    credibility of witnesses.  We expect Judge O'Toole will

19    instruct you to be particularly cautious in assessing the

20    credibility of these government witnesses.

21         Ladies and gentlemen, in closing, Stryker Biotech is a

22    good and honorable company that at all times was trying to help

23    patients, not hurt them.  Biotech never would have put its

24    business at risk by defrauding surgeons or the FDA.  Biotech

25    sales reps only gave surgeons information they thought the

1 surgeons wanted and would benefit from.

2        The evidence will show that the defendants are not

3 criminals.  They did not lie, cheat or steal; they did not

4 commit fraud.  We expect it will be several weeks before we

5 have the opportunity to call witnesses for the defense.  I

6 would ask you to listen carefully to all the evidence that

7 would be presented by both sides and reserve your judgment on

8 the fate of the defendants until all the evidence is in.

9        At the close of that evidence, we're going to have an

10 opportunity -- a chance -- to speak to you again, and at that

11 point we're going to discuss why the evidence is wholly

12 insufficient to prove beyond a reasonable doubt that Stryker

13 Biotech is guilty of federal felony criminal conduct.  Indeed,

14 as I said when I began, the evidence will show that this case

15 is nothing more than a misguided prosecution, a gross injustice

16 to these defendants.  For that reason, we will ask you to

17 return a verdict of not guilty.

18        Thank you very much for listening so carefully and,

19 again, thank you for your very important service as jurors.

20        THE COURT:  Jurors, we'll take a short recess before

21 we continue.  Let me just ask -- I'll probably be reminding you

22 of this constantly during the case.  It's important that you

23 reserve any discussion of any of the issues in the case until

24 your formal deliberations.  So even though there may be some

25 temptation to talk about what you've heard from people now or

1    as the case goes on, please stay away from the substance of the

2    case in any of your casual conversations during our recesses,

3    all right?

4            So we'll take a short recess.  We'll resume about

5    twelve o'clock and continue.

6            THE CLERK:  All rise.  The Court will take a short

7    recess.

8            (The Court and jury exit the courtroom and there is a

9    recess at 11:45 a.m.)

10           (After the recess:)

11           THE CLERK:  All rise for the Court and the jury.

12           (The Court and the jury enter the courtroom at

13   12:06 p.m.)

14           THE COURT:  You're already there.

15           MR. ULLMAN:  Ready to go, your Honor.

16           THE COURT:  Mr. Ullmann.

17           MR. ULLMANN:  Thank you, your Honor.  May it please

18   the Court, members of the jury.  My name is Bob Ullmann.  And

19   along with Maya Sethi, we have the privilege of representing

20   William "Bill" Heppner in this case.

21           Stand up, Bill.

22           Tricking surgeons, ignoring safety concerns,

23   defrauding the FDA, these were strong words from the

24   prosecutor.  There's just one problem.  None of it is true.

25           In May of 2005, one of the very first government

1    witnesses that you'll hear from, John Houghton, promoted Bill

2    Heppner to be director of sales for Stryker Biotech, and he

3    remained in that position throughout the time of the supposed

4    conspiracy, not because he was tricky or conspiratorial, but

5    because he was hard-working, earnest, and trustworthy.

6            And you don't need to hear that from me because you're

7    going to hear it from the government's own witnesses.  Bill

8    Heppner is charged in six counts of the indictment: one count

9    of conspiracy, five counts of fraud.  And every one of those

10   charges requires the government to prove beyond any reasonable

11   doubt criminal intent, an intent, intentional violation of the

12   law.

13           It's the complete opposite of the way that Bill

14   Heppner went about his job.  Call this prosecution anything you

15   want, call it misguided, call it overreaching, or call it just

16   plain unfair.  Bill Heppner was wrongly charged.  He's

17   innocent.

18           A little background on Bill.  He grew up outside of

19   Chicago.  In 1987, he was named as one of 20 high school

20   students in the entire country as McDonald's All American in

21   basketball.  He played Division 1 at DePaul until,

22   unfortunately, a congenital spinal condition ended his

23   basketball career.

24           But Bill turned obstacle into opportunity.  He learned

25   a lot about orthopedics, the spine and medical devices, and

1    that led to a career in orthopedic and medical device sales.

2    In fact, by the time Bill had reached his early 30s, he was

3    already in sales management.  But he actually took a step back.

4           In 2002, he went back to a field sales position when

5    he joined Stryker Biotech.  And he did it to join a great

6    company that was developing and selling and marketing a great

7    product: OP-1, a game changer in bone healing.

8           The entire case against Bill Heppner is built around

9    an implausible accusation that a well-respected career medical

10   sales device manager would intentionally trick surgeons.

11   Medical device sales is all about relationships and trust.  You

12   see the same surgeons week after week, month after month.  And

13   the orthopedic medical community is a small world.  You lose

14   the surgeon's trust, you are toast.  Career over.

15          Surgeons trusted Bill Heppner, and you'll see that.

16   And Bill also had the trust of Stryker Biotech management and

17   the sales team because he was straightforward, hard-working,

18   and he could be trusted.  And let me tell you, the accusation

19   that he defrauded the FDA, that is ridiculous.  The FDA

20   wouldn't know Bill Heppner if they bumped into him on the

21   street.  He barely had any contact with the FDA.  That

22   accusation is made up out of whole cloth.

23          Let me tell you a little bit about what Bill Heppner's

24   job was at Stryker.  Because there is so many things wrong with

25   the accusations in this case, it's hard to know where to begin.

1    For one thing, when you hear "conspiracy," you're probably

2    thinking about Bill Heppner skulking along the corridors at

3    Stryker Biotech, although I guess if you're six-foot-eight,

4    maybe it's hard to skulk.  You get my point, okay?

5         Well, Bill Heppner wasn't -- he operated out of his

6    home in Chicago, 900 miles away, all right?  I say that not to

7    distance him from the company because it was a company filled

8    with good people doing the right thing.  But you have to

9    understand when it comes to his communications, he was sending

10   emails from 900 miles away, and he felt sometimes there was an

11   issue that he cared deeply about for the sales force, and he

12   had one shot.  He took his best shot to send an email to make

13   his point.

14        His job was challenging, but it's actually quite

15   simple to explain: hire quality sales reps, coach them, spend

16   time with them.  Now, when you have a national sales force,

17   that involves travel.  And when you have young children, as

18   Bill has, that's difficult.  But you understand that comes with

19   the territory, all right?  And at the same time you have to be

20   responsive to the senior management above you, and you have to

21   be responsive to the sales force that reports to you.

22        The prosecution wants you to believe that Bill Heppner

23   woke up one day -- or maybe they think he woke up every day --

24   and said to himself, You know what I'm going to do today?

25   I think I'm going to defraud surgeons and the FDA, all right?

1          Nothing, nothing could be further from the truth.

2    Bill Heppner did what every sales director in the country does:

3    hire go-getters, help them meet sales objectives and other

4    goals, hold them accountable, but also advocate on their

5    account with the company's leadership.  And nothing he did, as

6    you will see, nothing he did was remotely fraudulent.

7          There's a core question in this case, it's a

8    fundamental question: why did surgeons use so much OP-1 and

9    Calstrux?  Is it that they were deceived?  Or is it that these

10   were actually good products?  And that's going to be your role:

11   to see whether the government has proved and can prove beyond

12   any reasonable doubt that surgeons were somehow tricked into

13   using these products.

14         To answer this, you're going to hear a lot of evidence

15   that OP-1 was a breakthrough product.  You're also going to

16   hear that Calstrux played an important role in surgeries.  And

17   you'll hear that Bill Heppner was passionate about OP-1 and his

18   sales team.  Yes, of course he was competitive.  He wanted them

19   to succeed.  He was open.  He was trustworthy.

20         But what you won't hear, what you won't hear is that

21   Bill Heppner engaged in any fraud because it didn't happen.

22   I'm sure you figured out already you're going to hear a lot of

23   technical information in this case.  You're going to learn a

24   little bit about biology, surgery, government regulation.

25   I know you'll do your best to get it down.

1         But what you really bring to this trial is something

2    very different.  What you bring is your life experience and

3    your common sense.  There's no expert in this world that's a

4    match for your collective knowledge and experience.  Common

5    sense and experience are very important in helping you assess

6    the evidence in this case.  All right?

7         Let me give you one example.  The government told you

8    about this supposed enormous pressure that Bill Heppner and

9    other managers were putting on the sales force, pressure where

10   it was so intense that they somehow had to violate rules and

11   regulations.

12        I'd like to show you an exhibit -- and I'll be showing

13   you just two, but if you -- if -- you don't have out your

14   screens -- right?  And this is an exhibit, Exhibit 143.  This

15   is an exhibit that the prosecutor showed you.  I'm going to

16   read the first paragraph.

17        And this comes -- this comes from Bill Heppner.  This

18   is actually a count -- this is a wire fraud count in the

19   government's indictment.  "If you're getting this email,

20   unfortunately your Calstrux numbers fell below 10 units last

21   month.  Some of our reps have put up huge numbers with Calstrux

22   our first four months and have been able to financially benefit

23   from it at 10 percent" -- I'm sorry -- "16 percent.  We, I,

24   need you to also start showing a northward trend with

25   Calstrux."

1          "We, I, need you to also start showing a northward

2     trend with Calstrux."

3          For those of you who have had bosses or who have been

4     bosses, does that sound to you remotely like the sort of

5     unbearable pressure, the brow-beating pressure to the sales

6     force to the point of fraud?  And I ask you what that says

7     about other parts of the government's case.

8          Your common sense and experience are very important

9     also in assessing the credibility of witnesses.  The

10    prosecution obviously is trying to present Bill Heppner in the

11    worst possible light.  Not surprisingly, there will be some

12    prosecution witnesses who have less-than-flattering things to

13    say about him.  But you will not hear this.  You will not hear

14    a shred of credible evidence that Bill Heppner deceived anybody

15    or suggested to any member of his sales force that they deceive

16    anybody.

17         And then there are a few witnesses -- Mr. O'Connor

18    mentioned them -- that engaged -- members of the sales force

19    who engaged in misconduct with regard to the institutional

20    review boards, the IRBs.  You might think the three individuals

21    here -- Mr. Heppner, Mr. Ard, and Mr. Whitaker -- that they

22    were part of that misconduct.

23         Well, what you'll hear, in fact, is the three of them

24    all played a role in dealing with the misconduct and getting

25    rid of the very few bad apples, okay?  Now, remember though,

1    these are witnesses, these few sales reps, they have sweetheart

2    deals with the government, all right?  They have every motive

3    to please the government because the government's going to make

4    a recommendation to a judge down the road about what happens to

5    them, all right?

6            And you may, from a couple of them, hear different

7    things.  You may hear a few things about Bill Heppner from them

8    that you won't hear from anybody else, all right?  And I

9    believe that Judge O'Toole will give you an instruction on how

10   the testimony of those people must be viewed with great

11   caution.  But I don't think you'll need that instruction.

12   If the couple people with a gun to their head say something

13   different about Bill Heppner than everyone else, I think that

14   you'll easily see through them.

15           There's something else that you're going to bring to

16   this trial, and that's a sense of fair play, all right?  The

17   prosecutor, Ms. Winkler, suggested to you that directions from

18   Bill Heppner to retrieve mixing instructions from out in the

19   field, that that was somehow part of a cover-up.  I'd like to

20   take a few minutes and actually present to you what the

21   evidence will show, all right?  Not this snippet, but in a

22   little bit broader context, okay?

23           In the fall of 2006, Stryker Biotech learned that a

24   sales rep -- Chris Ring's his name -- had posted mixing

25   instructions in a hospital in California.  He posted mixing

1    instructions.  I mean, they were the surgeon's own

2    instructions.  But still, violation of company policy, okay?

3    Because sales reps' companies can answer surgeon questions, but

4    they can't initiate off-label discussion.  You'll hear that,

5    okay?

6           And so if you post written mixing instructions, that

7    can be seen as proactive because a surgeon that didn't ask a

8    question could come into the operating room and, yes, they see

9    a mixing instruction and it is proactive.  They haven't asked,

10   okay?

11          So what does Bill Heppner do about this, okay?  And

12   you may have different views even as to, well, you know, how

13   bad is that?  But it's a violation -- that's a violation of

14   company policy.  And Bill Heppner reacts completely

15   appropriately.

16          In fact, if you put the second exhibit in front of

17   you, he sends a letter to Chris Ring, as we -- I'll just read

18   you a couple portions of it -- "As we have discussed many times

19   with you and all of our representatives is that the only

20   written documentation that you can provide a surgeon" -- "the

21   only written documentation" -- "on the use and mixing of this

22   document is ^  the packing insert which has been approved by

23   the FDA."

24          Now, you can answer a surgeon's questions, but the

25   only written information has to be the packing insert.

 1          And then further down, "Please understand that this

 2     type of behavior is unacceptable and that any further

 3     violations of this type or similar to this will be grounds for

 4     further disciplinary action up to and including termination of

 5     your employment with Stryker Biotech."

 6          Again, does this sound remotely like condoning

 7     violations of company policy -- no less fraud, right?

 8          Okay.  So then the next step, with the support of his

 9     superiors, Bill Heppner tells the sales force, get back, take

10     back -- if you have written instructions out there, take them

11     back, all right?  This is what the prosecutors call a cover-up,

12     okay?  Now, think about that, all right?  You keep those

13     written mixing instructions posted out there, you're violating

14     company policy.  You tell the sales reps to take them down and

15     bring them back, you're engaged in a cover-up.  I mean, how do

16     you win with that logic?  I mean, what kind of fraud is that?

17          Briefly, the prosecutor also mentioned an email in

18     which Bill Heppner -- Bill is advocating against sending a

19     letter about Calstrux to these hospital IRBs.  What the

20     prosecutor didn't mention to you is in that very same email,

21     which you'll see during the trial, I'm sure, in that very same

22     email, Bill Heppner says that he has no problem sending a

23     letter to every surgeon who has used the product, okay?  Any

24     one of those surgeons is free to tell their IRB.  Some might

25     feel obliged to tell their IRB.  Some were members of IRBs.

1   I mean, as evidence of fraud, that doesn't even begin to hold

2   water.

3          The long and the short of that email is simply this:

4   As Mr. O'Connor told you, in the fall of 2005, several months

5   earlier, the company sent a letter warning surgeons of possible

6   adverse events from Calstrux.  It sent it to every surgeon it

7   could identify who had used the product.  Now it's five months

8   later, it's early 2006, there are a small number of reported

9   adverse events.  The company's trying to decide, are they going

10   to send a letter.  And there's a separate question.  Well, if

11   you send a letter, does it go to all the surgeons or does it go

12   to the hospital IRBs?  The headquarters wants to know -- people

13   at headquarters want to know, what does the sales force think

14   about this.

15          And Bill gives a heartfelt response.  He articulates

16   in one email the sales force position.  And he says this:

17   Institutional review boards, they don't even regulate Calstrux.

18   They regulate OP-1, the bone healer, all right?  They don't

19   regulate this Calstrux product.  And if they get a letter

20   warning them about Calstrux, you're going to have one of two

21   reactions.  Either they will be confused or they will assume

22   the worst, right?  They're going to assume there are problems,

23   not just with Calstrux, but they're going to assume that there

24   are problems with OP-1, the product that they regulate.

25          The long and the short of this, as Mr. O'Connor told

1  you, is that 900 miles away from where Bill Heppner is in

2  Chicago, the company's regulatory personnel, the senior

3  management, decide it is not the right time to send a letter.

4  In fact, not the right time to send a letter to IRBs or

5  surgeons for completely legitimate reasons.

6        So what is the government saying here?  All right?

7  A company can't ask its employees for their honest opinion

8  about things?  I mean, honest feedback is not fraud, all right?

9  Email has changed how we communicate.  It's incredibly popular

10 because it's spontaneous.  We've all hit the "send" button and

11 thought, You know what?  I could have phrased something a

12 little bit better.  We've all been misunderstood.  Bill Heppner

13 was open.  He was earnest.  Sometimes he wore his heart on his

14 sleeve.

15       And you know what?  If down the road prosecutors and

16 agents look at every single email you ever sent and they just

17 pick out portions, misleading portions of emails, you know

18 what?  Maybe that's not the best way to be an employee.  But

19 let me tell you something else, all right?  That's precisely

20 why people at Stryker Biotech trusted Bill: because he was

21 open, he was candid.  There's nothing -- and most importantly,

22 there is nothing in any email that you will see that suggests

23 that Bill Heppner engaged in fraud or that he had any criminal

24 intent.  Nothing.  All right?

25       Already I'm hoping you see that a couple of the

1    government's accusations in this case don't quite add up.  They

2    tell you that somehow there's a fraud going on.  Let's confuse

3    the surgeons.  Let's trick them into thinking that OP-1 and

4    Calstrux are all one product.  Oh, but at the same time, let's

5    send them instructions on how to mix OP-1 and Calstrux.

6    Clearly they're two different products.

7         The prosecution told you about supposedly hiding

8    adverse events.  Turns out that they're on the label.

9         The defendants in this case have answers to every

10   accusation.  But there's something important I have to say

11   about that.  This is a criminal case.  It involves our most

12   basic liberties.  And in a criminal case in these United

13   States, defendants and their counsel don't have to do anything.

14   All optional.  Burden from the start to the finish rests on the

15   government to prove its case beyond any reasonable doubt.  And

16   that is fundamental to our system of justice.

17        A little bit about FDA regulations, all right?  And I

18   wish -- I really wish we didn't have to get into them.  And in

19   a way we don't because it's a fraud case.  It's not a case

20   about regulations.  But the prosecutors, I believe, want to

21   take regulatory issues that are complicated, and even, as

22   you'll see, to the FDA, and turn it into a fraud case.  So

23   there are three things you do need to know about the FDA's

24   regulations.

25        One, surgeons can use devices off label, all right?

1    They are free to do what is best for their patients.

2         Two, sales reps can answer questions that are

3    initiated by surgeons about off-label use.

4         And three, which is related to one, of course, the FDA

5    does not regulate the practice of medicine.  It doesn't tell

6    surgeons what approved products to use, how to use them, whom

7    they can ask for guidance, who can be in the operating room,

8    how to educate themselves to get the best results.

9         And let's give the FDA credit for that.  The FDA

10   recognizes that surgeons are well educated, they are well

11   trained.  They are specialists.  They are the decision makers.

12   It's your health and your family and your friends' health

13   that's at stake here, and the FDA recognizes that's what's most

14   important.

15        I mentioned earlier that the entire accusation against

16   Bill Heppner, that someone in his position would engage in

17   intentional trickery of surgeons and the FDA, that it's

18   implausible, all right, for the very reason that deceiving

19   surgeons is a career-ending move.

20        But there's a second reason why this makes no sense.

21   And that's because the surgeons' interests and the interests of

22   Bill Heppner and other sales force members were aligned.  It's

23   accurate information that leads to better-informed surgeons,

24   not deceptive information.  It's accurate information that

25   leads to better-informed surgeons and that leads to better

 1  patient outcomes and that leads to more use of a product, more

 2  sales, and yes, more income for people that are selling the

 3  product.

 4        And if that chain is criminal, you might as well

 5  indict most of the American economy.  Bill Heppner had a

 6  cardinal principle.  He believed that the mission of the

 7  Stryker Biotech sales force was to help surgeons get the best

 8  results: Know your products.  Be there when the surgeon wants

 9  you.  Answer surgeon questions.  You're not a potted plant.

10  You know your products.

11        And 90 percent of the use of these products, as you

12  will hear, was off label.  And nothing wrong about that.

13  That's a surgeon's choice.  So accurate answers to surgeon-

14  initiated questions involve off-label use.  But on label, off

15  label, the operating room, the seminar of the nation's best

16  medical schools, wherever it is, there is nothing fraudulent or

17  deceptive about helping surgeons do their jobs.

18        Bill Heppner tried to follow every rule about

19  providing information to surgeons.  I don't think you're going

20  to hear that he got anything wrong.  But even if he did,

21  getting a rule wrong is not fraud.  It's not fraud on doctors;

22  it's not fraud on the FDA; it is not fraud on anyone.

23        In closing, we have a long trial ahead of us.  I think

24  what the prosecutors are going to try to do in this case is

25  throw a lot of stuff up against the wall and hope that

```
 1   something sticks.
 2          Keep an open mind.  Witness testifying on direct
 3   examination and then cross-examination is coming up around the
 4   bend.  And keep your eye on the ball.  Just keep asking
 5   yourselves, where is the evidence of fraud?
 6          Once you've heard all the evidence, reviewed it,
 7   thought about it, you are going to have no trouble concluding
 8   that Bill Heppner had no criminal intent, that he acted in
 9   complete good faith.  The burden is on the government to prove
10   criminal intent and lack of good faith beyond a reasonable
11   doubt.  And the government is not even going to come close for
12   a very simple reason: Bill Heppner engaged in no fraud.
13          Thank you all.
14          THE COURT:  Mr. Gurney?
15          MR. GURNEY:  Thank you, your Honor.
16          May it please the Court, good afternoon, everyone.
17   I know what you're thinking at this point.  You're thinking
18   this guy -- me -- is the one thing that stands between you and
19   lunchtime.  But I ask for your attention for a little bit
20   longer.  I'm not going to repeat everything that's been said
21   already.  But I'm going to make for you what I think are the
22   essential points about Dave Ard.
23          Again, my name is Brent Gurney.  And I represent Dave,
24   along with my colleague, Miranda Hooker.
25          Dave, would you stand.  Thank you.
```

1          It's my privilege and honor to represent Dave.  Dave

2    has been waiting for his day in court for several years now.

3    Let me say this loud and clear: Dave is innocent of these

4    charges.  Dave is innocent of these charges.  There is not

5    going to be a shred of evidence to support the charges against

6    Dave Ard.  Everything about these charges is inconsistent with

7    Dave, who he is, how he has lived his life, how he conducted

8    himself when he was at Stryker Biotech.  Dave always tried to

9    do the right thing as he believed and understood it at all

10   times.  That is completely inconsistent with criminal intent.

11         Now, Dave is charged in just two counts -- excuse

12   me -- with two things: conspiracy and wire fraud.  The

13   conspiracy charges Dave with a conspiracy to defraud the FDA.

14   We've heard the word "fraud" a couple of times.  What does that

15   mean?  It means to lie, to trick, to cheat.  To deliberately

16   mislead.  That is a completely unfair allegation against Dave

17   who, as you will see, had nothing to do with the FDA.

18         And the second half of that is that he conspired to

19   commit wire fraud.  And then he's charged in a separate set of

20   counts with scheming to commit wire fraud.  Conspiracy in a

21   scheme to commit wire fraud.  To establish a conspiracy, the

22   government must prove first that there was a conspiracy, which

23   is an illegal agreement, that two or more people got together

24   and said, Let's commit a crime.  Here cheating and tricking the

25   FDA and surgeons.

1          And a scheme, a wire fraud scheme is the same thing.

2    You have to show that there was a scheme.  People got together

3    and schemed.  It wasn't like an accident or a single event.

4    You got together and you schemed to commit wire fraud.

5          Both of those crimes require something else.  They

6    require criminal intent.  The Judge will explain to you at the

7    end of the case, they require proof of willfulness.  That is

8    the intent to commit a crime with a bad purpose: to disregard

9    the law.  Criminal intent.  No intent, no crime.

10         The flip side of that is good faith is a complete

11   defense to these charges: doing what you thought was right,

12   making statements you believed were truthful, doing the best

13   you could.  That's good faith.  Good faith is a complete

14   defense to these charges: no intent, no crime, good faith, a

15   complete defense.

16         Let me make one other comment about these charges.

17   Dave is not charged with anything called misbranding or

18   off-label promotion or anything like that.  He's charged with

19   these two very different charges: conspiracy and scheming.

20   There isn't even a crime called mixing.  There isn't a crime

21   called off-label promotion.  Dave is not charged with any such

22   thing.

23         Now, I know what else you might be thinking or you may

24   have been thinking when you came in the other day.  Judge

25   O'Toole told you how every criminal defendant is presumed

1   innocent.  You learned that in grade school.  But I know that

2   some of you or maybe all of you might be thinking, because it's

3   natural, you come into this nice big federal courtroom and

4   there's a federal judge here and there's a mile-long table with

5   all these lawyers and there's people in the back and it takes

6   three days to select a jury, and you might be thinking to

7   yourself, despite the presumption of innocent, Wow, somebody

8   must have done something or we wouldn't be here.

9        You look around and you see Dave sitting over here,

10  and maybe you're not presuming that he's innocent.  That would

11  be very, very dangerous.  Of course, it would be wrong.  It

12  violates all of our constitutional principles and the Judge's

13  instructions.

14       But putting that aside, it would be very dangerous for

15  the following reasons.  We can all think of situations in our

16  personal experiences -- maybe with our families, maybe at work,

17  maybe at school, maybe with our children -- where we rushed to

18  judgment, and we didn't have the facts.  Somebody rushed to

19  judgment about us when they didn't have the facts.  And we made

20  false assumptions and false conclusions without evidence to

21  back them up.

22       Dave is presumed innocent unless the government has

23  evidence that proves him guilty beyond a reasonable doubt, and

24  they do not have that evidence.  The Judge mentioned before we

25  started this morning that this case can be sort of like a

1    puzzle.  And that's a wonderful analogy.  It is like a puzzle.

2    Each document, each witness is a piece of the puzzle.  And you

3    have to wait until you have all the pieces until you see what

4    kind of a picture emerges.

5           In fact, it reminds me of a story that a friend told

6    me about his two boys.  They were playing with some puzzles one

7    day down on the floor, they had them spread out, and he walked

8    by and that was nice, they were occupied and not fighting.  And

9    he came back a little later, they had made a little progress on

10   the puzzle.  He looked at it, he said, That's nice.

11          And he passed by a little while later and he came

12   back, and they had completed a little more of the puzzle and he

13   looked down and he looked at the box nearby, the puzzle box,

14   and what they were putting together didn't seem to quite really

15   match up with the picture.  Maybe they were doing it wrong.

16   They're just little boys.  But he wasn't going to say anything.

17   Kids play.  Let them figure it out.

18          And he came by later, and this time they had the whole

19   puzzle completed.  And he looked down and it definitely didn't

20   match the box, the puzzle box.  Because it was a completely

21   different puzzle.  They had a bunch of puzzles on the floor and

22   they had a bunch of boxes.  And the one he had been looking at

23   and assuming went with this box did not.  So he made a false

24   assumption until the puzzle was completed.

25          That's what the government is doing here.  They're

1    trying to take a bunch of puzzle pieces and put them together

2    as best they can that do not add up to the sinister criminal

3    picture that they're trying to convey.  That is what the

4    presumption of innocence is all about.

5         Who is Dave?  Well, Dave's a family man.  He's married

6    to a lovely woman named Natalie who's here today.  Natalie.

7    She can't be here every day.  They have three young children

8    who are ages five, three, and a baby, ten months, so -- and

9    they live in California.  So she'll come when she can, but she

10   can't be here all the time.

11        Dave comes from a close family of four.  His father,

12   now retired and disabled, was a sheriff.  He worked his way

13   through school.  In high school he worked at a muffler factory

14   and a printer -- he was a printer for a local union.  He

15   qualified for the United States Olympic trials in wrestling.

16   He went on to the University of Sacramento where he also

17   continued to work his way through school.  He worked on a union

18   crew at night loading trucks, and in the summers in the

19   farmlands there hauling hay, another thing by truck.

20        Then after he graduated from the University of

21   Sacramento, he held a series of jobs until about 1994-1995.  He

22   began selling medical devices for the first time for a company

23   named OrthoLogic.  He did that for several years.  And in 2001

24   he started his own small business, which was a distributor of

25   orthopedic products.  And he built that business up, it was a

1    small business, but he built the business up, and it was

2    relatively successful.  And in 2005, he sold it.  And shortly

3    thereafter, he went to work at Stryker Biotech in August of

4    2005.

5            I'm a visual person, so I put this chart together to

6    help me tell the story.  In August of 2005, this is when Dave

7    starts at Stryker Biotech.  And I'll go over some of this other

8    stuff in a moment.  Why does he join Stryker?  Well, he was

9    excited about the opportunity, and in particular, he was

10   excited about OP-1.  You've already heard about it.  Why?

11   Because this product grows bone.  This product grows bone.

12   Think about that.

13           You know, we moved from putting broken bones in casts

14   and splints.  Now we have a product that grows bone.  It helps

15   the body heal itself.  And that was -- was and is a wonderful

16   product.  And he thought it presented to him an exciting

17   opportunity, for him and his career, for him and his family, on

18   a long-term basis.  And so he went to work at Stryker Biotech.

19           Stryker hired him specifically to be the regional

20   sales manager in the West.  They were very interested in Dave

21   as being -- to take the position as regional sales manager

22   because he already had strong relationships with surgeons in

23   the western part of the United States.

24           You've already heard several people talk about how

25   relationships with these very elite spine surgeons is

1    everything.  Well, it is.  These salespeople -- it's not like

2    going door to door selling vacuums -- not that there's anything

3    wrong with that -- but this depends on a long-term, deep,

4    repeat relationship.  That's the way that you grow

5    professionally.  And so they were interested in that.

6         They were also interested in his management

7    experience.  Remember, he had run this small business.  So they

8    thought he would be a good manager.  So he came to work at

9    Stryker in August of 2005, and he had about six sales reps as

10   part of his territory out in the West.  Now, he lived and

11   worked out of his house in California.  That's why I put a

12   little picture of a house here.  He lived and worked out of his

13   house here in California, in Alamo, California.  And Stryker is

14   over here in Massachusetts.  That's where headquarters is.

15   That's where regulatory affairs is.  That's where marketing and

16   sales support, quality, the president, that's where the

17   headquarters is.

18        He had very -- he made limited trips out here.  He

19   spent most of his time out here and worked out of his -- out of

20   his home.

21        Now, you've heard about the launch of OP-1 Implant,

22   Putty, and Calstrux.  That all happened before Dave came to

23   Stryker.  The first one that was approved, OP-1 Implant, that's

24   the one that goes into the long bones.  That was approved back

25   in 2001.  OP-1 Putty, that's the one that goes into the spine,

1    that was approved in 2004.  He wasn't at the company then.

2    Calstrux, which you've heard about, that was approved in August

3    of 2004.  He still wasn't at the company.  And then in August

4    he comes to the company.

5         Now, one month after Dave joins the company, Stryker

6    Biotech sent out their first Dear Doctor letter, which several

7    have already talked about.  What's a Dear Doctor letter?  Well,

8    it's a letter to doctors, it's an educational letter, reminding

9    them of the instructions for the use of the products,

10   discussing any issues that the surgeon should be aware of.

11   This letter went to hundreds and hundreds of surgeons.

12        I don't really understand the allegation that the

13   company was out to deceive surgeons when just one month after

14   Dave arrived, the company is sending out letters to surgeons.

15   That doesn't make any sense to me at all.  But the real point

16   here is just one month after Dave arrived -- he probably still

17   hasn't gotten his security pass -- the company sends out this

18   letter.  He didn't have anything to do with it.  This was all

19   handled over here because he's the sales manager out there.

20        Then in February of 2006, there's another issue about

21   whether they should send out a second Dear Doctor letter.

22   And you heard how that was discussed at the highest levels of

23   Stryker Biotech, and eventually they decided there were good

24   and valid reasons why they didn't need to send it out right

25   then, and they decided to send it out several months later.

1    And again, there doesn't seem to be anything wrong with that.

2    But the important point here is Dave also had nothing to do

3    with that.

4         There's very little about this case that has anything

5    to do with Dave.  That happened ultimately at the end of 2006.

6         You heard the government talk about a teleconference

7    in March of 2006 concerning the rules on off-label promotion.

8    The first thing I want to say is, the rules on off-label

9    promotion are not what Dave is charged with in this conspiracy

10   and scheming count, okay?  The rules against off-label

11   promotion are rules over here.  Dave is charged with something

12   completely separate: conspiring and scheming.  When you hear

13   the prosecutors talk, you might think sometimes there's some

14   crime called off-label promotion.

15        Dave is not charged with any such thing.  And

16   violation of rules, policies, and procedures, while nobody

17   intentionally sought to do that, has nothing to do with charges

18   of conspiring and scheming.  You know, we all have giant policy

19   manuals where we work.  Violating the rules and the policies

20   and procedures, that's one thing.  It's not conspiring and

21   scheming.

22        But they have this conference in 2006, and the purpose

23   of the conference was to reinforce the rules on off-label

24   promotion and other purposes.  Well, Dave knew and understood

25   and believed in following the rules, and he -- to the extent

1   they're relevant at all -- and knew that it was inappropriate

2   to promote products off label.  And he did not do that.  He

3   followed those rules.  And you'll see examples of him following

4   and educating his own people on the rules.  This whole

5   conference -- I don't have it on my timeline here -- that

6   occurs in March of 2006.  Dave's only been at the company for

7   about six months at that point.

8          Now, Dave also knew that while you can't promote off

9   label, that surgeons often and frequently do use products off

10  label.  He knew that surgeons want information and ask

11  questions about off-label uses.  And he knew by law that the

12  FDA cannot regulate or interfere with the practice of medicine.

13  So doctors can use these products any way they want.  Doctors,

14  in order to practice and help their patients, often need

15  information; and doctors often seek it from sales

16  representatives.

17         Dave did the best he could to follow these rules as he

18  understood them.  And he did follow those rules.  He did so in

19  good faith.  Remember, good faith is a complete defense: no

20  intent, no crime.  The government's theory here boils basically

21  down to surgeons were tricked into using these products in some

22  way they didn't otherwise want to use them.  To believe in that

23  theory, to accept that theory, you have to believe that these

24  surgeons, these highly educated spine, brain, orthopedic

25  surgeons with résumés as long as this table are too stupid to

1    know how to use products that they put in patients' bodies.

2           This may not be clear.  There's really only two

3    products out there in the bone-growing category: OP-1 and

4    InFuse.  So this isn't like going to the grocery store, and

5    there's 400 brands of toothpaste with fluoride and cavity

6    protection and all the rest, and you get confused which is

7    which.  There's only two bone-growing proteins out there.

8           A surgeon could not be easily confused about the

9    indications of how to use these products.  And certainly not

10   these surgeons, which are among the elite of the elite.

11          Let's talk about what Dave was not.  As I said, Dave

12   was a sales manager in the Western Region, doing the best he

13   could to help the people he worked with.  That meant helping

14   them form surgeon relationships like he had, helping them to

15   grow the business, helping them with problems, setting

16   standards.

17          Dave was not a regulatory specialist.  He was not a

18   lawyer.  He had absolutely nothing to do with the FDA.  He had

19   nothing to do with FDA filings.  He had nothing to do with

20   reporting to the FDA or communicating with the FDA.  The charge

21   that he could possibly have defrauded the FDA in any way,

22   shape, or form is preposterous.

23          Let's show -- let me talk about what the proof will

24   not show against Dave.  The proof will not show that Dave made

25   a single false statement.  And that is the essence of the

1    scheming and conspiracy charges: lying, tricking, deceiving,

2    misleading.  The evidence will not show that he made a single

3    false statement.  The evidence will not show a single instance

4    of concealment on his part.  Everything Dave did was in the

5    open.  No secret behavior, no scheming behind closed doors.  He

6    is not a conspirator; he is not a schemer.  There's absolutely

7    and will be no evidence that he sought to lie or trick or cheat

8    a doctor.

9          In fact, as several said, that makes absolutely no

10   sense whatsoever.  You would come to a company because you're

11   excited about the product and a long-term professional career

12   at the company, and you would build your business plan on lying

13   and cheating and tricking doctors?  That makes no sense

14   whatsoever.

15         There will be no evidence of willfulness or bad intent

16   on Dave's part.  Remember, no intent, no crime.

17         The government talked about adverse events.  I believe

18   a picture is worth a thousand words.  Mr. O'Connor gave you

19   some of the statistics.  But I've tried to put it in a picture

20   form to drive home the point.  You will see and hear evidence

21   that there are well over 10,000 uses of these products -- OP-1

22   and Calstrux -- used in combination, okay?  Over 10,000.  And

23   to hear the government talk, you'd think that there would be an

24   equal number of adverse events.  That's not the case.  There's

25   just 63 potential adverse events reported out of over 10,000.

1          I want to pause on the word "potential," okay?

2     Because although they call it an adverse event, what is an

3     adverse event?  An adverse event is any event -- any

4     potentially bad experience that occurs during the use of a

5     product.  It could be inflammation, could be a headache.

6     It could be anything.

7          But there's no requirement to establish causation when

8     you report these things, all right?  So we say "potential"

9     because even -- these are all that were reported, but nobody

10    has shown that these were even due to the use of the products.

11    So "potential" is very important.

12         So out of over 10,000 uses, over several years, we

13    just have 63 reports.  Just 63.  Less than one percent.

14    Actually, 0.63, to be precise, okay?  All right?

15         All products have adverse events.  Baby aspirin can

16    cause an adverse event.  All products have some risk.  The fact

17    that there might be concern about preventing adverse events

18    doesn't mean that the product is unsafe.  In fact, these show

19    that these products were extraordinarily safe, okay?  And so

20    Dave, to the extent he had any say whatsoever about adverse

21    events or disclosing them, would have had no motive whatsoever

22    to try and conceal these because there's really nothing to

23    conceal.

24         As Mr. O'Connor told you, all of the potential -- all

25    of the adverse events were warned about on the package labeling

1    and otherwise.  That information was communicated up the wazoo

2    by this company.

3           I listened very carefully to the government's opening,

4    and I heard them throw around a lot of allegations.  I heard

5    them say only one specific thing about Dave.  They said that he

6    sent some mixing instructions, which are the basis for Count 5.

7           Now, remember, there's several counts in this wire

8    fraud scheme that are charged.  Only one of them is Dave doing

9    anything.  The government said he sent some mixing

10   instructions.  And it went by so fast maybe you didn't even

11   catch it or maybe they didn't say, but the mixing instructions

12   that he sent, he sent to another company employee, all right?

13   They didn't go to a doctor.  They didn't go to a surgeon.

14   There wouldn't be anything wrong if they had gone to a surgeon

15   because they weren't false.

16          I mean, these are just -- all they were are some

17   instructions about how to mix.  They weren't false any more

18   than a recipe for making brownies could be false.  You know,

19   the recipe says put in the two eggs and a cup of oil and the

20   mixture and you mix it up.  The recipe can't be false.  These

21   are just instructions.  But in any event, they didn't go to a

22   surgeon.  They went to an employee, somebody -- a member of the

23   sales team.

24          Well, that is a big load of nothing.  There's no

25   crime, there's no false statement.  They're just going

1    internally.  And you will hear evidence that it's important to

2    educate members -- employees so that they are appropriately

3    prepared for when they are in surgeries.  So there's a lot of

4    internal education going on, sharing of information.

5        And yes, if an employee finds himself in the operating

6    room and that surgeon has made the decision to mix -- the

7    surgeon has made the decision to mix, as he is entitled to do

8    under law -- and he turns to a sales rep in the OR and he says,

9    Okay, give me the products.  We're ready to do the implant, and

10   he turns and he asks a question to the employee -- to the sales

11   rep in the OR, who is there by the surgeon's invitation and

12   many times demand, and he asks him a question, that sales rep

13   better be prepared to answer it, okay?

14       These spine surgeons, again, they're among the elite

15   of the elite.  And in the OR, they are the captains of the

16   ship.  And everybody else is a deckhand, okay?  And when they

17   turn to the sales rep and they ask a question, the rep better

18   be prepared to answer it or they are done with that surgeon,

19   okay?  So it's important that they be in a position to be able

20   to do that.

21       Now, here's where the whole -- the government's case

22   just totally blows up.  In order for the government's case to

23   work, you have to believe -- you really have to believe that

24   these elite surgeons are just really stupid.  You also have to

25   believe that it was Dave's business plan to go out and lie and

 1  trick doctors on a repeated basis, all right?  That you would

 2  do this repeatedly.  That's what a scheme and a conspiracy is

 3  all about.  It's not just -- it's not run in, sell the vacuum,

 4  and run out.

 5          This was all about long-term relationships, building a

 6  business, and bringing and promoting and selling this wonderful

 7  product: OP-1, okay?  You lie or you trick a surgeon, the

 8  captain of the ship, you are dead.  Your business is over.

 9  Relationships are everything.  And that's where this case just

10  blows up.

11          The government really has thrown the whole kitchen

12  sink at Dave.  It's trying to connect a bunch of dots that

13  don't go together, that can't be connected.  They're trying to

14  put the puzzle pieces as best they can into a picture that just

15  isn't there.  There's not a shred of evidence that Dave tried

16  to lie, cheat, or trick surgeons, the FDA, or anybody else.

17  At the end of the evidence after you've seen all the puzzle

18  pieces, the picture will be clear.  And there will be only one

19  verdict for Dave Ard.  And the outcome will be very simple for

20  you: Not guilty.

21          Thank you.

22          THE COURT:  Jurors, we've reached 1:00 o'clock.  We do

23  have one further opening statement.  We'll do that tomorrow

24  morning.

25          MR. LIBBY:  Thank you, your Honor.

1           THE COURT:  We're going to try to keep to our

2      schedule: 9:00 to 1:00, as I promised you, so you have other

3      things to do.

4           Let me remind you, I urge you to remember my

5      instructions to not discuss the substance of the matter either

6      among yourselves or with anyone at home, and no independent

7      investigation and so on.  And again, if there are any press

8      reports that you happen to stumble across, put them aside and

9      don't pay attention.  It's what you hear in the courtroom that

10     matters.

11          With that, enjoy the rest of the day.  It's a pretty

12     miserable day, but do your best.  And we'll see you tomorrow.

13     We'll have the opening statement for Mr. Whitaker, and then

14     we'll begin the evidence.

15          THE CLERK:  All rise for the Court and the jury.  The

16     Court will be in recess.

17          (The Court and the jury exit the courtroom and the

18     proceedings adjourned at 1:00 p.m.)

19

20

21

22

23

24

25

```
1                    C E R T I F I C A T E

2

3            We, Marcia G. Patrisso, RMR, CRR, Official Reporter of

4    the United States District Court, and Kimberly A. Smith, RDR,

5    CRR, do hereby certify that the foregoing transcript

6    constitutes, to the best of our skills and abilities, a true

7    and accurate transcription of our stenotype notes taken in the

8    matter of Criminal Action No. 09-10330-GAO, United States v.

9    Stryker Biotech, et al.

10

11   /s/ Marcia G. Patrisso
     MARCIA G. PATRISSO, RMR, CRR
12   Official Court Reporter

13   /s/ Kimberly A. Smith
     KIMBERLY A. SMITH, RDR, CRR
14

15   Date:  January 12, 2012

16

17

18

19

20

21

22

23

24

25
```