```
                    UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS


                                 )
UNITED STATES OF AMERICA,        )
                                 )
          Plaintiff,             )
                                 )   Criminal Action
v.                               )   No. 09-10330-GAO
                                 )
STRYKER BIOTECH, LLC,            )
et al.,                          )
                                 )
          Defendants.            )
                                 )



        BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
                UNITED STATES DISTRICT JUDGE



                         DAY FIVE
                        JURY TRIAL



         John J. Moakley United States Courthouse
                    Courtroom No. 9
                    One Courthouse Way
               Boston, Massachusetts  02210
                Friday, January 13, 2012
                       9:07 a.m.



               Marcia G. Patrisso, RMR, CRR
                  Official Court Reporter
                Kimberly A. Smith, RDR, CRR
               John J. Moakley U.S. Courthouse
               One Courthouse Way, Room 3510
                Boston, Massachusetts  02210
                     (617) 737-8728

        Mechanical Steno - Computer-Aided Transcript
```

```
 1   APPEARANCES:

 2        OFFICE OF THE UNITED STATES ATTORNEY
          By: Jeremy M. Sternberg, Susan B. Winkler, and
 3            Gregory F. Noonan, Assistant U.S. Attorneys
          John Joseph Moakley Federal Courthouse
 4        Suite 9200
          Boston, Massachusetts  02210
 5        On Behalf of the Government

 6        ROPES & GRAY
          By: Brien T. O'Connor, Esq.
 7            Joshua S. Levy, Esq.
              Aaron M. Katz, Esq.
 8            Cori A. Lable, Esq.
          Prudential Tower
 9        800 Boylston Street
          Boston, Massachusetts  02199-3600
10        On Behalf of the Defendant Stryker Biotech, LLC

11        NUTTER, McCLENNEN & FISH, LLP
          By: Robert L. Ullmann, Esq.
12            Maya L. Sethi, Esq.
          Seaport West
13        155 Seaport Boulevard
          Boston, Massachusetts  02210-2604
14        On Behalf of the Defendant William Heppner

15        WILMER CUTLER PICKERING HALE & DORR, LLP
          By: Brent J. Gurney, Esq.
16            Miranda Hooker, Esq.
          1875 Pennsylvania Avenue
17        Washington, D.C.  20006
          On Behalf of the Defendant David Ard
18
          LIBBY HOOPES, P.C.
19        By: Frank A. Libby, Jr.
              Alathea E. Porter, Esq.
20        175 Federal Street
          Boston, Massachusetts  02110
21        On Behalf of the Defendant Jeffrey Whitaker

22

23

24

25
```

I N D E X

                    <u>DIRECT</u>   <u>CROSS</u>   <u>REDIRECT</u>   <u>RECROSS</u>

<u>WITNESSES FOR THE
  GOVERNMENT:</u>

JOHN CLIFFORD HOUGHTON

     By Mr. Sternberg            62

                    E X H I B I T S

<u>GOVERNMENT'S         DESCRIPTION                FOR ID   IN EVD.</u>

No. 12    Email from Houghton to Ring                    119

No. 85    Exemplar of OP-1 Implant in box with label     77

No. 86    Exemplar of OP-1 Putty in box with label       76

No. 92    OP-1 Putty package insert                      80

No. 107   Comments from regional sales managers TCP Putty
          (Calstrux) related concerns/questions national
          sales meeting                                  115

No. 111   "Dear Doctor" draft from Dr. Silverman         123

No. 115   Email from Ryan Denney to Whitaker, Idris, Ard,
          Murphy, and Heppner                            127

No. 214   Sales plan May 2005, with handwriting          99

No. 226   2006 sales quotas                              93


OPENING ARGUMENT BY MR. LIBBY.........................PAGE 30

1          (The following proceedings were held in open court

2     before the Honorable George A. O'Toole, Jr., United States

3     District Judge, United States District Court, District of

4     Massachusetts, at the John J. Moakley United States Courthouse,

5     One Courthouse Way, Boston, Massachusetts, on January 13, 2012.

6          The defendants, William Heppner, David Ard and Jeffrey

7     Whitaker, are present with counsel.  Assistant U.S. Attorneys

8     Jeremy Sternberg, Susan Winkler and Gregory Noonan are

9     present.)

00:24 10          THE CLERK:  All rise.

11          (The Court enters the courtroom at 9:07 a.m.)

12          THE COURT:  Good morning.

13          COUNSEL IN UNISON:  Good morning, your Honor.

14          THE COURT:  You heard about the issue with Juror No.

15     1, I gather?

16          MR. NOONAN:  Yes, your Honor.

17          THE COURT:  Just to recap it, he had told us during

18     the selection that his wife had an appointment that he would

19     like to accompany her to.  And he told us at the time that it

00:31 20     was Monday, which is a scheduled holiday, so we didn't think

21     there was an issue.  He brought in his actual form, and it

22     turned out they had the dates confused and it is Tuesday.

23          He has two -- there are two appointments:  One is

24     Tuesday morning at 9:45.  There's another one the following

25     Tuesday, but that's at three o'clock.  I have a copy of the

1    appointment card for that.  And so the problem is Tuesday

2    morning.

3         I think Paul notified counsel yesterday of the issue

4    and asked you to think about it.  And it seems to me there were

5    two options:  One is to excuse the juror -- well, there are

6    three options:  One is to make him miss his appointment with

7    his wife, which I think is not a viable one; the other is to

8    excuse him and proceed; and the final one would be to just

9    skip -- Monday is a holiday.  Just skip Tuesday and proceed to

00:32 10   reconvene on Wednesday.

11        So what is the view of counsel?

12        MR. NOONAN:  Well, your Honor, the government believes

13   while it's obviously unfortunate to skip a day, and we're all

14   eager to get into this trial, the government thinks it's

15   awfully early to being excusing a juror in a long winter trial.

16   And we also don't want to encourage other people on the jury by

17   seeing someone go permanently at this stage.

18        So we think -- it's one day.  We think the best course

19   is to take Tuesday off and carry on from there.

00:32 20        MR. LEVY:  Your Honor, if I may, we had a chance,

21   defense counsel, to speak, and I'll speak on behalf of the

22   group.  It's a tough decision.  You know, I think this juror is

23   not terribly excited to be on jury duty.  He did try a couple

24   of times with some problems.  And I think it's related to his

25   wife's health.  She's on a breathing machine.  And while we

1  don't want to lose jurors either, we also are eager to get

2  going on this trial.  We have scheduling issues on the back end

3  we've raised with the Court about expert witnesses we have.

4  And we're concerned about losing another day of trial.

5       You know, obviously, the Court has much more

6  experience with your rate of attrition with alternates.  We

7  have three more.  And, you know, I think the winter issues will

8  affect us all equally, so I don't think that will cause us to

9  lose jurors, in particular.  It's another fact we have of

00:33 10  potentially more days off.

11       So our collective position is that we would excuse

12  this juror, albeit reluctantly, but keep moving ahead with the

13  trial and not be limited to three trial days next week.

14       THE COURT:  One of the concerns is -- as Mr. Noonan

15  suggested, is the power of suggestion to the other jurors,

16  which is a concern.

17       MR. LEVY:  It is a concern.  All I can say is that

18  we'll have to take it on a case-by-case basis.  I certainly

19  believed he had raised this issue, had the dates wrong.  That's

00:34 20  a very natural thing to have happened.  I don't think other

21  jurors are going to fabricate issues to get out of service at

22  this point.

23       THE COURT:  One of the concerns implicit in what

24  you're saying is that it may not be that this is as limited a

25  problem to Tuesday morning as it might appear; in other words,

1    if his wife is suffering from some medical difficulties, that

2    will continue, and the question will be how much will that

3    affect -- I mean, we know that there's a particular time point

4    where we could solve it one way or the other.

5         I guess the question is what kind of betting that that

6    would be it.

7         MR. LEVY:  Your Honor, you speak about the

8    distraction.  That's a very good point.  I'm also concerned two

9    medical appointments --

00:35 10        THE COURT:  I'm not saying so much the distraction.  I

11   think he could stay focused.  I'm guess I'm just wondering if

12   it's just going to repeat.

13        MR. LEVY:  Two appointments in a very short period of

14   time could very well lead to more follow-up, depending on

15   what's going on with her condition.

16        MR. NOONAN:  Your Honor, the government's concern is

17   the primary suggestion to other jurors.  Certainly, if after

18   one date this appears like it's going to be a continued issue

19   with the juror, at that point the government would take an

00:35 20   alternate position and we would have the alternate jurors at

21   that stage.  The government position is that if we do it this

22   early on, when as of now his representation is he's going to

23   miss one day, we think we'll give him the one day.  And if it

24   appears to be a problem after that, cut him loose.

25        THE COURT:  Maybe we have to probe a little deeper

1    with him.  I would prefer to do that in as low-key a way as

2    possible, and so I guess I would like to do it just myself, but

3    do it on the record.

4         MR. NOONAN:  No objection from the government.

5         THE COURT:  But just to see whether a one-time

6    accommodation would calm his anxieties or not.

7         MR. LEVY:  Your Honor, we certainly don't object to

8    the Court doing it on its own.  I do have concerns about losing

9    the trial date.  We all have concerns about losing the trial

00:36 10   date -- we all are concerned about losing the trial day.  The

11   inevitable January snow, February snow is going to come.  I

12   think potentially we're looking at losing two or three days if

13   it's a normal winter -- it hasn't been so far -- but it's going

14   to add up.  But I think we probably need more information to

15   make the final assessment.

16        THE COURT:  All right.  So we'll take a break, and

17   we'll have the reporter come back, and I'll talk to him and see

18   if I can get a sense as to whether a one-time accommodation

19   would solve the problem.  I gather implicit in the government's

00:37 20   position is that -- one of the things I was thinking about is

21   you've got witnesses lined up and scheduled.  You're willing to

22   deal with that issue, I guess?

23        MR. NOONAN:  Yes, your Honor.  If your Honor should

24   decide we'll take one day off, we have a few things we would

25   like to address with the Court, but we could wait until that

1   decision is made.

2           MR. O'CONNOR:  Your Honor, one issue before the first

3   witness -- not before Mr. Libby speaks, but before the first

4   witness gets on we do have an important issue we want to raise

5   about the first witness.  And so we could do it at sidebar but,

6   you know -- and I'm sure everyone's anxious to get going.

7           Well, are you proposing that you would talk to him

8   right now?

9           THE COURT:  Yes.

00:37 10        MR. O'CONNOR:  Before the jury comes in because I

11  don't want to suggest, your Honor, to come in and go out.  I

12  know that takes time.  But --

13          THE COURT:  I'm not going to bring him into the

14  courtroom.

15          MR. O'CONNOR:  I'm mixing things.  Forgive me.  We

16  have an issue we want to talk to you about that has to do with

17  the first witness, and I obviously don't want to do it in front

18  of the jury.  I think it's better to do it in open court, but

19  we could do it at sidebar after Mr. Libby speaks or after

00:38 20  you're done with your discussion with the juror.  Either way.

21          MR. NOONAN:  Your Honor, the government has two

22  relatively brief issues we would like to --

23          THE COURT:  I think what we'll do, let me talk to the

24  juror, I'll come out, tell you what I think we should do.

25          MR. O'CONNOR:  Okay.

1          THE COURT:  And then we could deal with these issues

2     and then we could call the jurors in.

3          MR. NOONAN:  Thank you, your Honor.

4          THE CLERK:  All rise.  The Court will take a brief

5     recess.

6          (Lobby conference as follows:)

7          THE CLERK:  Judge, I have Juror No. 1, Mr. Pomprowicz.

8          THE COURT:  Good morning, Mr. Pomprowicz.  Have a

9     seat; make yourself comfortable.

00:40 10          I just wanted to talk to you about your wife's

11    appointments and all.  Let me tell you:  We do not want you to

12    miss your wife's appointments.

13          JUROR NO. 1:  Good.

14          THE COURT:  Okay?  All right.  So it sort of gives us

15    a couple of options:  One is we could just, as a trial, skip

16    Tuesday and have you go with your wife on Tuesday morning and

17    then the trial would resume on Wednesday.  That would put

18    things back a little bit.  The other would be, you know, we

19    could just excuse you and we'd just continue on without you.

00:40 20          I guess one of the things I'm interested in is --

21    without knowing in detail about the medical circumstances, is

22    this something that might recur over the next several weeks?

23    Will there be more appointments and things like that?  That's

24    why I --

25          JUROR NO. 1:  It depends on what they find in the CAT

scan.  We have the follow-up the following Tuesday at three

o'clock in the afternoon.  And we'll know from there if it's

something that needs to be addressed right away or months away.

THE COURT:  What is it they're investigating for?

JUROR NO. 1:  She has a growth in her lung.  And they

wanted to do a CAT scan in December but they held off because

of the holidays.  You don't want to ruin your holiday.  So they

put it to January, and that's where it is now.

THE COURT:  So they want to diagnose what that growth

is?

JUROR NO. 1:  Right.

THE COURT:  And I guess --

JUROR NO. 1:  I have no idea.  It could be -- maybe it

stays the same, maybe it's something that needs to be addressed

right away.  I have no idea.

THE COURT:  Yeah.  Now, the appointment is at an MRI

or CT scan facility, I guess.  And then the appointment the

following week is at the doctor's office.  Is that it?

JUROR NO. 1:  Yes.

THE COURT:  That's in the afternoon.  You would be

able to leave here at one and be there at three?

JUROR NO. 1:  No, I have to leave here quarter to

twelve to get home to get her there at three.  The train don't

leave till ten past twelve.

THE COURT:  Oh, because of the train schedule?

1          JUROR NO. 1:  Yes.

2          THE COURT:  And you're taking the train rather than

3     driving?

4          JUROR NO. 1:  Yes.  I'm not familiar with this area.

5          THE COURT:  So you think by the train schedule the

6     following Tuesday you would have to leave at --

7          JUROR NO. 1:  Quarter to twelve.

8          THE COURT:  -- quarter to twelve?  Okay.

9          The other question, which is probably hard for you to

00:42 10   answer because it's asking you to speculate about the future,

11    when somebody close to you like this is undergoing these kinds

12    of things people can, you know, obviously be concerned about

13    them.  And one question would be how much you might or might

14    not be distracted from the issues in the trial by the --

15         JUROR NO. 1:  Because I don't know what the outcome

16    would be and I don't know -- I'm sure it would be weighing on

17    my mind.  Somebody talks a long time and I can focus for the

18    whole hour and a half they're talking but -- you know, to

19    follow them, but I know -- it depends on the outcome.  If

00:43 20   nothing happened, then I'm okay.

21         THE COURT:  Then you'd be fine?

22         JUROR NO. 1:  Yeah.

23         THE COURT:  Let me ask you this:  Have you mentioned

24    any of this to any of the other jurors?

25         JUROR NO. 1:  No.

```
 1              THE COURT:  Okay.  Is there anything else you think I
 2     should know that I haven't asked you about?
 3              JUROR NO. 1:  No.
 4              THE COURT:  Okay.  Thanks.  I still have to talk about
 5     it with the lawyers, and we'll decide what to do.
 6              JUROR NO. 1:  Okay.  Thank you.
 7              (Lobby conference concluded and in open court:)
 8              THE CLERK:  All rise.
 9              (The Court enters the courtroom at 9:27 a.m.)
10              THE COURT:  Be seated.
11              I've talked with the juror.  Paul, can you sit down
12     for a minute, please -- thank you -- so I can see?
13              So I've talked to the juror.  One thing respects next
14     Tuesday, and that is, apparently, the juror lives in
15     southeastern Massachusetts and has been taking the train up.
16     And in order to get back and get his wife and get to the three
17     o'clock appointment, he says he would have to catch a train
18     that would require him to leave here by about a quarter to
19     twelve.  So it's not just the one day; it would be eating into
20     another half day.
21              It's very difficult to predict how people will respond
22     to things, but I did ask him whether he thought that -- and let
23     me just briefly -- as I understand, the medical issue is his
24     wife is having a diagnostic CT scan.  That's this-coming
25     Tuesday.  And then the following Tuesday is meeting with the
```

00:50 (line 10)
00:51 (line 20)

```
     1    doctor to find out the results of that.  And so there's a

     2    medical diagnosis which is uncertain at this time.  It could be

     3    entirely benign, it could be a problem, and there's no way of

     4    assessing that.

     5         I think it likely from talking to him that if it

     6    turned out to be anything other than totally benign, he would

     7    be seriously distracted here.  So I think -- it's a hard call

     8    and I don't like doing it, but I think the better course is to

     9    excuse him.  I just can see it being a continuing management

00:52 10  problem.  And I am concerned about the effect that that might

    11    have on other jurors if it develops and goes along that way.

    12         We do have -- the reason we do four, I guess -- as I

    13    say, this is reluctant -- but I think it's probably the better

    14    course.  I'm not sure -- put another way, I'm not sure we would

    15    have solved the problem if we just skipped the problem.

    16         So my proposal to try to minimize the impact on the

    17    other jurors is simply to have the juror sit through today.

    18    We'll communicate privately with him that he's excused.  And

    19    when the other jurors return on Tuesday, he just won't be here,

00:53 20  and we'll just -- rather than dramatically excuse him now and

    21    create any suggestion.

    22              MR. LEVY:  That's fine with the defense, your Honor.

    23              MR. NOONAN:  Fine, your Honor.

    24              THE COURT:  Okay.  So, Mr. Noonan?

    25              MR. NOONAN:  A few brief issues on behalf of the
```

1    government.  First, yesterday Mr. O'Connor opened on many

2    things, but also on the fact that there were some unindicted

3    coconspirators in this case, named two in particular,

4    Mr. Murphy and I believe Mr. Denney, and referred to other

5    unindicted coconspirator sales representatives.  And he

6    specifically mentioned -- I don't have the transcript --

7    specifically mentioned these people are not being prosecuted by

8    the United States.

9          Now, the government is not trying to reargue your

00:54 10   Honor's immunity order, but we would like the unindicted

11   coconspirators who have immunity orders in this case who are

12   called as witnesses -- we think the door's been opened.  This

13   may be overlapping.  This might be people the defense planned

14   on impeaching with immunity orders.  We don't know.  We think

15   the door's been open, and right now the jury is going to think

16   there's a group of people who simply aren't being prosecuted by

17   the government when, in reality, they have an immunity order,

18   they were compelled in exchange for them not being prosecuted

19   by the government.

00:54 20         MR. O'CONNOR:  Your Honor, one, I'm not sure I follow

21   the logic of -- to the extent that we said, as the Court

22   allowed, that the government has identified some people as

23   unindicted coconspirators that, therefore, they ought to be

24   able to put in front of the jury that these people have been

25   immunized unless -- if the defense is willing to commit not to

1   impeach them with that.  So I just don't follow -- I don't

2   follow that logic.

3         I have not had a chance to speak with any of the other

4   defense lawyers, you know, about this issue.  I do think, your

5   Honor, as we discuss -- we're going to go person by person.  I

6   do think that judgments will be made.  Yes, we would like to

7   impeach, and we will tell the government ahead of time, and

8   they can put it in on a case-by-case basis.

9         THE COURT:  Well, let me just -- Mr. Ullmann?

00:55 10   MR. ULLMANN:  If the door was opened -- I agree with

11   Mr. O'Connor.  I don't follow the logic, but if the door was

12   opened, it was opened for two individuals:  Mr. Murphy and

13   Mr. Denney.  We might well want to impeach them.  And if that

14   is the case the issue is moot.  So I don't see any need to

15   discuss it further at this point.

16         THE COURT:  Well, I'm not sure that the issue is

17   simply the question of impeachment by the immunity orders.  I

18   think ordinarily it's not germane to the issues of the trial to

19   point out the government's prosecution strategy, why it

00:56 20   prosecutes some people and not others, for example.

21         The characterization of someone as an unindicted

22   coconspirator by the government might be done in order to have

23   advantage of the hearsay rules that would allow their

24   statements to be admitted.  And if that's the case, then, of

25   course, the fact that they are alleged by the government to be

1    unindicted coconspirators is necessary to present so that the

2    jury can consider, among other things, *Petrozziello* factors.

3          In the absence of that, if they're just plain

4    witnesses and they're not going to be impeached by immunity,

5    then it would seem to me that there would be no reason for the

6    jurors to have them characterized; that is, if the government

7    doesn't want to use them as coconspirators for hearsay

8    purposes, and the defense doesn't want to accuse them by

9    impeachment through the immunity, then there would be no reason

00:57 10   for the jury to do it.

11          So I'm not sure what the respective strategies are

12    with respect to the witnesses.  I mean, they've already now

13    been referred to in that characterization, but it seems to me

14    that there are limits as to why that should happen on both

15    sides.

16          MR. NOONAN:  Agreed, your Honor.  But -- and I'll get

17    the transcript.  My recollection is Mr. O'Connor specifically

18    said, especially as to Mr. Murphy and Mr. Denney, unindicted

19    coconspirators who are not being prosecuted.  That issue now is

00:57 20   alive.  They've been told that and it will leave an improper

21    inference in the jury's mind.  And I believe he made a broad

22    reference to other sales representative who are unindicted

23    coconspirators.

24          THE COURT:  Well, let me ask this:  The government

25    identified people, I guess, to the defense as unindicted

```
 1  coconspirators.
 2          MR. NOONAN:  Yes, your Honor.
 3          MR. O'CONNOR:  Yes.
 4          THE COURT:  Why?
 5          MR. NOONAN:  For evidentiary reasons.
 6          THE COURT:  Okay.  All right.  So it's likely, then,
 7  the government is going to want to characterize them as
 8  coconspirators.  I think it's fair for the defense, then, to
 9  probe as to their status as possible biased witnesses for the
10  government because of promises or inducements or orders that
11  the government has obtained.
12          MR. NOONAN:  Absolutely, your Honor.  I completely
13  agree.  At least with respect to the two individuals who are
14  named, Mr. Murphy and Mr. Denney, the government's position is
15  that they've already been, in some way, impeached.  So we
16  should be able to lead off their directs, should we choose,
17  with directly bringing up their immunity orders.
18          MR. O'CONNOR:  Your Honor, I'm not sure I follow the
19  logic.  And they say they told us, you know, just for
20  evidentiary reasons.  But they've indicted a conspiracy and
21  they've said that, you know, the company's part of that and
22  these people are the coconspirators.  So I don't see any
23  problem with what I said -- at least, you know, certainly with
24  respect to the sales representatives in the opening.
25          We have to deal with a criminal charge.  And the
```

1    criminal charge is that these people were involved in a

2    conspiracy.  And it either makes sense or it doesn't, and we

3    think it doesn't.  So I think it's okay to point that out.

4         On the theory, you know, that we said that they're not

5    being prosecuted -- and this is the two, Murphy and Denney -- I

6    don't see the logic for why the government ought to be able to

7    put down in front of the jury that they've been immunized

8    unless we're going to cross, because these people are senior

9    managers too.  They are at the level of Mr. Whitaker --

00:59 10        THE COURT:  Well, I think the point is that in a sense

11   they've already been impeached by the characterization in the

12   opening, and that's enough.  I agree with the government on

13   that.

14        MR. NOONAN:  Thank you, your Honor.

15        MR. O'CONNOR:  Your Honor, on those two, right?

16        THE COURT:  On those two.

17        You had something or --

18        MR. O'CONNOR:  Yes, I do.  Are you done?

19        MR. NOONAN:  I have a logistical matter, but if yours

01:00 20   is more substantive.

21        MR. O'CONNOR:  Yes, your Honor, this is substantive.

22   And this is important from our perspective, and it goes to --

23   we made a motion in limine with respect to -- I would like to

24   hand up -- I know the government has it -- and then ask you to

25   hand it down because I need it.  But this is the so-called

```
 1   Houghton slide deck and the consequences of off-label promotion
 2   slide.
 3           And I want to say this, your Honor:  Our fears with
 4   respect to what the government's trying to do here were
 5   well-founded, as demonstrated by Ms. Winkler's opening.  I'm
 6   just going to read a few -- we have eight statements
 7   where -- I'm going to read the first one.  You'll see that
 8   she's holding PowerPoint presentations that "They," the
 9   defendants, "were actually trained that it was illegal and that
10   they should stop."
11           Second:  "They were also told that it was illegal,
12   that it was criminal, and that it was a serious offense" -- you
13   can see the slide -- "if they did those things."
14           Third:  "They also knew that promoting the mixture of
15   Calstrux and OP-1 to doctors was illegal."
16           Fourth:  "Now, the evidence that you're going to hear
17   is that all of these defendants knew that promoting the mixture
18   of OP-1 and Calstrux to doctors was illegal."
19           That is what we were afraid -- and its first witness
20   is the guy on the slide.  So their case is to charge felony
21   misbranding with intent to defraud or mislead, and also felony
22   fraud conspiracy and wire fraud.  And they're going to try to
23   persuade the jury that pure, honest, truthful, off-label
24   promotion, if it occurred, is what's charged in the indictment
25   and that they ought to convict on it.
```

01:00 10

01:01 20

1    John Houghton and anyone else who had to do with that

2    slide, not a lawyer, not a judge.  This jury needs to

3    understand what -- at a minimum, you know, what the law really

4    is if -- they're going to play it out the way Ms. Winkler did

5    in her opening and the way they're going to do it, trust me on

6    this, in the direct of Mr. Houghton.  And so we ask that

7    the -- again, we renew our request that the slide either -- you

8    know, that it be excluded.

9    In the alternative, your Honor, we would like an

01:02 10   instruction before Mr. Houghton gets on the stand on these

11   legal principles.  And I think that -- if I can just grab my

12   papers, you know, there's a couple of things.  I mean, you do

13   have -- and we have the motion with the proposed instruction.

14   But, you know, let me just read -- you know, the question posed

15   by the superseding indictment is not whether the defendants

16   engaged -- we have a motion but I don't want to file it because

17   you have enough paper -- an off-label promotion after having

18   been told it was illegal.  The question in the indictment is

19   can the government prove beyond a reasonable doubt the elements

01:03 20   of the charged offenses.  And misbranding includes an intent to

21   defraud or mislead.

22   The slide -- before the slide, if you peel back One

23   there, is:  "Do not promote off-label.  Do not mix.  Do not

24   share recipes.  Do not recommend the use of Calstrux and OP-1

25   Implant.  To not give directions for mixing Calstrux and OP-1

1    Implant.  No off-label promotion or off-label activities will

2    be tolerated."

3         Turn the page.  "Consequences of off-label

4    promotion" -- right there -- "criminal misbranding

5    prosecution."  That's what we have here.  But, your Honor, we

6    have a felony criminal off-label promotion case in Counts 7

7    through 12 against the company.

8         And so what the jury is going to go home for the

9    weekend and listen through at least the government's case

01:04 10   believing is that what they were -- what's instructed on the

11   "do-not" slide is criminal misbranding like we have charged

12   here.  It is not.  There is a misdemeanor -- you can charge it

13   as a misdemeanor, strict liability offense.

14        Your Honor, we wouldn't be here if that's what the

15   government had wanted to do.  So they're trying to turn it up,

16   get the heavy penalties, charge a fraud misbranding case, but

17   have the jury take the law from John Houghton's slide deck.

18        And so we would like you, if you're not going to

19   strike the slide, to instruct them with respect to, you know,

01:04 20   A, the law comes from the Court.  You mentioned earlier, you

21   know, that all of these offenses require proof of fraud,

22   including misbranding, which has an intent to defraud or

23   mislead element to it.  Because otherwise, I just think the

24   danger of unfair prejudice to these men, Jeff, Bill, Dave, and

25   to this company, is too great.

1          THE COURT:  Mr. Sternberg?

2          MR. STERNBERG:  Thank you, your Honor.  A couple of

3    things about the slides.  First, the crimes at issue all

4    require acts and then proof of intent.  The slides at

5    issue -- the conclusion slide, the one that says "do not," "do

6    not," "do not," talk about a series of acts that are being

7    communicated to the sales force not to engage in.

8          The consequences slide then talks about potential

9    consequences for those acts.  They don't -- as a matter of --

01:05 10    as the defense has put in one of their briefs, as a syllogism,

11    say one follows the other.  Intent will have to be proven and

12    cannot merely be proven by looking at the slide, but by what

13    other acts there were, what other evidence was there of their

14    mental state after March of 2006.  The slide, though, is highly

15    relevant to what these people were told they should and

16    shouldn't do and how serious that instruction was given the

17    potential consequences that they were talking about.

18          Mr. O'Connor talks about a jury instruction to be

19    given now which the government objects to.  Mr. O'Connor gave

01:06 20    the jury quite a bit of law yesterday about misbranding and

21    off-label promotion.  Mr. Houghton is not going to be

22    testifying as an expert; he's going to testify about the

23    process he went there with other of his colleagues to develop

24    the slide set; the manner in which he gave it; who got it; what

25    was said; what the responses were.  And then there will be

1    evidence of other trainings during the course of this trial

2    that postdated Mr. Houghton's training in 2006 and 2007.  And

3    there will be other evidence that either will or will not prove

4    the intent of the defendants.

5           But this is a key milestone in this case and a key

6    piece of evidence that should come in, and should come in

7    without any jury instruction at this time that would highlight

8    it over any of the other pieces of evidence that are going to

9    come in during the course of the trial.

01:07 10          MR. O'CONNOR:  Your Honor, there will be no other

11   evidence -- no other evidence -- in this case like this slide.

12   None.  And so we -- we just say -- and, you know, Mr. Sternberg

13   said in the filing on November 9th, "We're not trying to

14   bootstrap a misdemeanor misbranding charge into a felony

15   conspiracy charge."

16          Well, let's tell -- have the Court tell the jury what

17   the law is.  This is a compliance -- you know, this is

18   compliance training.  This is the most significant, by far --

19   if they've got a little other compliance training in the case,

01:07 20   it's nothing like March 1, 2006.  Ms. Winkler -- they

21   featured -- I've got eight quotes from her.  It's from this in

22   her opening.  And she is trying to set the bar at:  If you do

23   the things on the "do-not" slide, you are guilty of criminal

24   misbranding, which is charged here.

25          But we have felony criminal misbranding, intent to

1  defraud.  They said it from the beginning:  This is a fraud

2  case.  That's why it's a felony.  It is not a strict liability

3  misdemeanor case.  They are trying to bootstrap a misdemeanor

4  case into a felony conviction.  And that's not fair.  And

5  that's what 403 is about.

6        So I think, your Honor, if you're going to allow

7  them -- and I understand why you would -- to use the slide --

8  because the government makes good points about, you know, the

9  evidence of intent and all of that is important, but I just

01:08 10  don't want them to be confused about what the standard is, what

11  the question is that they're supposed to be focused on.

12        If I were them, even as a lawyer I'd think that, well,

13  you're putting in this.  It sounds legal to me.  "Criminal

14  misbranding prosecution."  "Serious offense."  "Illegal."

15  "Criminal prosecution and criminal fines."  That's legal talk.

16  And it's fine if they want to say, "Listen, people went out and

17  gave out mixing instructions without surgeon questions or

18  requests for information after this."  I'm willing to live with

19  that and we can deal with it.  But I think we can't deal with

01:09 20  the jury having the understanding, as they listen to six weeks

21  of evidence, that, you know, this is the -- the question is

22  just affirmative -- you know, without any discussion by these

23  men, sales reps for whom the company's responsible about the

24  mixture.  Because that's what they're going to think the case

25  is about.

1          And it's a long time -- we have to sit there -- and

2     even when we get to our case -- I mean, unless we put on a

3     legal expert, which we don't want to do, obviously.  You know,

4     I don't know how you -- how you undo the misimpression, if

5     that's what they have, if I'm right about that, about, you

6     know, what the government's shooting at.

7          MR. ULLMANN:  Very briefly, your Honor.  On behalf of

8     the three individual defendants, we don't think the slide is

9     fair, we don't buy the government's arguments at all, and we do

01:10 10    think the issue is broader than just confusion about

11    misdemeanor misbranding versus felony misbranding.  We think

12    that clearly the government wants the jury to conclude from

13    that slide that these three individuals and the company are

14    guilty of all the charged offenses.

15         THE COURT:  All right.  There's no question that each

16    of the counts requires proof of fraud and, therefore, intent to

17    defraud.  It seems to me that the three openings by the defense

18    yesterday emphasized that point.  I think the jury probably

19    absorbed it.

01:10 20         I'm not going to instruct at this time, principally

21    because I am not going to instruct before I've heard the

22    evidence, on a prediction of what the evidence will be.  And

23    not only does it go to whether there should be an instruction

24    but how it should be framed.

25         So there will be time to emphasize and, I think, make

1    clear to the jurors what the issues are and how they're to

2    resolve them, and we'll be aware of that, but the distinction

3    between proving a simple misbranding, or an off-label use

4    promotion or something like that, and the crimes charged is a

5    distinction that we will observe, but at the appropriate time.

6            MR. STERNBERG:  Your Honor, there's one other issue

7    with respect to --

8            MR. O'CONNOR:  Thank you, your Honor.

9            THE COURT:  So I will neither exclude the slide nor

01:11 10   instruct at this point.

11           MR. STERNBERG:  Your Honor, there's one other issue

12   with respect to immunity, or maybe a broader immunity issue we

13   wanted to discuss with the Court at sidebar, if we could.

14           THE COURT:  Do we need to do it now?

15           MR. STERNBERG:  It is relevant to the first witnesses

16   witness.

17           THE COURT:  Okay.

18           (Discussion at sidebar and out of the hearing of the

19   jury:)

01:12 20          MR. STERNBERG:  The form of immunity order that we're

21   using says if the witness refuses to testify, then immunity

22   flows from that.  Given the regime we're operating under,

23   counsel for the witnesses have been asking how do we know the

24   immunity is operative.  In keeping with the Court wanting

25   to -- as long as the defense is not going to cross-examine

```
 1    about the immunities, our suggestion is that the Court can say
 2    on the record that for all the orders that have been signed by
 3    the Court, the immunity is active and, therefore, for the
 4    witnesses the defense is not going to cross-examine, we can
 5    communicate that to those witnesses.
 6             MR. O'CONNOR:  That's a good way to handle it.
 7             MR. GURNEY:  That's fine.
 8             THE COURT:  Rather than have to put them on and have
 9    them refuse and so on and so forth?  Well, if that's the
01:13 10  agreement of the parties, then --
11             MR. O'CONNOR:  I think it's a good suggestion and I
12    appreciate it.
13             THE COURT:  -- I guess what happens is I can accept
14    the representation that all of the witnesses have stated, and
15    all counsel agree that they have done so, that they will not
16    testify without immunity.
17             MR. O'CONNOR:  Yeah.  I think that's fine.
18             THE COURT:  So we can take that as a fact.
19             MR. STERNBERG:  Okay.  And I'll communicate that.
01:13 20  The other issue --
21             THE COURT:  Now, Houghton is the first witness?  So he
22    has an immunity order?
23             MR. O'CONNOR:  Uh-huh.
24             THE COURT:  Are you going to --
25             MR. O'CONNOR:  Thank you, your Honor.  We're
```

1    committing not to impeach him.

2         MR. STERNBERG:  On that point, because counsel for the

3    witnesses are asking us the night before, the day before, can

4    we ask for 24-hour notice on that?

5         MR. O'CONNOR:  Absolutely.  Absolutely.  That's fair.

6         THE COURT:  Is he going to be the rest of the day

7    after we finish the opening?  Predictably, anyway, a couple of

8    hours?  So it will be 10:30 or something?

9         MR. LIBBY:  Yes.

01:14 10       MR. O'CONNOR:  I'm not sure on that.  I

11   don't -- I'm --

12        THE COURT:  The only reason I ask, is there any issue

13   with the next witness?

14        MR. O'CONNOR:  Oh, yeah.

15        MR. LEVY:  We won't be impeaching.

16        THE COURT:  Okay.

17        (In open court:)

18        THE COURT:  Okay.

19        MR. NOONAN:  Your Honor, the government's logistical

01:15 20   issues can probably wait.  Let's crack on.

21        THE COURT:  All right.  So we're ready for the jurors.

22   Now, one minor thing --

23        You can start doing this and I can talk.

24        -- I am going to permit them to take notes.  I didn't

25   address it yesterday because I thought I'd do it when we were

1    handing out the pads.  So I'll pause to tell them that they can

2    take notes.

3            MR. NOONAN:  Your Honor, does the Court allow them to

4    take notes during the closings as well?

5            THE COURT:  No.  No, just the evidence.

6            (Pause.)

7            THE COURT:  We won't do it now because there's still

8    an opening to be done, but after Mr. Libby's opening we'll do

9    it.

01:16 10         Are you using the chart?  Yeah.  The monitors at all?

11            MR. LIBBY:  No, your Honor.

12            (Pause.)

13            THE CLERK:  All rise for the jury.

14            (The jury enters the courtroom at 9:54 a.m.)

15            THE CLERK:  Please be seated.

16            THE COURT:  Good morning, jurors.

17            THE JURORS:  Good morning.

18            THE COURT:  As I predicted, there were a couple of

19    issues the lawyers and I had to deal with, and we've resolved

01:17 20   them now and we're ready to proceed.  So we have one more

21    opening statement and then we'll commence the evidence.  So

22    Mr. Libby on behalf of Mr. Whitaker.

23            MR. LIBBY:  May it please the Court, counsel, and may

24    it please you, ladies and gentlemen of the jury.  Once again,

25    my name's Frank Libby, and together with my colleague, Althea

1    Porter, we're proud to represent Jeff Whitaker.

2         You've been very patient yesterday and again this

3    morning.  You've heard a great deal already.  A lot of

4    material.  Several hours of presentation by some very

5    experienced counsel on a matter that's very likely unfamiliar

6    to you.  And I was planning on asking you to hang in there just

7    a little bit longer, telling you that it was just one more

8    opening statement, but that wouldn't do justice to this moment

9    because it doesn't come near capturing what's really unfolding

01:18 10   before you right now.

11        I'm standing before you on behalf of a good and decent

12   man.  His entire life he cared deeply about how he carries

13   himself, how he behaves, how others view him.  He cares deeply

14   about his family, his friends, his colleagues at Stryker and in

15   the relatively small surgical community, surgeons and the like,

16   what they think about, what they say about him.  Simply put:

17   Jeff Whitaker is eager to be both exonerated in this criminal

18   matter and to clear his good name, the name that he has built

19   up his entire life.

01:19 20        He wants to do that very much in the course of this

21   proceeding with you, and he wants to get this

22   process -- everybody wants to get this process underway, with

23   you all as the judges of the facts.  You and you alone find the

24   facts in this case.  And that begins with testimony which

25   commences virtually immediately after I'm done.  But I make no

1    apology for taking this time with you.

2         So Jeff Whitaker:  He's a family man.  Married Linda

3    about 20 years ago.  Two young children:  Jacob and Hannah.

4    She's home taking care of them.  Jeff grew up and attended high

5    school in Maryland and South Carolina, and graduated college in

6    1985.  He bounced around at a couple of entry-level positions

7    after graduating college and then had the great fortune to join

8    the medical-device industry.

9         His first job in the medical-device field had to do

01:20 10    with legs, anti-coagulation devices and the like.  Prevents

11    deep vein thrombosis.  So why is that important to mention?

12    Because it was his first opportunity to deal with a very select

13    customer base:  doctors, surgeons.  He called on them.  He

14    found it was an exciting new world.  These are busy people with

15    serious work.  And he came to appreciate what they're able to

16    do and how they go about their work.

17         He came to know and respect individual surgeons not in

18    the role of a patient like you or I would typically, but to

19    present himself as a potential asset, a resource to that

01:21 20    surgeon, to that doctor.  And after some time Jeff concluded,

21    Do you know what?  This is pretty good.  This is a great way to

22    make a living.  This is meaningful and this is what I want to

23    do.

24         So after some time he moved on from legs to knees.  He

25    worked for a company that sold surgical instruments for

arthroscopic surgery and the like, provided stability to the

knees.  And then moved up to the shoulders.  Started with legs,

knees, now shoulders, rotator-cuff surgery-type instruments,

and so on, suture anchors, to stabilize the shoulder.

In 2002 Jeff had the great fortune to join Stryker

Biotech.  And what an opportunity.  He moves from

instrumentation-type devices to the cutting-edge world of

biologics.  His initial experience was with OP-1 Implant.

Mr. O'Connor told you a little bit of history about OP-1

Implant with the long-bone nonunion product.  A year or so

later Implant was joined on the market by OP-1 Putty.  You

heard a great deal about that already.  That's the bone

morphogenetic protein.

Now, here some of the most demanding customers on the

planet, neurosurgeons, orthopedic surgeons, he's dealing with

them on a routine basis.  It's a demanding task, but if you

know your stuff and you're good at what you do and you know

people -- and sales is all about people.  It's all about trust

and confidence -- you can build solid working and professional

relationships and you have a shot at growing a loyal customer

base, customers who will not only come to know you and respect

you and trust you, but give your name to other surgeons.

That's how you make a good living and you carve out a career

for yourself, a future for yourself and your family.

Now, you heard from Ms. Winkler, Jeff was a regional

1    sales manager for Stryker.  He was proud to be a regional sales

2    manager for Stryker.  In '05 he became the southeast sales

3    manager, and then in late '07 he became the eastern region

4    sales manager.  Now, it's not a manager in the executive sense

5    of the word.  He worked out of his home, North Carolina.  He

6    doesn't hire or fire.  He doesn't make salary decisions or

7    design training in any way.  That's all handled elsewhere in

8    the company.  But he's an experienced sales motivator, a

9    communicator and a facilitator for the ten or so reps that he

01:23 10    covers in his territory.

11         And that includes traveling throughout his region,

12    supporting his reps, looking after their well-being, and going

13    on things you'll hear called ride-alongs.  A territory

14    manager -- or, rather, a sales manager, a regional manager,

15    will go and see a rep and go on some rides, pay visits to

16    surgeons in their offices, see how his reps are handling

17    themselves in the field.

18         So from years of experience in the surgeons' offices,

19    in and around hospitals and surgical clinics, Jeff helped his

01:24 20    sales reps learn the ropes, learn -- he learned the ropes, and

21    he would teach his reps how best to prepare to help the surgeon

22    and actually be helpful to that surgeon.  You'll see and learn

23    how his own people uniformly thought very highly of him; valued

24    his energy, his willingness to step up and to help with

25    whatever they needed.

1          So let's fast-forward to the present.  Jeff's day in
2      court begins right now -- right here, right now.  And this is
3      my opportunity on behalf of Jeff to tell you what I believe
4      this case is fundamentally all about.  Now, I'm not going to
5      intentionally go into plowing the ground that these lawyers did
6      yesterday.  I'm not going to try to do that.  I'm going to try
7      to avoid that.  There may be some overlap, but I'll see if I
8      can avoid it.  Rather, I'm going to suggest to you two, and
9      only two, guideposts to keep in mind as you listen to the
01:25 10   testimony, you see the evidence, you hear the people from the
11     witness stand.
12          And those two points -- each of those two points have
13     to do with one thing, and that's being free to do your job.
14     Being free to do your job.  One -- Mr. O'Connor briefly
15     mentioned this yesterday and I want to underscore it -- the FDA
16     may not interfere in the practice of medicine.  The FDA may not
17     interfere in the practice of medicine.  That means doctors,
18     surgeons, are free to call the shots -- all of them, because
19     it's their obligation to call the shots -- regarding the care
01:26 20   and treatment of their respective patients.
21          The FDA's role as a regulator is, of course,
22     important, but at the end of the day -- at the end of the
23     day -- it's the surgeon's decision.  And the surgeon's decision
24     regarding his patient trumps the FDA, something you didn't hear
25     from Ms. Winkler yesterday.  That's one.

1          Two:  When a surgeon asks for help or poses a question

2     to a manufacturer's rep, a sales rep, regarding the care or

3     treatment of that surgeon's patient, the rep -- such as Jeff is

4     a rep, now he's a regional manager -- they're completely free

5     to respond -- completely free to respond -- to that request for

6     help, or that question.  Another item not included in

7     Ms. Winkler's comments.

8          Now, doctors know this.  They know they're free to

9     practice medicine, and so do those in the medical-device

01:27 10   community, including Jeff.  He knows it too.  You'll see from

11    the evidence that Jeff acted in good faith, that whatever the

12    circumstances were, he believed he should be prepared to

13    respond and that it was perfectly permissible to respond to

14    that request for help.

15         Now, why do I single out these two points up-front

16    first?  Because the government has charged Jeffrey Whitaker

17    with fraud; that is, lying and cheating surgeons.  Lying and

18    cheating surgeons.  Make no mistake.  That's the

19    charges -- those are the charges in this case.  And to convict,

01:27 20   they have to prove to you, ladies and gentlemen, among other

21    things, and beyond a reasonable doubt, that Jeff -- this man,

22    Jeffrey Whitaker, had criminal intent.  And not just any kind

23    of intent -- any kind of criminal intent -- specific intent.

24    Specifically intended to defraud a surgeon, to lie, to cheat a

25    surgeon.  And here's the home-run point:  Good faith is

1    completely inconsistent with an intent to defraud.  Completely

2    inconsistent with an intent to defraud.

3         You will conclude that after all is said and done and

4    all the evidence is in in this case, contrary to believing that

5    any of his actions were criminal, Jeff had every good reason to

6    believe and, in fact, believed genuinely that he was acting in

7    good faith.  He was doing good.  Helping a surgeon, in turn,

8    help that surgeon's patient.

9         So here let me be a little more visual and offer a

01:28 10   scenario where both of those things are in play.

11        If I may, your Honor?

12        THE COURT:  Go ahead.

13        MR. LIBBY:  It's going to be to your back, but this is

14   what we have here.  Can everybody see this okay?

15        Now, these two principles I'm talking about are

16   actually at play in what you see here in this photograph.  And

17   they're at play with -- everybody in this room has to be on his

18   or her own toes.  And that takes place every day in every

19   operating room in this nation.

01:29 20        One way or another, virtually everything you hear and

21   see in this case is going to come down to this.  All of it.

22   All the evidence in this case.  Everything you need to decide

23   about the government's charges can be found right here.  It's

24   personified in what you see here.

25        This is the operating suite, the operating room.

1   You're going to learn from the evidence in this case, ladies

2   and gentlemen, how the surgeon, this gentleman right here with

3   his back to you, bent over as tasked, calls all the shots in

4   the operating room to include who's in the room, what takes

5   place, at what stage, in what manner, and for what purpose.

6   Everything.  The surgeon.

7        So it's a little tight quarters here and it doesn't

8   capture everybody in the room, but just so we're clear we have

9   a patient you can't see.  The surgeon is bent over him.  We've

01:30 10   got the scrub nurse, the surgical assistant; we've got the

11   neurology, radiology folks.  Why do we have radiology?  We're

12   dealing with spines, bones, constantly taking X-rays.  That's

13   why we're wearing lead vests.

14        We have a circulating nurse -- not in the photograph

15   here, but every one of these procedures -- you'll learn about

16   the surgical procedure, including who's in a room, what

17   happens.  A circulating nurse is not in the sterile field.

18   That's the area immediately above the incision.  Nothing can go

19   in there unless it's sterile.  It's called the sterile field.

01:31 20   The circulating nurse gets whatever product, boxes, opens the

21   boxes, makes sure the instruments from the back table are made

22   available to the scrub nurse and so forth.  So it goes

23   circulating nurse to scrub nurse to the assistant, and

24   ultimately, the surgeon.

25        And that circulating nurse is documenting in real time

1    everything that is being used in that surgery.  Everything.

2    Documenting it so there's a record, a real-time record so

3    you'll know -- and you can see.  And you'll see documents in

4    this case -- what happened in that room, two- or three-hour

5    procedure.  A complete record.  What was used, who was there,

6    who did what, when.

7            Now, I haven't talked about this fellow right here in

8    the red vest.  This might surprise you, but that's the

9    medical-device representative.  Why's he there?  Well, we'll

01:32 10  tell you later.  You'll learn why he's there.  He's there often

11   at the request, and most often at the insistence, of this man,

12   the surgeon.  He's not barging in.  He's expected to be there

13   under the complete direction and control of the surgeon.

14           Now, here he's using a laser pen.  You'll see here,

15   you'll learn that because the rep is not in the sterile field

16   and he's not scrubbed in and he's not, in fact, involved in any

17   way physically with the surgery, he needs to point out

18   products, boxes and so forth, and talk to the circulating nurse

19   and make sure that people are getting what needs to be gotten.

01:32 20          He never opens a box or moves or touches an

21   instrument, but -- and you'll hear about this too -- he can be

22   helpful in telling the surgical team, maybe unfamiliar with the

23   vials -- and you've seen a couple of the vials of OP-1 and

24   Calstrux in this case -- how to open it.  It's not easy.  It's

25   got serrated edges; it's got rubber stoppers.  They want to

1    make sure that people open this properly when it's time.  And

2    this gentleman here says when it's time.

3         Now, he doesn't simply show up.  These are calendared.

4    These procedures -- as you might imagine, it's a fairly

5    complex, significant procedure for everybody involved.  There's

6    a game plan.  It's scheduled.  Need to know who's on the team,

7    who's going to be there, how much product is necessary.  It's

8    all played out ahead of time.  It's too late once this

9    procedure gets underway to try to figure out how much product

01:33 10    is necessary for whatever the procedure is.  So the bottom-line

11   dynamic, you'll find -- you'll find in the course of this

12   trial -- is that this person's purpose is to do all he or she

13   can to help this person do all he or she can to help the

14   patient.  That's it.  That's what this case is all about.

15        Now, the patient -- a word about the patient you don't

16   see here in this photo.  At this stage in this kind of

17   surgery -- leading up to the surgery, rather, there's just only

18   one word for this patient's life, and that's miserable.

19   Whoever that person is has been dealing with spinal instability

01:34 20   for years.  After years of pain management and physical therapy

21   and so forth and so on, this person has been effectively

22   deprived of all daily functions of life and enjoyment of life.

23   They consider themselves out of the mainstream of family life

24   and business life.  They can't move.  They can't bend over.

25   They can't lift.  They can't sleep.  They can't walk.  They're

1    at the end of their rope.

2            Now, 20 years or so ago all that was available to help

3    folks like that -- some folks like that -- was the procedure

4    that Mr. O'Connor laid out for you yesterday, and that's the

5    iliac crest graft surgery.  Brutally painful.  Even with

6    anesthesia, brutally painful.  Patients will tell you they

7    don't want to go through that.  They could feel the hollow

8    piece from their hip.  It's where they go in, they crack open

9    the hip with a hammer and chisel and pull out that soft bone.

01:35 10   They need the person's own bone to try to make a fusion in the

11   spine, basically.

12           But for some they can't even -- years ago they

13   couldn't even submit to that procedure.  They were just flat

14   out of luck.  They weren't good candidates for it.  And, again,

15   Mr. O'Connor mentioned briefly some of those folks weren't good

16   candidates because they didn't -- they had poor bone quality,

17   if they had any bone available at all for that type of

18   procedure, iliac crest graft.  These are people who were

19   elderly, smokers, diabetic, osteoporosis, had a prior failed

01:36 20   surgery.  There wasn't any bone left to go back and get.  So

21   their misery continued, no options.

22           Then along came bone morphogenic protein, a brand-new

23   day for spine surgery.  A brand-new day for spine surgeons.

24   And that's why, ladies and gentlemen, this man joined Stryker.

25   He saw it for what it was:  a great development.  Patients were

1    no longer shut out of the operating room by poor bone.  It's a

2    huge leap forward.

3            You heard Mr. O'Connor talk about Stryker's research

4    and development story.  This is the kind of -- this is the kind

5    of product, this OP-1 -- it's like a radio signal.  Very strong

6    radio signal.  A hundred, even a thousand times stronger than

7    your own bone.  Tells the body:  Grow bone.  Fill in, give me

8    stability in my spine.  Surgeons don't have to go and tell

9    their patient, You've got to undergo this crest graft, this

01:36 10   hip -- we're going to crack open your hip.  He doesn't have to

11   say that anymore.  So most of all, with the advent of BMPs,

12   surgeons can say yes to these people that were previously out

13   of luck.

14           So in the course of this trial you're going to learn

15   surgeons obviously wanted to avoid exposing their patients to

16   this unnecessary pain, and not for nothing, additional surgical

17   procedure concerning the risk of anesthesia and so on and so

18   forth.  Two procedures.  They understood the benefit of BMPs.

19           A little bit of relevant history.  Just a little.  The

01:37 20   first on the market was not OP-1.  It was a thing called

21   InFuse -- a product called InFuse -- from Medtronic.  First on

22   the market.  The surgeons became familiar with InFuse, and then

23   they began combining InFuse with other materials to give it

24   volume and handling, okay?

25           And the scaffolding.  The scaffolding -- you heard the

1    term "scaffolding" already.  It's something to grow on.  When

2    the active ingredient sends that signal to grow bone, it's got

3    to grow on something, to provide scaffolding.  So doctors were

4    already mixing before OP-1 came on the market.  And all that

5    was widely known in the spine surgery community and the

6    medical-device community, known to Jeff.  OP-1 later came on

7    the market as an approved product.  Now that's available to

8    surgeons as well.  And sometime later Stryker launched

9    Calstrux, the TCP product, that tricalcium phosphate which

01:38 10   occurs in things such as you see in this Gerber baby food.

11          You'll also hear a constant reframe, and the evidence

12   in this case, and that is this:  Surgeons ask each other and

13   reps all the time about mixing, combining products.  All the

14   time.  Mixing was the standard of care throughout this whole

15   time.  Surgeons believe that combining an active ingredient and

16   inert materials such as TCP was beneficial.  It was the best of

17   both worlds.  It provided the bone growth signal and the

18   scaffolding on which to grow the bone.  You're going to learn

19   again that all of that was widely known in the medical-device

01:39 20   community, to folks including Jeff.

21          Surgeons, their surgical teams and the sales reps

22   providing the latest, greatest advancement all believed -- all

23   of them believed -- they were playing a genuine role towards

24   greater prospects for successful surgical procedures.  And

25   you'll see and hear in this case, in this courtroom, the very

1    same thing Jeff and his colleagues saw and heard:  that OP-1

2    provided a second chance, wonderful opportunities for a vastly

3    improved life.  Get these people back to their near-normal

4    daily function.  No more pain.  I can sleep.  I can walk.  I

5    can lift.  And in some cases with trauma patients, I don't have

6    to lose a limb.  I don't have to lose a limb.

7         These are wonderful opportunities for surgeons.  These

8    are folks -- the gentleman here an example among them --

9    they're wired to move.  They're active people.  They want to

01:40 10   help.  They want to achieve things.  They want to accomplish.

11   They want to use everything that's available to them to

12   maximize their ability to get a good result for their patients.

13        So why's this important to go into this with you here?

14   Well, in addition to the wonderful results themselves, far from

15   any criminal intent of any kind, these results add to Jeff's

16   store of understanding, knowledge and appreciation of the

17   wonders that OP-1 brings to patients.  Jeff and his colleagues

18   are personally and professionally motivated by these success

19   stories.  They give them pride in what they do, in their work,

01:40 20   and why they can offer surgeons a way out.

21        Now, surgeons.  Very briefly.  You're going to see and

22   hear from several of them.  These are the folks who deal with

23   the spine.  Orthopedic surgeons and neurosurgeons, they both

24   cover the human spine.  Needless to say, they're highly

25   educated, skilled and trained.  I would consider them the

1    fighter pilots of the surgical community, the very best of the

2    best.  They're busy people.  You'll hear about their

3    time -- their tight time clock and time management day in and

4    day out.  They have special surgery days.  They do rounds.

5    They have time set aside for new patients.  They're not very

6    casual in their workplace, as you might imagine.  And they

7    can't and don't tolerate folks on their team who don't show up,

8    don't perform and don't come prepared for business and aren't

9    prepared when the surgeon poses a question or asks for help.

01:41 10        Sales reps, the entire medical-device community, know

11   this, including Jeff.  This is a relatively small tight-knit

12   surgical community, you'll learn from the witnesses on the

13   witness stand.  They stay up on the latest advancements and

14   techniques in this kind of surgery.  They talk to each other

15   all the time.  What better source than your colleagues, who are

16   also your competitors for the surgical business?  They go to

17   the same lectures, they read the same literature, they attend

18   the same conferences, and they're all on the internet.  They

19   want to be the best at what they do.  And that's where it comes

01:42 20   from, that information, all those sources.

21        Sales reps know this too.  And you're going to -- in

22   the operating room -- in the operating room -- this man's word

23   is law.  He's got the first word, he's got the last word, and

24   every word in between.  That man.  You're going to hear from

25   some of them yourself.  You'll see them on the witness stand.

1    You can size them up all yourself.  And you're going to see --

2    what you're going to see and hear is that they call the shots.

3    All of them.  The who, what, when, where, how.  All of it.  And

4    why?  Ultimately, because they're accountable.  They're

5    responsible for that patient and the patient's family.  They're

6    the ones who walk out of the operating room and talk to the

7    family.  They're accountable at the end of the day.

8         So for that reason, among others -- and as I pointed

9    out in the beginning of my comments but it bears repeating

01:43 10  here -- you're going to learn that a surgeon is free to

11   practice medicine without interference from the FDA.  He's

12   accountable.  He's free to practice medicine.  Surgeons will

13   tell you that while there's a lot of science involved, once

14   that surgical procedure begins, the incision is made, that's

15   when the surgeon sees the landscape, actually sees what he's

16   dealing with in that spine.  And he sees where he's got room to

17   act, what it is that he needs to do now that he couldn't see

18   before.

19        And he'll tell you there's far more art than science

01:43 20  involved in this.  Now I've got a decision to make.  How do I

21   help this patient right here, right now?  Each patient is

22   different.  No surprise there.  Each procedure is

23   correspondingly different.

24        So you're going to hear a lot about things such as the

25   space to be filled in the gutters.  You'll hear about gutters,

1  the space to be filled.  The volume that I need -- the

2  consistency.  The handling -- the surgeon needs to deal with

3  this now in the course of the procedure.  The surgeon then

4  believes in those.  "I have to have everything available to me,

5  all the tools and resources, everything.  My training -- I

6  bring to bear my training, my education, my experience, my

7  expertise, and my independent exercise of medical judgment."

8        Now, the surgeon, as with any doctor, is completely

9  free to make his or her own decisions, to elect, to prescribe

01:44 10  or use for any purpose any drug or device lawfully on the

11  market.  He can reach anything that's lawfully on the market in

12  the exercise of his independent medical judgment.  That

13  includes devices such as OP-1, Calstrux, or any other inert

14  substrate, as we call it.  That's the mixing material.  And any

15  combination of the two.  Any combination of the two.

16  Completely free to reach and use those things as he or she sees

17  fit in the course of the surgical procedure.

18        Now, I expect that you'll see instances in this case,

19  primarily emails, of Jeff's discussing with his colleagues

01:45 20  various ways that spine surgeons in their discretion might --

21  given the history of mixing and combining generally, how they

22  might consider and ultimately decide, the doctors -- rather,

23  the surgeon calling the shots -- they might decide to combine

24  these products.  Their call.  That's their shot.

25        And in doing so, you'll see that Jeff, as a

1   knowledgeable device representative and regional sales manager,

2   is genuinely trying to be helpful both to his sales reps and,

3   in turn, to the surgeon in every case.  That's all there is to

4   this case, ladies and gentlemen.  He's not hiding a thing.

5   It's completely out in the open.  He's acting completely in

6   good faith rather than criminal, as the government charges

7   here.

8          Now, you're going to learn that the medical-device

9   community, including Jeff, all knew and understood these

01:46 10   critical points:  One, again, that the FDA may not interfere

11   with a physician's judgment in the practice of medicine; and,

12   two, that that judgment encompasses everything about the care

13   and treatment of the patient including the use of medical

14   devices, again, such as OP-1 and bone void fillers such as

15   Calstrux, and that surgeon's judgment includes such decisions

16   as to whether to use any device on-label or off-label.

17          Now, you heard a great deal from counsel yesterday

18   about those terms, on-label, off-label.  There's nothing bad

19   about off-label.  There's nothing bad at all.  You'll hear that

01:47 20   too from the physician.  Oftentimes off-label is the standard

21   of care.  It's way ahead of the FDA.  And I told you I wouldn't

22   plow old ground, and I'm going to do my best to keep that

23   promise and move this along.  But please bear this in mind when

24   you listen to the evidence -- please bear these three points in

25   mind:  One, the FDA rules and regulations, the administrative

1    rules and regulations, can be and often are complex, vague and

2    inconsistently conveyed and interpreted.  And that's when

3    they're conveyed at all, which will be an issue in this case.

4    I'm not going to get into the details of that last point, when

5    they're conveyed at all, but pay particular attention -- I

6    would ask you to pay particular attention to the evidence

7    showing the disconnect between what John Houghton, the

8    government's first witness, believes he achieved during his

9    conference call with the sales force -- you're going to hear

01:48 10    about that very shortly -- and what the members of the sales

11    force actually took away from that call.  You'll find two very

12    different things, ladies and gentlemen.  That's one:  the FDA

13    rules and regs.  Complex, vague and inconsistently conveyed.

14         Two:  Jeff genuinely believed and had every good-faith

15    reason to believe that he and his reps not only could but

16    should be prepared to respond to a surgeon's question or

17    request for help and to, in fact, respond to that question or

18    request.  And that includes -- that encompasses any surgeon's

19    question regarding mixing or combining two or more devices, if

01:48 20    you will, such as OP-1 and Calstrux.  He had every good-faith

21    reason to believe that he could respond to a surgeon's request

22    when it came to that, combining products, because the doctor is

23    completely free to do that.

24         Third and last:  This is not a regulatory case.  This

25    has nothing -- this is not a diminished regulatory case.  There

1    are no administrative or regulatory charges against Jeff or any

2    of these men or the company in this case.  The Court's going to

3    give you the law at the end of this case, but for now, please

4    bear in mind this is a criminal case.  There is far more at

5    stake here.

6         And for this reason, the question for you as jurors

7    will not be whether Jeff, or any particular sales rep or

8    defendant, actually stayed inside or stumbled or strayed

9    outside the white lines of any agency regs or standards or

01:49 10  policies regarding promotion or anything having to do with the

11    interaction with surgeons.  That's not this case.  It's not

12    about staying within the white lines or stumbling or straying

13    outside the lines.

14         Even if Jeff or a sales rep might later be found or

15    thought to have run afoul of those rules or regs, the actions

16    at issue, and you're going to hear about them in this case,

17    were completely motivated by a genuine good-faith impulse to be

18    of help, to actually help.  And that's the polar opposite of

19    criminal.

01:50 20       Now, very briefly, Ms. Winkler made a few comments on

21    this conspiracy -- this conspiracy to defraud the FDA and to

22    defraud surgeons.  And a couple of points very quickly.  First,

23    to defraud the FDA.  There's not going to be any evidence,

24    ladies and gentlemen, of Jeff targeting, entering into any kind

25    of unlawful agreement to target or otherwise conspiring to

1    defraud the FDA.  He had no dealings with the FDA.  There's no

2    evidence of any dealings with the FDA.  You will not see it.

3    He couldn't find the FDA with a map.  So that's not an issue in

4    this case, respectfully.

5         Defraud surgeons.  Ms. Winkler made a couple of points

6    yesterday about Jeff and defrauding surgeons.  And it takes two

7    forms.  The first is some comment about how surgeons are handed

8    a ball of Calstrux, and Jeff allegedly trained a rep to say

9    something like, "This is what OP-1 is going to feel like."

01:51 10  That's in the course of a ride-along, where he goes into the

11   various territories and he rides along with the sales rep.

12        Well, you'll learn that, actually, that's true.

13   Surgeons will tell you, yes, that's what it does feel like.

14   That's what it does feel like when it's combined.  Again,

15   they're looking for handling characteristics, volume.  You'll

16   hear these words:  consistency, malleability.  Will it work

17   when I'm in a surgical operating room?  You'll recall that

18   mixing is a given; it's a standard of care at the time all of

19   this is happening.  Even before OP-1 came on the market.

01:52 20       Now, a surgeon's interested in the BMP, the bone

21   morphogenic protein.  And here that's the active ingredient.

22   In our case it's the OP-1.  The surgeon's interested in the

23   bone-growth qualities and properties of OP-1.  But every

24   surgeon that you're going to hear from, I expect, both

25   government and defense, is going to tell you the surgeon is

1    seriously interested in, again, the opportunity for

2    scaffolding, for volume, the handling characteristics, and that

3    comes only in a combined form, not just the active ingredient

4    alone.  No surgeon, ladies and gentlemen, in this case -- the

5    evidence in this case -- sees this ball and thinks it's all

6    OP-1.

7         Now, second, Ms. Winkler read to you yesterday an

8    email, a message by Jeff in response to a question from

9    headquarters about what kind of questions can you expect,

01:53 10   anticipate in connection with a proposed letter going out.

11    "What do you think the sales rep's going to say, what do you

12    think the surgeon's going to say when they see this letter?"

13    And in response, as she read, pointed out, identified,

14    highlighted, one part of that email said, "Some doctors are

15    handed the product prior to implantation and think it's all

16    OP-1."  Think it's all OP-1.  The government wants to suggest

17    to you that this is evidence of Jeff's knowledge of a

18    successfully orchestrated fraud.  Great.  We got the doctors to

19    think it's all OP-1.

01:53 20        Nothing could be further from the truth.  First,

21    Jeff's a sales guy.  He's actually being frank and candid with

22    the people back at headquarters.  You send this letter out,

23    here's my views.  Here's the things you're going to hear from

24    the reps and from the surgeons.  That's one.  Not terribly

25    artful, but he's been asked his opinion on the potential

1    downsides of this controversial letter and he gives his views.

2    He's completely straightforward to the folks back at

3    headquarters.

4         Now, Jeff, as all medical-device reps, knows that all

5    surgeons mix, but they aren't focused on the particulars of the

6    scaffolding material; that is, the inert part.  There's several

7    dozens of those in the market.  And you're going to hear

8    about -- you'll hear and learn the identities of those on the

9    market.  And, in fact, Ms. Winkler told you yesterday Calstrux

01:54 10   is nothing but a bone void filler.  It's like spackle.  No

11   argument here.  You won't get any argument from the surgeons

12   who used it either.  They'll tell you as much in this

13   courtroom.  It's the same substance that's found in this baby

14   food.

15        Jeff knows this and that's what he's saying in his

16   email.  He knows this, the doctors are focusing in on the

17   active ingredient.  He knows it because the sales reps and the

18   surgeons game plan every surgery.  They discuss and identify

19   the products to be used.  And when the patient is ready for

01:55 20   implantation of the combined OP-1 and Calstrux, the combination

21   is no surprise to anybody in the room.  No surprise.  It's been

22   played out, planned well beforehand.  So it's completely

23   understandable, reasonable, predictable to believe that

24   surgeons all think of it and call for it by name.  "I'm ready

25   for the OP-1."  "I'm ready for the OP-1."  That's the main

1  player here.  That's not proof of any conspiracy.

2         So what other basis can I say in response to this,

3  they think it's all OP-1?  Well, even aside from on its face,

4  it's a statement of observation; it's a remark about how

5  doctors behave and view things, about the busy lives and the

6  shorthand way that surgeons refer to the active ingredient

7  here.  It's not a statement of intent.  We want the doctors to

8  think it's all OP-1.  He's not saying that at all.  That's one.

9         Two:  The internal contributions -- you'll see it in

01:56 10  the email -- it's two-faced.  It's completely contradictory.

11  The government's theory here.  We got a two-pronged conspiracy.

12  The first is:  We're going to defraud doctors by handing them

13  something immediately before surgery and tell them it's all

14  OP-1.  That's the first group.  The second is:  We're going to

15  defraud them by sending them mixing instructions where there

16  are two things involved.  So one is:  You hand them one thing,

17  they'll think it's just one product; the other part of the

18  conspiracy is we're going to defraud them by showing them how

19  to mix.

01:56 20         Well, that's a pretty tall order, ladies and

21  gentlemen, for a conspiracy.  It calls for some pretty tightly

22  coordinated action between and among the coconspirators, it

23  seems to me.  So you'd better have a color-coded wall chart,

24  make sure that you get your surgeons in the right group.  We'll

25  have a red group.  These are the surgeons with it's all OP-1.

1    And then we'll have a blue group, make sure we see that these

2    surgeons are all in the mixing instruction part of the fraud.

3    We want to make sure we don't blow our cover by putting

4    Dr. Jones, who is at all OP-1, in the part of the mixing

5    instruction part of the fraud.  We don't want to do that; it

6    will blow our cover.

7         Even aside from those points, there's the fundamental

8    reality of this.  It's open.  It's obvious.  It's completely

9    transparent.  Understand what the government's claiming here.

10   This gentleman's coming in here and he wants to defraud the

11   surgeon in the course of this procedure.  Well, look at all the

12   witnesses.  They're all on top of each other here, one; two,

13   and I mentioned the pre-game plan.  We've gone over this

14   beforehand.  There is nothing surprising happening here at all.

15   It's all according to plan; and, three, the accompanying

16   documentation would choke a horse.

17        Among them you've got the informed consent, you've got

18   booking forms, you've got circulating nurse notes, you've got

19   operative notes, you've got delivered goods receipts.

20   Ms. Winkler talked about it yesterday, the little stickers you

21   pull off of the boxes from the products you actually use?

22   Well, you're going to learn they go on the invoices and they

23   get faxed back to the company.  That shows what product was

24   used in the course of the surgery.  That's how the company gets

25   paid.  The company wants to get paid.  The hospital wants to

know and the doctor wants to know for records what was used in

that room.  That's a strange way to carry out a conspiracy, it

seems to me, to have all that documentation showing in real

time who's doing what, using what, in what fashion, completely

transparently.  You're going to learn that all that

documentation -- all of it -- is standard in the surgical

community, and that, ladies and gentlemen, is all widely known

to the members of the medical-device community, including Jeff.

So bottom line, with all that in mind, the

government's pitch is this:  This sales rep is going to try to

wind up and blow a curveball past this gentleman, try to pass

off two products as one in this room.  He's going to put his

career, his future, his family's future, his livelihood,

everything on the line.  He's going to pull off a federal

felony within one of the most orchestrated, tightly controlled

environments, second only maybe to Houston Control, in the

world.  And he thinks he could get past these highly skilled

medical professionals with all that documentation, and he

thinks he can get away with it time and again.

For this theory to fly, the government has to be

suggesting -- and it has to prove to you, respectfully, ladies

and gentlemen -- that the circulating nurse, the scrub nurse,

the surgical assistant, the radiology tech, everybody is in on

this.  Everybody is in on this except the surgeon, the

so-called victim of the fraud.  It doesn't fly at all.  None of

1    it.

2            Sales reps:  You're going to be hearing from some

3    sales reps.  Basically, ladies and gentlemen, these are good

4    folks, specialized education and training, all excited, proud

5    to be working for a company known as an industry leader, and

6    working together with other medical-device professionals,

7    including folks back at headquarters known to have legal,

8    regulatory, compliance training qualifications and

9    responsibilities.  They all take their job seriously.  They all

02:01 10   know the serious purpose of their business.  They take great

11   care to know about their benefits and believe in their products

12   and the wonderful benefits that those products provide.

13           They stay current with the bone morphogenic protein

14   literature and developments in the field.  You see them, you'll

15   see them here, routinely working alongside surgeons and their

16   surgical teams.  They're trusted by and responsive to the

17   surgeons who are expert in their field, whom the surgeon

18   expects and, indeed, requires to be present in the operating

19   room, to be responsive to the surgeon's real-time needs.

02:01 20   That's when we get in there, we make that incision.  Now we see

21   what we're dealing with.  That surgeon's need for input and

22   knowledge of the product.

23           So one last time, back to the brass tacks of the

24   government's charges.  They charge fraud.  That's a broad term.

25   And they use terms such as craft, trickery and deceit,

1    dishonest means.  But in plain English, it's lying, it's

2    cheating and stealing.  Lying, cheating and stealing.  The

3    charges say that Jeff, these men, company, are frauds,

4    hucksters, charlatans.  And here's the MO, basically.  Spent

5    all that time, effort and energy developing this wonderful

6    product, and from the sales reps' -- regional managers'

7    perspective, learn all about of those products, how they work,

8    how the surgeon can use them to benefit a spine surgery

9    patient, but don't do that for the benefit of anyone else.  Do

02:02 10   it to get yourself in the surgeon's office.

11         You fly under false colors.  They think you're there

12   to help them, but you're not.  You're really there to make a

13   quick buck.  Do you remember Ms. Winkler's comments about it

14   was all about to put money in their pockets?  All of this to

15   put money in their pockets.  Gain their trust, gain their

16   confidence, get into the operating room, work the con, lie to

17   them, deceive them, pick their pockets and hustle out the door.

18   That's the government's case.

19         From what you're about to see and hear in this

02:03 20   courtroom, you will conclude that nothing about those charges

21   square with what you see in this photo or who this man is.

22   Nothing.  Not for a minute.  Rather, you're going to find

23   good-faith motivation at every turn, and that is good faith

24   is a belief -- and I believe the Court will instruct you at the

25   end of the case.  Take your instruction from him.  That is a

1    belief or opinion honestly held even if it's later shown to be

2    wrong.  That's completely inconsistent with the specific intent

3    to defraud, which the government must prove beyond a reasonable

4    doubt.

5           Now, in conclusion, a surgeon has a relationship with

6    the patient.  A surgeon has a relationship with the patient,

7    the sales rep has a relationship with the surgeon.  Jeff wished

8    to be responsive to the surgeon.  He knows what the

9    surgeon -- he understands.  He's been familiar.  He's been in

02:04 10   these operating rooms.  He's worked with surgeons before.  He

11   wants to be responsive to the surgeon and generally wished to

12   be helpful in that surgeon's efforts to find a solution to the

13   patient's condition and, most often, misery.  And that, ladies

14   and gentlemen, is how you carve out a long-term career in the

15   medical-device field.  And you make a good living at it, to

16   boot.  Nothing wrong with making a good living.

17          Now, the Court's going to tell you that no defendant,

18   none, has any burden here.  I don't have an obligation to make

19   this opening statement.  I don't have to question a witness,

02:04 20   offer any evidence, cross-examine anybody, lift a finger.

21   Nothing.  The government has every burden all the time in this

22   case to prove its case to you beyond a reasonable doubt.  And

23   that includes the obligation of proving absence of good faith.

24   I don't have to demonstrate to you good faith; they have to

25   prove absence of good faith beyond a reasonable doubt.

1       So at the close of all the evidence, ladies and

2   gentlemen, I will have an opportunity to come back before you a

3   final time and speak with you and lay out for you the many ways

4   that I believe the government has failed in its task to prove

5   any charge against Jeff beyond a reasonable doubt.  Rather, you

6   will find that he acted in genuine good faith throughout here.

7   And that's when I'll ask you formally that you clear Jeff's

8   good name and return your verdict of not guilty.  Thank you for

9   your attention.

02:06  10       THE COURT:  Jurors, that completes the opening

11   statements.  We're now going to begin the presentation of the

12   evidence.  As a strict matter you have no evidence in the case,

13   yet you've heard a lot of talk about what it will be, and we'll

14   see what will happen when the witnesses begin testifying.

15       The clerk is now going to hand out some notebooks for

16   you.  We're going to permit you to take notes as you wish

17   during the course of the trial to help you eventually at the

18   end of the trial in your deliberations.  We often do this in

19   trials that are going to take a little while so that you can

02:07  20   jot down some things to help your memories.  And each of you

21   will have a notebook, and it will be dedicated to you and kept

22   secure -- nobody else will see it -- during the trial.

23       Now, let me just say this about note-taking:  Some

24   people find it helpful and take lots of notes because it does

25   help them.  Some people find it an interference with their

```
 1    ability to pay attention to what's going on in the room and
 2    would just rather jot down a few things, if any, but keep
 3    focused on what's happening in the testimony and so forth.
 4         It is an entirely personal thing for you to do.  You
 5    don't have to take notes because your neighbor is doing so, and
 6    so on.  So to the extent it helps you as an individual, we'll
 7    allow you to do it.  And if you find it's not particularly
 8    helpful, you don't have to do it at all.  So it's just a
 9    resource to have available for you to help your deliberations,
10    okay?
11         All right, Mr. Sternberg?
12         MR. STERNBERG:  Your Honor, the government calls John
13    Houghton.
14         THE COURT:  May I ask, Mr. Sternberg, are you going to
15    be using the electronic equipment?
16         MR. STERNBERG:  I'm going to use the ELMO this
17    morning.
18         THE COURT:  The jurors in the back row should get your
19    monitors ready because there will be some evidence displayed.
20         THE CLERK:  Sir, do you want to step up to the box,
21    please?
22              JOHN CLIFFORD HOUGHTON, duly sworn
23         THE CLERK:  Have a seat, please.  State your name and
24    spell your last name for the record.
25         THE WITNESS:  John Clifford Houghton.
```

02:07  10

02:09  20

1          THE CLERK:  Spell your last name, please.

2          THE WITNESS:  H-O-U-G-H-T-O-N.

3          MR. STERNBERG:  Members of the jury, your Honor, may I

4     proceed?

5          THE COURT:  Please.

6                    DIRECT EXAMINATION

7     BY MR. STERNBERG:

8     Q.   Mr. Houghton, could you please give us a little background

9     about yourself, tell us where you grew up?

02:10 10   A.   Sure.  I was born in England and grew up in England.  I

11    worked in the pharmaceutical industry, started in England, and

12    worked for several large pharmaceutical companies.

13    Q.   Did you go to school in England?

14    A.   Yes, I went to school in England.  University as well.  I

15    went to Liverpool University.

16    Q.   If you could take us through your work history after

17    university.

18    A.   Sure.  After leaving university, I joined Lederle

19    Laboratories, which is an international company that's now

02:11 20   Wyeth and Pfizer.  I worked as a sales representative for them,

21    and then became a regional sales manager.  And then I joined

22    Rhone-Poulenc Rorer.

23    Q.   Can you give us approximate times?

24    A.   Yes.  I was five years with Lederle and then joined

25    Rhone-Poulenc Rorer.

```
 1   Q.   About what year did you join --
 2   A.   1987.
 3   Q.   Take us forward from 1987.
 4   A.   So from 1987 I was with Lederle, and then around about
 5   1992 I joined Rhone-Poulenc -- Rhone-Poulenc Rorer, again
 6   started in sales, but then progressed to sales management.
 7   Q.   Sales of what kinds of products?
 8   A.   Pharmaceutical products, drugs, and hospital products as
 9   well, and also primary care products, physician products.
10        After about a year working in the sales team I became a
11   sales manager, so I managed sales representatives in the U.K.,
12   and after about a year and a half of doing that, staying with
13   Rhone-Poulenc Rorer, I was asked to go into head office.
14        I moved into head office, which was in the U.K. at the
15   time, working in sales information, which essentially managed
16   the sales information for the organization and also the
17   incentive schemes for the representatives; spent about a year
18   and a half, two years doing that, and then moved into
19   commercial operations, still with Rhone-Poulenc Rorer as
20   business manager for commercial ops.  And then I moved into a
21   more pure marketing role, essentially to launch a drug in the
22   U.K.  This was the first country outside of the U.S. that was
23   going to launch this particular drug.
24   Q.   Was drug product?
25   A.   It was Nasacort for allergic rhinitis.
```

```
 1   Q.   That's a nose issue?

 2   A.   Yes, for allergies.  Yes.

 3        I successfully did that, and based on some of that success

 4   interacted with my colleagues in the global team which was at

 5   that point with -- Rhone-Poulenc was based in Paris, and

 6   France.  They had asked me to join them in Paris as an

 7   international marketing director working on Nasacort.  At the

 8   time I declined to do that, but then the company reorganized

 9   and there was a merger announced between Hoechst Marion Roussel

02:13 10   and Rhone-Poulenc Rorer.  And they were moving head office --

11   global head office from Paris to Bridgewater in New Jersey.  So

12   the detraction became a little more attractive for us to move

13   to the States.

14        So my wife and my one child -- this was in the end of

15   1999 -- moved to the U.S. to take up a position as

16   international product director for Nasacort globally.  Moved to

17   Bridgewater --

18   Q.   As international product director, can you give us an idea

19   of what you did day to day?

02:13 20   A.   Yeah, my day-to-day role was managing the global strategy

21   for the product.  The product was to be launched in multiple

22   countries.  So beyond, you know, managing that strategy, it was

23   also managing the future strategy of the product, what other

24   indications could we be looking at with Nasacort, any line

25   extensions.  All of that was managed through me as the
```

1    commercial person working with my colleagues in clinical, and

2    also regulatory and quality, to bring this product through in

3    other areas and grow the brand.  That was more in the strategic

4    side.

5         On the operational side, I was more involved in making

6    sure that all the countries that were able to launch the

7    product had the tools they need to launch the product in their

8    countries.  So I did a lot of traveling internationally to meet

9    with my international colleagues to ensure that the product was

02:14 10   successfully launched across the globe.

11   Q.   And how long were you with this product?

12   A.   That was about -- I've been with the product in the U.K.

13   obviously prior to it being launched in the U.K., and I spent

14   in the U.S. -- from what I recall, it was about a year, year

15   and a half in the U.S. -- managing it globally.

16   Q.   What was your next position?

17   A.   My next position was new products commercialization,

18   working on the Aventis -- because by now the company has merged

19   and become Aventis -- the Aventis Millennium collaboration,

02:15 20   which Millennium at this point was based in Boston.  So my role

21   there was to provide commercial support and guidance and

22   strategy to the discovery and development teams in both Aventis

23   and Millennium of how, as a combined portfolio products that we

24   were developing and discovering together, which indications,

25   which diseases should be the ones that we should be targeting.

1    Q.    So at this point you're working with products that are in

2    development as opposed to products that are on the market?

3    A.    Correct.  All of the products were in both discovery and

4    development.  So some of them were way, way back, still working

5    on computer screens with them.  So it was discovery and

6    development.

7    Q.    But with Nasacort you were working on a product that was

8    already on the market, approved by the FDA, being marketed?

9    A.    Yes.  Yes.

02:15 10   Q.    Take us through with your Aventis-Millennium group.

11   A.    Yeah, that was -- I think that lasted about a year, year

12   and a half, and then we had a reorganization back in Aventis.

13   So I was the Aventis-Millennium commercial lead.  And when we

14   reorganized, I became the head of respiratory and inflammation,

15   which included the Aventis-Millennium collaboration.  So now

16   not only now did I have responsibility for the products and

17   discovering development that were part of Aventis and

18   Millennium collaboration, but also products that were Aventis

19   only, in respiratory and inflammation.  And did that, I recall,

02:16 20   again, about two years.

21        And then at that point, because I had been quite

22   successful in managing that portfolio of products predominately

23   in the U.S. -- the discovery teams were based in the U.S. and

24   here in Boston -- I was asked to sort of repeat that process

25   but working on the cardiovascular, metabolism and thrombosis

products, which that discovery and development was undertaken

in Frankfurt.

    I didn't move to Frankfurt, but I had to spend a lot of my

time traveling to Frankfurt to work with the discovery and

development sites there.

Q.   Frankfurt, Germany?

A.   In Germany, yes.  Sorry about that.

    That only lasted for a short period of time because Sanofi

decided to buy Aventis.  So at that point the company

reorganized again.  I was involved in working on that takeover

and providing portfolio analysis for that.  The company was

taken over; I was offered a position in Paris, again.  Nothing

against going to Paris, but we liked it here in the States and

didn't want to move to Paris, so we decided to stay here in the

USA.  Initially, I started working for the U.S. domestic team

in Bridgewater for Sanofi.

Q.   What year is this now?

A.   That was 2004.  Yeah.  Yes.

    And I did that -- I implemented the new products team

there, the commercialization team, put that in place and helped

them through that merger, but I didn't get a warm feeling from

the job that I was doing.  I was just dissatisfied with it.  I

wanted to do something different.  And it just coincided with

the time I received a phone call from a recruiter requesting --

you know, that they have this position at Stryker Biotech and

1 would I be interested.

2 Q. And how did you go about pursuing the position at Stryker

3 Biotech?

4 A. I said I would be interested and I'd like to put my name

5 forward, which I did.  And, you know, usually the way forward

6 then is your resumé is sent to the company.  If the company

7 likes what they see, then they'd invite you for interview, and

8 they did.  So I came up here to Boston for interview.

9 Q. Who did you interview with?

02:18 10 A. I recall Mark Philip, David Renker, Sau Gee Yung, Judith

11 Sernatinger, Bernadette Alford and Sandy Eltringham and Steve

12 Koenigsberg.  They're the only ones that I recall.

13 Q. At some point in early 2005 did you take a position at

14 Stryker Biotech?

15 A. I did, yes.

16 Q. What position did you take?

17 A. I assumed the role of global vice president of global

18 marketing and strategic planning.

19 Q. That was in --

02:19 20 A. February of 2005.

21 Q. Can you generally tell the jury what that title meant?

22 Again, what would you do day to day, week to week?

23 A. Yeah.  My understanding -- and certainly what was in the

24 job description -- was to manage the global marketing strategy

25 for Stryker Biotech, the division.  That involved both products

1    that were in line; i.e., being promoted or being available for

2    use, but also products that were in development.  So that was

3    one key part of my role.  And that was globally.  So not just

4    in the U.S. but also in Europe, Japan, Asia, et cetera.  That

5    was one of my roles.

6        The other part of my role was obviously not just looking

7    at products within our portfolio but also looking for products

8    outside of Stryker Biotech that we might want to acquire or

9    license in or bring into the portfolio.  So I had a business

02:20 10   development role and a global marketing role as well.

11   Q.   You mentioned a couple of different types of products

12   there.  One was products that Stryker Biotech already had and

13   was selling at the time?

14   A.   Uh-huh.

15   Q.   And then -- you have to use words.

16   A.   Yes.

17   Q.   Yes?

18   A.   Yes.  Sorry.  Yes.

19   Q.   And then products that were in development at the time?

02:20 20   A.   Yes.

21   Q.   Can you tell us, when you joined Stryker Biotech in

22   February of 2005, what products were then on the market?

23   A.   As I recall, OP-1 Implant was available in the U.S.; OP-1

24   Putty was available in the U.S.; Osigraft, as it was called,

25   the same as OP-1 Implant, was available in Europe and

1    Australia.

2    Q.   Can you refine your answer to what was available in the

3    U.S. at the time?

4    A.   TCP Putty, as it was known.  I do not recall if it was

5    already launched or not when I joined, but whilst I was there I

6    remember we changed the name to "Calstrux," and then that

7    became launched.

8    Q.   So TCP Putty and Calstrux are one and the same?

9    A.   Are the same, yes.

02:21 10   Q.   So when you got to Stryker Biotech in February 2005, there

11   were three products on the market?

12   A.   Yes.

13   Q.   OP-1 Implant, OP-1 Putty, and Calstrux?

14   A.   I believe -- it was TCP Putty then.  From what I recall, I

15   believe it was available.

16   Q.   When you started at Stryker Biotech, who did you report

17   to?

18   A.   Mark Philip.

19   Q.   What position did he have?

02:21 20   A.   He was the president and CEO of Stryker Biotech, the

21   division.

22   Q.   And you mentioned a bunch of names, people who you

23   interviewed with.  Can you tell us who were the other senior

24   executives at the company when you joined?

25   A.   Yes.  To the best I remember, Bernadette Alford was the

1    vice president of regulatory; Judith Sernatinger was the vice

2    president of quality assurance; Sau Gee Yung was the vice

3    president of operations; Dean Falb was the vice president of

4    development, discovery and development; David Renker was the

5    vice president of human resources; and --

6    Q.   Who was managing the sales force day to day at that point?

7    A.   At that point -- yes, at that point Ken Reali was the vice

8    president of sales.

9    Q.   Did that change while you were at Stryker Biotech?

02:22 10    A.   It did, yes.

11    Q.   To whom?

12    A.   To me.

13    Q.   And how long were you at Stryker Biotech?

14    A.   I'd been there three months, I think it was, I seem to

15    recall.  So this was now in the -- sort of the

16    April-June -- sort of June period.  And I was offered the

17    position of -- they expanded my role, basically.  So going from

18    global marketing and strategic planning, my new title was

19    global sales and marketing.

02:23 20    Q.   So in June of 2005 when you take over the sales in the

21    U.S. as well, how was your sales team organized?

22    A.   At that time I implemented a restructuring.

23    Q.   Can you tell the jury about that restructuring?

24    A.   Yeah.  From what I recall, when I took over there were two

25    regional directors, one for the east, one for the west, and

1    then beneath those two regional directors were the

2    representatives.  And, again, from what I'm recalling --

3    because it wasn't my structure, but from what I'm recalling --

4    it was two regions reported into the east and two into the

5    west.  That's how I seem to think it was.

6    Q.    Is that how you restructured it?

7    A.    No.

8    Q.    How did you restructure it?

9    A.    I restructured it -- I brought it in line to reporting to

02:23 10    one person, which would be the -- you know, the U.S. director

11    of sales.

12    Q.    Who was that?

13    A.    I promoted Bill Heppner to that role.  And then beneath

14    Bill we implemented having four regional managers in place at a

15    regional level.

16    Q.    Who were they?

17    A.    At that time Jeff Whitaker, Dave Ard came on a little bit

18    later but he ultimately became one of the regional managers,

19    Peter Murphy and Ryan Denney.

02:24 20    Q.    Roughly organized east, south, central and west?

21    A.    Roughly, yes.

22    Q.    And Mr. Heppner was managing those four regions?

23    A.    Correct.

24    Q.    So by February 2005 you'd been in the pharmaceutical and

25    medical industry for about how long?

1   A.   I started in '87.  So, yeah, 20 years nearly.

2   Q.   Twenty years?

3   A.   Yeah.

4   Q.   And was the sales organization that you put into place

5   with the national sales director, the regional managers, a type

6   of sales organization that you were familiar with from your

7   experience?

8   A.   Yes.

9   Q.   When you made this reorganization in roughly June of 2005,

02:25 10  how many sales representatives were there working under

11  Mr. Whitaker, Mr. Ard, Mr. Denney and Mr. Murphy?

12  A.   Yeah, it was roughly seven to eight for each, so around 30

13  sales representatives --

14  Q.   And --

15  A.   -- in total.

16  Q.   How were they configured geographically?

17  A.   Again, it was seven to each region.  So roughly seven on

18  the west coast, seven in the central, seven representatives in

19  the south and seven in the east.

02:25 20  Q.   Your office was where?

21  A.   In Hopkinton, Massachusetts.

22  Q.   About how many people worked in the Hopkinton office of

23  Stryker Biotech?

24  A.   A hundred and twenty, possibly.

25  Q.   Where was Stryker Biotech's manufacturing facility?

1    A.    We had -- the main manufacturer was in Lebanon, in New

2    Hampshire.

3    Q.    What was manufactured there?

4    A.    The protein, BMP.

5    Q.    That was part of the --

6    A.    Part of OP-1, yes.

7    Q.    Mr. Houghton, can you tell the jury a little bit about why

8    you decided to go to work for Stryker Biotech?

9    A.    You know, when I interviewed with Mark Philip -- I mean,

02:26 10   obviously, you look to your boss to give you an idea where he

11   wants to take the company and the vision for the company.  And,

12   you know, Mark had described to me that he wanted Stryker

13   Biotech to become one of the bigger divisions of Stryker, so

14   there was some ambition there.  He also described to me that,

15   you know, maybe someday Stryker Biotech could become a

16   standalone company and trade publicly on its own.  So I felt

17   there was a lot of ambition there.

18        And he gave me the opportunity to start with a blank piece

19   of paper.  When I joined the company, directly reporting to me

02:26 20   were four people.  There was no real marketing structure, as I

21   would call a marketing structure, and no real structure to the

22   strategic side as well.  So it really seemed to be a blank

23   canvas for me to, you know, implement 18 years of my experience

24   and build the company with Mark.

25   Q.    What excited you about the products, about the OP-1

1    products?

2    A.   What excited me was the potential for these products.   You

3    know, obviously, they treat very debilitating circumstances.

4    And patients who are in a lot of pain, you bring a lot of

5    relief to them.   But also, the future of these products, you

6    know, to grow bone, to grow cartilage, and not to have to go

7    through some of the mechanical approaches to dealing with their

8    pain.   But actually using a product like OP-1 to help with that

9    was something I thought was exciting for the patient, also for

02:27 10   the company.

11   Q.   Mr. Houghton, I would like to show you some of these

12   products.

13          MR. STERNBERG:  Your Honor, may I approach?

14          THE COURT:  Yes.

15   BY MR. STERNBERG:

16   Q.   Mr. Houghton, if you would take these in numerical order,

17   Exhibit 86.  Do you see it?  It has a yellow sticker on it.  86

18   for identification purposes.

19   A.   I guess I'll need my glasses.  Yup.

02:29 20   Q.   What is Exhibit 86?

21   A.   This is an OP-1 Putty.  This is what was the

22   representatives were using [sic] to the surgeons.

23          MR. STERNBERG:  I offer Exhibit 86.

24          MR. O'CONNOR:  No objection.

25          THE COURT:  No objection?  All right.

1        (Government Exhibit No. 86 received into evidence.)

2    BY MR. STERNBERG:

3    Q.   Mr. Houghton, can you open the box and show us the vials

4    that are in there?

5    A.   (Witness complies.)

6    Q.   The larger of the two vials, the one in your left hand,

7    hold that up?

8    A.   (Witness complies.)

9    Q.   What is that?

02:29 10   A.   This is the cellulose, the reconstitution that you put

11   with the OP-1 Putty.

12   Q.   Is that the powder that is meant to grow the bone?

13   A.   No.  I believe this is the powder that is meant to grow

14   the bone.

15   Q.   The smaller of the two vials?

16   A.   Yes.

17   Q.   The one that says "OP-1 additive"?

18   A.   No, the other way around.  Yeah, this is the OP-1 Putty;

19   this is the additive.

02:30 20   Q.   The smaller vial is the additive?

21   A.   Yeah.

22   Q.   And those two together are what is OP-1 Putty?

23   A.   Yes.

24   Q.   Take a look, please, at the box marked Exhibit 85 for

25   identification.

1    A.    Yes.

2    Q.    What is that?

3    A.    This is OP-1 Implant.

4          MR. STERNBERG:  I'd offer Exhibit 85.

5          MR. O'CONNOR:  No objection.

6          THE COURT:  No objection?  All right.

7          (Government Exhibit No. 85 received into evidence.)

8    BY MR. STERNBERG:

9    Q.    Would you open up that box, Mr. Houghton?

02:30 10   A.    (Witness complies.)

11   Q.    How many vials are in there?

12   A.    Just one.

13   Q.    Would you take it out, please?  What is that?

14   A.    This is the OP-1 Implant --

15   Q.    And --

16   A.    -- which is the BMP7 that is in there.

17   Q.    So for the OP-1 Implant that is in the box, that comes

18   with just one vial?

19   A.    Correct.

02:30 20   Q.    What was OP-1 Implant?  What kinds of additions was OP-1

21   Implant meant to treat?

22   A.    It was for tibial nonunions.

23   Q.    What about OP-1 Putty?

24   A.    For spinal implants.

25   Q.    What kind of FDA approval did OP-1 Implant and OP-1 Putty

1    have?

2    A.    Both of them had what is called the HDE.

3    Q.    Is "HDE" shorthand for "humanitarian device exemption"?

4    A.    It is.

5    Q.    When you got to Stryker Biotech, or before you took the

6    job at Stryker Biotech, did you know that those products had a

7    humanitarian device exemption?

8    A.    I did.

9    Q.    And either before getting to Stryker Biotech or after you

02:31 10    got there, what did you learn were the restrictions of a

11    humanitarian device exemption?

12    A.    What I understood the restrictions to be is that there was

13    a limit on the number of patients that the product could be

14    used in in an annual period.

15    Q.    What limits did you learn?

16    A.    4,000.

17    Q.    Who did you learn that restriction from?

18    A.    From regulatory, from Bernadette Alford, but also from,

19    you know, talking to Mark Philip and most of the other

02:32 20    executives when I was interviewed.  You know, they had told me

21    at the interview that there was a limit on the HDE.

22    Q.    When you got to Stryker Biotech what, if anything, did you

23    learn about something called an "institutional review board"?

24    A.    I learned that before any clinical trial can be undertaken

25    at an institution, then the institutional review board would

1    have to review the trial, and that is to protect the patient.

2    That is why they have all of these.

3    Q.   While you worked at Stryker Biotech, what did you learn

4    about whether Stryker Biotech was attempting to get a different

5    form of FDA approval for OP-1 Putty?

6    A.   We were attempting to get a PMA.

7    Q.   "PMA" stands for what?

8    A.   Premarket approval.

9    Q.   Why?

02:33 10    A.   Because that's a full approval with no patient

11    restrictions.  It's for an indication on -- any patient that

12    comes in with that indication, the product can be used for.

13    Q.   While you worked at Stryker Biotech, was there any other

14    product on the market that was a bone morphogenic protein that

15    had full PMA approval?

16    A.   Yes.

17    Q.   What product was that?

18    A.   InFuse by Medtronic.

19    Q.   Mr. Houghton, I would like to show you what we've marked

02:33 20    for identification as Exhibit 92.  Do you see that on your

21    screen?

22            THE COURT:  No, he doesn't yet.  I have to know to

23    whom I should expose these things.  If this is for the witness

24    only first and then to the jury, let me know that.  If it's

25    agreed exhibits, we can skip the step and go directly to the

1   jury, so...

2          MR. O'CONNOR:  Your Honor, Mr. Sternberg has not given

3   me a copy, so obviously I need to see it before --

4          THE COURT:  All right.

5          MR. STERNBERG:  At this point witness and counsel,

6   your Honor.

7          THE COURT:  Fine.

8          MR. O'CONNOR:  Thank you.

9   BY MR. STERNBERG:

02:34 10  Q.   Do you see --

11          THE COURT:  You're using the document camera?  I'm

12   sorry.  Wrong feed.  There you are.

13   BY MR. STERNBERG:

14   Q.   Mr. Houghton, do you see Exhibit 92 for identification?

15   A.   I don't see "92" anywhere, but I see an exhibit in front

16   of me.

17   Q.   I'll show you --

18   A.   Oh, there it is.  Now I see it, yes.

19   Q.   What is Exhibit 92 for identification?

02:34 20  A.   This is the package insert for OP-1 Putty.

21          MR. STERNBERG:  I offer Exhibit 92.

22          MR. O'CONNOR:  No objection.

23          THE COURT:  Okay.

24          (Government Exhibit No. 92 received into evidence.)

25          THE COURT:  Do you want it displayed?

1        MR. STERNBERG:  Please.

2   BY MR. STERNBERG:

3   Q.   Mr. Houghton, you just said it was the package insert?

4   A.   Yes.

5   Q.   Is that also known as a label?

6   A.   Yes.

7   Q.   And is this a piece of paper that comes in the box of OP-1

8   Putty?

9   A.   Yes.

02:35 10  Q.   Do you see the first paragraph of Exhibit 92 is called

11   "humanitarian device"?

12   A.   Yes.

13   Q.   And then at the last sentence of that paragraph it says,

14   "The effectiveness of OP-1 Putty for this use has not been

15   demonstrated."  Do you see that under the yellow line?

16   A.   Yes.

17   Q.   What does that mean?

18        MR. O'CONNOR:  Objection, your Honor.

19        THE COURT:  Well, let me see you briefly.

02:35 20        Actually, do you know what?  We're about at a recess

21   anyway.  So why don't we excuse the jurors and I'll hear from

22   you and then we'll come back after the recess.

23        We'll take the morning recess, we'll stay briefly with

24   the lawyers, and then we'll come back with the jurors.

25        THE CLERK:  All rise for the Court and the jury.  The

```
 1    Court will take the morning recess.
 2            (The jury exits the courtroom at 11:13 a.m.)
 3            THE COURT:  Okay.  I guess what's -- we have to
 4    understand what the purpose of the offer is.  Obviously, the
 5    witness -- I think it's obvious the witness can't interpret the
 6    FDA regime for us, necessarily.  He can give us his
 7    understanding.  And so I guess that's the question, is his
 8    understanding particularly.
 9            MR. STERNBERG:  His understanding if this is the
02:37 10    exemption from the effectiveness requirements.
11            MR. O'CONNOR:  Your Honor, should we be doing this in
12    front of the witness?
13            MR. ULLMANN:  Yeah.
14            THE COURT:  Okay.  Mr. Houghton, would you step
15    outside, please?
16            (The witness is excused.)
17            THE COURT:  All right.  Go ahead, Mr. Sternberg.
18    What's the purpose of the question?
19            MR. STERNBERG:  I want him to explain his
02:37 20    understanding of the exemption from the effectiveness
21    requirements that the FDA ordinarily imposes for premarket
22    approval:  The humanitarian device exemption exempts the
23    manufacturer from the effectiveness requirements.
24            MR. O'CONNOR:  Your Honor, they don't, number one.
25    And the law is the law.  I mean, as I said in my opening
```

1  yesterday, there is some effectiveness requirement in the HDE

2  requirements.

3           You know, the government -- this business about cap,

4  you know, let it go.  It's not correct what he said, all right?

5  So it's just like the criminal misbranding on the slides and

6  now we're going to, you know, there's no effectiveness element.

7  We're going to get it from the witness from reading this on a

8  labeling.  It shouldn't be.  You know, the requirements are

9  what they are.  They have FDA folks on their witness list and

02:38  10  maybe --

11           THE COURT:  Well, I guess -- no, I understand that and

12  I agree that it cannot be substantive evidence of what the FDCA

13  requires.  So what I want to hear is why it matters what the

14  witness thinks it means, I guess, is the question.

15           MR. STERNBERG:  The witness is joining a company that

16  has two products with limited approvals, and there's another

17  competitor on the market that has full approval.  His

18  understanding of why their approvals are different from and

19  less than the other.

02:39  20           THE COURT:  By why does his

21  understanding -- subjective understanding, I think is the

22  question -- why does his subjective understanding matter?  It

23  may matter what the regime is, and the jurors may have to be

24  told at some time either by myself or through a qualified

25  expert witness what the regime is.  He has not yet been

 1    qualified to do that, so all he can say is what he thought it

 2    meant.  And so I guess that's the question:  What's the

 3    relevance of what he thought it meant?

 4              MR. STERNBERG:  We can move away from it, your Honor.

 5              THE COURT:  Okay.  All right.  We will.

 6              MR. O'CONNOR:  Thank you, your Honor.

 7              THE COURT:  Okay.  We'll take the morning recess.

 8              MR. O'CONNOR:  Thank you.

 9              THE CLERK:  All rise.  The Court will take the recess.

02:39 10              (The Court exits the courtroom and there is a recess

11    in the proceedings at 11:17 a.m.)

12              (After the recess:)

13              THE CLERK:  Counsel, if you could do me a favor.  When

14    you're questioning, keep your voice up.  Jurors aren't hearing,

15    okay?

16              All rise for the Court and the jury.

17              (The Court and the jury enter the courtroom at

18    11:42 a.m.)

19              THE CLERK:  Be seated.

03:05 20              THE COURT:  Continue.

21    BY MR. STERNBERG:

22    Q.   Mr. Houghton, before we broke, you told us that OP-1 was

23    manufactured in New Hampshire?

24    A.   Yes, sir.

25    Q.   How did the OP-1 get from New Hampshire to hospitals

1    around the country where it was used?

2    A.   It was packaged in Hopkinton, in Massachusetts.  Then it

3    was distributed from Hopkinton, initially from Hopkinton

4    direct.  And then later on, we implemented a hub system where

5    we distributed to hubs and they then sent it to the hospitals.

6    Q.   When you talk about hubs, what do you mean?

7    A.   Local warehouses, is the best way I can describe it, you

8    know, that could hold the product in the condition that the

9    product had to be held in.

03:06 10   Q.   What conditions were those?

11   A.   The temperature was supposed to remain at zero degrees.

12   It wasn't supposed to go above zero.  Temperature control.

13   Q.   While you worked at Stryker Biotech, did Stryker Biotech

14   sell OP-1 both on consignment and as a straight purchase?

15   A.   As I recall, yes.

16   Q.   Can you explain to the jury the difference between a

17   consignment order and a straight purchase order.

18   A.   Straight purchase order, my understanding, is that the

19   order was made and then there would be a financial transaction

03:06 20   directly for however many units they purchased, four, five,

21   however many they would purchase.

22        A consignment, they would receive the product without

23   paying for it.  But then when they would use it -- they would

24   hold it at the hospital.  And then when they used it, that's

25   when the cash transaction would take place.

1    Q.   For most of the OP-1 business, was it consignment or

2    straight purchase?

3    A.   I don't recall the exact percentage.  What I do recall is

4    that initially there was more consignment than I was

5    comfortable with.  So we -- that's why we implemented the hub

6    system: to enable faster distribution of the product so we

7    didn't need to have as much consignment.

8    Q.   On the straight purchase, if the hospital wanted to order

9    one unit of OP-1 --

03:07 10   A.   Um-hum.

11   Q.   -- and just purchase it directly --

12   A.   Yes.

13   Q.   -- they would just pay the -- what was it?  $5,000?

14   A.   The OP-1 Implant was 5,000 and the OP-1 Putty was 5,250.

15   Q.   So there would be an exchange of money for product right

16   away?

17   A.   Correct.

18   Q.   On a consignment basis, the product would sit in a

19   refrigerator at the hospital --

03:07 20   A.   Yes.

21   Q.   -- unpaid for --

22   A.   Yes.

23   Q.   -- until it was used?

24   A.   Yes.

25   Q.   And then once it was used, can you tell us about the

1    process by which Stryker Biotech would find out it had been

2    used and, therefore, know how to bill the hospital?

3    A.   Yes.  The hospital would notify that they had used it in

4    that surgery, usually through fax machine or however best

5    direct communication we had.  And then that would be billed.

6    Q.   While you worked at Stryker Biotech, did you ever attend

7    any surgeries involving the use of OP-1?

8    A.   I recall one that I attended where it was used.

9    Q.   Tell us about that.

03:08 10   A.   It was a spine surgery in Philadelphia.  And I believe

11   that one unit of OP-1 was used in that spine surgery.

12   Q.   One unit of OP-1 was used in the spine surgery?

13   A.   Yes.

14        MR. O'CONNOR:  Objection.  And you know --

15        THE COURT:  Yes.  Sustained.  I'll strike that.  Lack

16   of foundation.

17   BY MR. STERNBERG:

18   Q.   How did you know how many units of OP-1 had been used in

19   the spine surgery that you observed?

03:08 20        MR. O'CONNOR:  Objection.  In the question, that it

21   was.  I mean --

22        THE COURT:  No.  Overruled.  He may answer that.

23        THE WITNESS:  I'm sorry.  Can you repeat that.

24   BY MR. STERNBERG:

25   Q.   How did you know how many units of OP-1 had been used in

1   the spine surgery that you observed?

2   A.   I recall seeing one box of the OP-1 there.  So what I

3   recall was what I saw: one box.  And I don't recall if more

4   were used.  I recall one was used.

5   Q.   Were you -- Who else from Stryker Biotech was with you at

6   that surgery?

7   A.   From what I recall, Peter Murphy was with me that day.

8   And I believe -- I don't recall the representative that was

9   also there.  I can't recall his name.  But there was a

03:09 10   representative there as well from the Pennsylvania area.

11   Q.   Why were you there observing that surgery?

12   A.   To increase my knowledge, to have a better understanding

13   of what happens in the surgery.

14   Q.   How much of the surgery did you observe?

15   A.   I observed three operations -- four operations in total.

16   Q.   Over the course of how many days?

17   A.   One day.

18   Q.   About how long were the surgeries that you observed?

19   A.   Probably an hour each.

03:10 20   Q.   Performed by the same or different surgeons?

21   A.   The same surgeon.

22   Q.   Who was that?

23   A.   Alex Vaccaro.

24   Q.   During these surgeries that you observed --

25   A.   Yes.

1    Q.   -- what, if any, other Stryker Biotech products were used?

2    A.   I don't recall any other Stryker Biotech products being

3    used in that surgery.

4    Q.   You may have already mentioned this.  If you did, I

5    apologize.  What kind of a surgery was it?

6    A.   There were four different surgeries.  The first one was a

7    posterior on the neck area.

8    Q.   "Posterior" means --

9    A.   The back.

03:10 10  Q.   -- the backside?

11   A.   Yes.  On the spine at the top.  Then went next door and

12   the patient had been prepped for another spinal surgery, but

13   lower in the lumbar area.  Then went next door and saw the next

14   one, which again, I believe, was another spine surgery.  And

15   they were using a new disk that had been developed by Johnson &

16   Johnson in that surgery.  And then we went back to the first

17   person, who they'd flipped over and were doing an anterior.

18   Q.   All four with OP-1 Putty?

19   A.   No.  Only one.

03:11 20  Q.   How many with OP-1 Putty?

21   A.   From what I recall, only one.

22   Q.   While you were at Stryker Biotech, what was Stryker

23   Biotech doing to try to get premarket approval for OP-1 Putty?

24   A.   We had undertaken --

25              MR. O'CONNOR:  Objection.  Foundation.

1          THE COURT:  Overruled.

2          THE WITNESS:  I can answer?

3          THE COURT:  Yes.  You may answer.

4          THE WITNESS:  We had undertaken a clinical trial.  And

5    we were looking at the results from that trial.  At the same

6    time we were looking to start another trial.

7    BY MR. STERNBERG:

8    Q.   What other trial?

9    A.   Another -- Sorry.  Another trial involving OP-1 in a --

03:12 10   either a spinal indication or a trauma indication if it was

11   going to be OP-1 Implant.

12   Q.   While you worked at Stryker Biotech -- and by the way,

13   Mr. Houghton, how long did you work at Stryker Biotech?

14   A.   I joined in February 2005.  My last day in the office was

15   May 15, 2006.  And I officially left the company at the end of

16   June 2006.

17   Q.   Over the course of those 15 months, what, if any,

18   applications to the FDA did Stryker Biotech make for premarket

19   approval?

03:12 20   A.   I don't recall any application being made during that time

21   that I was there.

22   Q.   In your job as global sales and marketing director --

23   A.   Yes.

24   Q.   -- what role did you have in setting budgets for the sale

25   of the Stryker Biotech products?

1   A.    The primary role?  The process that we had in place was to

2   look at the strategic plan for the next three to five years,

3   look at that at a high level of what kind of numbers we

4   required for development for the factory, all of the aspects of

5   the business, the whole business.

6        And then to break that down then into what that meant at

7   the operational level, both in the U.S. and also in the other

8   countries that were selling product.

9   Q.    And confining your answer now just to the United States,

03:13 10   who did you work with to set the budget for United States sales

11   of OP-1 Putty, OP-1 Implant, and Calstrux?

12   A.    I worked with the marketing team and also, of course, the

13   sales management team, which was Bill and the four regional

14   managers -- Mr. Heppner.

15   Q.    When you say "Bill," you mean Mr. Heppner?

16   A.    Mr. Heppner, sorry.  Yes.

17   Q.    And when you say "the four regional managers," who do you

18   mean?

19   A.    Mr. Ard, Mr. Whitaker, Mr. Murphy and Mr. Denney.

03:14 20   Q.    In the calendar cycle at Stryker Biotech --

21   A.    Um-hum.  Yes.

22   Q.    -- when did the budgets for, say -- when did the budget

23   for 2006 get developed?

24   A.    In October of 2005.

25   Q.    When is that budget then presented to the sales force?

1    A.    It doesn't get presented normally until the January

2    timeframe as we're coming into that new year.  First of all, it

3    has to go to the leadership team, my peers and Mark Philip, and

4    then, of course, it has to be going to corporate Stryker.

5    Q.    When you say "corporate Stryker," what do you mean?

6    A.    Head office, Kalamazoo Stryker.

7    Q.    Kalamazoo, Michigan?

8    A.    Yes.

9    Q.    The parent company of Stryker Biotech?

03:14 10    A.    The parent company of Stryker Biotech, yes.

11    Q.    In your 15 months of work at Stryker Biotech, how many

12    annual sales budgets were you involved in preparing?

13    A.    From what I recall totally preparing, one.

14    Q.    The sales budget for which year?

15    A.    2006.

16    Q.    Mr. Houghton, let me show you what we've marked for

17    identification as Exhibit 226.  What is Exhibit 226?

18    A.    This, according to the title there, is the 2006 sales

19    quotas broken down by individual representatives for OP-1

03:16 20    Putty, OP-1 Implant, and TCP, also known as Calstrux.

21    Q.    How do you figure out what numbers to assign to each of

22    the representatives in each of the regions?

23    A.    We -- You start with a total number, which is based on

24    historic sales and historic growth rates, look at how that's

25    progressing, total.  And that becomes your total number for the

1    year.

2         And then doing that same application at a regional and

3    territory level, individual rep level, looking at how they've

4    been performing and how they're growing.  And a lot of that is

5    dependent on how long the representative has been with the

6    company.  If they're new, you expect a lower growth rate.  If

7    they've been there longer, you'd expect a larger growth rate.

8         So really the total number was developed probably more for

9    myself and for the marketing team, and then breaking it down at

03:17 10   the individual region territory levels was very much with the

11   sales management team.

12   Q.   Whose input did you rely on to set both the regional

13   numbers and then, within the regions, the individual

14   representative numbers?

15   A.   The sales management team: Mr. Heppner, Mr. Ard,

16   Mr. Whitaker, Mr. Murphy, Mr. Denney.

17             MR. STERNBERG:  I offer Exhibit 226.

18             MR. O'CONNOR:  No objection here.

19             THE COURT:  All right.  It's displayed now to the

03:17 20   jury.

21             (Government Exhibit No. 226 admitted into evidence.)

22   BY MR. STERNBERG:

23   Q.   Mr. Houghton, at the bottom of Exhibit 226, there's a box

24   that says "Bill Heppner"?

25   A.   Um-hum.  Yes.

1    Q.   And then it goes across and has a series of numbers, one

2    for OP-1 Putty, one for OP-1 Implant, one for Calstrux/TCP, and

3    then a total.  What does that row represent?

4    A.   That represents the total sales that we were trying to

5    achieve or would hope to achieve in 2006 across the USA.

6    Q.   And are those total numbers -- if one were to do the math

7    and add up each of the columns, are they meant to total up?

8    A.   I would expect them to.  That was the intent, yes.

9    Q.   What's the -- In terms of Stryker Biotech's day-to-day

03:18 10   business, what's the internal significance of these sales

11   quotas?

12   A.   This -- this is what drives salespeople.  They need a

13   target to achieve.  And this is something that we would set for

14   them to aim to achieve that on an annual basis.  And they would

15   be -- their salary was paid for that, but also they would be

16   bonused depending on whether they achieved this or not.

17   Q.   How often did the sales representatives and the sales

18   managers get information about how they were doing relative to

19   their quotas?

03:18 20   A.   Regularly.  We were fortunate in this situation because we

21   handled all of the direct orders.  Sales data and sales

22   information was available within 24 hours, unlike other

23   businesses where it takes a little longer to process that.  We

24   wouldn't necessarily provide it to the representatives daily,

25   but usually certainly on a weekly or -- and certainly on a

1    monthly basis, they would receive what they were doing.

2    Q.   While you worked at Stryker Biotech, what, if any,

3    concerns did you have about the sales culture?

4    A.   Could you be more specific.

5    Q.   What, if any, concerns did you have about the sales

6    culture, being focused less on the indication of the

7    products --

8    A.   Um-hum.

9        MR. GURNEY:  Objection to the leading, your Honor.

03:19 10        THE COURT:  Sustained.

11   BY MR. STERNBERG:

12   Q.   Mr. Houghton, let me show you what we've marked as

13   Exhibit 214.001 for identification purposes.

14        MR. O'CONNOR:  Object.  It's a multipage document.  We

15   can't even see the first page.  And we haven't been given a

16   copy.  We need copies.

17        Oh, we've got copies.  Thank you, your Honor.

18        Thank you, Jeremy.

19        MR. GURNEY:  Do you have a copy for me, Mr. Sternberg?

03:20 20   Thank you.

21        MR. ULLMANN:  Your Honor, may we be heard at sidebar

22   about this document?

23        THE COURT:  All right.

24        (Discussion at sidebar and out of the hearing of the

25   jury:)

1          MR. ULLMANN:  It appears to me that the government may

2     be trying to get in through the back door of part of this case

3     that your Honor severed in -- in severed Count 13.

4          And it seems as if the government is trying to suggest

5     that the only appropriate quota would be something based on

6     this 4,000-patient limit, or cap.  First of all, as

7     Mr. O'Connor said, that was not the law -- there is no

8     4,000-patient limit on the number of patients who can be

9     treated with an HDE-approved device.

03:23 10          What the government is trying to do here is lay a

11     foundation and then suggest that on higher sales quotas in

12     later years, they were somehow improper or illegal.

13          I believe that that's a part of the case that the

14     government has already decided is not part of this trial.

15          MR. STERNBERG:  If I may.  This has nothing to do with

16     statements to the FDA -- any false statements to the FDA or any

17     of the overt acts associated with that that were part of the

18     severance.  It's part of the company's budgeting process.  And

19     the line of questioning is about the fact that the company

03:24 20     knows that the label for OP-1 Putty says you're supposed to use

21     two units per patient.

22          And the company knows that most of the sales are of

23     one unit because it's too expensive when you sell two units and

24     that the way to solve that expense issue is to mix one unit of

25     OP-1 with one unit of Calstrux in order to make the sale.  And

1    the objection to the sale is two units are too expensive.  This

2    is the company's own document.  It reflects its understanding

3    of its budgeting process.

4         THE COURT:  I don't think evidence concerning 4,000

5    patients as a cap or limit is necessarily excluded by the

6    severance of Count 38.  Certainly the false statement issue is

7    out.  But there may be other proper evidentiary value to the

8    understanding of the HDE exemption.  I don't know.  So it's not

9    automatic, is what I'm saying.

03:25 10         MR. ULLMANN:  I understand the Court's broad ruling.

11   But I'm very sensitive to any use of that limit to suggest

12   wrongdoing by the individual defendants, who have no

13   responsibility for working with the HDE rules and regulations.

14        MR. O'CONNOR:  Your Honor -- and I'd just say on

15   behalf of the company -- I understand Mr. Sternberg's

16   rationale.  The basis, the relevance point is that the company

17   promoted one unit off label because the label said two units.

18   And the motive -- the motive for promoting one unit instead of

19   two is an understanding that there was some kind of, you know,

03:26 20   problem with 4,000.

21        And if that is the relevance that the government is

22   aiming at, that, from the company's perspective, is okay.  But

23   anything else about it, I don't see any other potential

24   relevance.  If that's it, that's fine.  But I do have

25   concerns --

        1            THE COURT:  Well, don't -- we'll go one piece of

        2    evidence at a time.

        3            MR. O'CONNOR:  That's why you do it that way.  Thanks,

        4    your Honor.

        5            (In open court:)

        6    BY MR. STERNBERG:

        7    Q.   Mr. Houghton, I'm showing you what's been marked for

        8    identification as Exhibit 214.001.  Do you see that on your

        9    screen?

03:27  10    A.   I do.

       11    Q.   What is Exhibit 214.001?

       12    A.   It's the sales plan from May 2005, outlining what the key

       13    goals are for the plan and the scope of that and giving an

       14    overview of what the current situation is.

       15    Q.   What involvement did you have in preparing the sales plan

       16    that is Exhibit 214.001 for identification?

       17    A.   I don't recall precisely my -- if this was my document.

       18    I'm not remembering that.  Given it was May 2005, at that point

       19    I don't recall if I'd actually taken over fully as the global

03:27  20    sales and marketing VP.

       21        I believe Ken Reali was still involved at that point.  So

       22    I believe I probably saw this document and had some input into

       23    this document, but I'm not sure whether I was the owner of this

       24    document or whether Mr. Ken Reali was the owner of the

       25    document.

1    Q.   You had some input into the document?

2    A.   Yes.  I recall being -- seeing this document, but I don't

3    recall whether it was mine or Ken's.

4            MR. STERNBERG:  Offer Exhibit 214.001.

5            MR. ULLMANN:  Objection.

6            THE COURT:  Well.  We've dealt with -- The objection's

7    overruled.

8            MR. O'CONNOR:  I don't object subject to my comment at

9    the sidebar.

03:28 10         THE COURT:  All right.

11            (Government Exhibit No. 214.001 admitted into

12    evidence.)

13   BY MR. STERNBERG:

14   Q.   Mr. Houghton, while you worked at Stryker Biotech, what

15   did you learn about the rate at which sales of OP-1 Putty --

16   Strike that.

17       While you worked at Stryker Biotech, what did you learn

18   about what the label said about how many units were supposed to

19   be used for OP-1 Putty per spinal surgery?

03:28 20   A.   My understanding of the label was that the label allowed

21   for two units of OP-1 Putty to be used in the indication that

22   it was indicated for in the spine.

23   Q.   Let me show you what's in evidence as Exhibit 92.  Do you

24   see in the "Preparation for use" part of the label, it says,

25   "One unit of OP-1 Putty...will be used on each side of the

1  spine"?

2  A.   Yes, I see that.

3  Q.   And that was your understanding while you worked at

4  Stryker Biotech, that two units should be used per spinal

5  surgery, according to the label?

6  A.   Two units could be used, yes.

7  Q.   You see the label says, "One unit of OP-1 Putty...will be

8  used on each side of the spine"?

9  A.   Um-hum, yes.

03:29 10  Q.   From your interactions with the sales force, what did you

11  learn about the frequency with which two units were used in

12  surgeries as opposed to one unit?

13         MR. O'CONNOR:  Objection.  Hearsay.

14         THE COURT:  Sustained.

15  BY MR. STERNBERG:

16  Q.   From your interactions with the sales force, what did you

17  learn about how often two units of OP-1 were used in surgeries?

18         MR. O'CONNOR:  Objection.

19         THE COURT:  Sustained.

03:30 20  BY MR. STERNBERG:

21  Q.   While you worked with Stryker Biotech, Mr. Houghton, did

22  you interact with the sales force?

23  A.   I did, yes.

24  Q.   What kinds of regular interactions did you have with them?

25  A.   I had regular meetings with the sales managers of the

1    team: Mr. Heppner, Mr. Ard, Mr. Whitaker, Mr. Denney, and

2    Mr. Murphy.  Face-to-face meetings, at least once a quarter.

3    And I had regular phone calls and emails with those gentlemen

4    on a daily basis.

5    Q.   What kinds of opportunities did you have to meet with the

6    entire sales force?

7    A.   We had conferences.  There was an annual sales conference.

8    Or we would call conferences where required, as we did when I

9    first took over the position.  We had a sales conference, I

03:31 10   believe it was in June or July of 2005, where we rolled out the

11   new sales force structure and the new compensation plan.

12   Q.   In your various interactions with the sales force, what,

13   if any, difficulties did you learn the sales force was having

14   in selling two units of OP-1 Putty per surgery?

15             MR. LIBBY:  Objection, your Honor.

16             MR. O'CONNOR:  Objection.

17             THE COURT:  I'm going to have to see you at the side.

18             (Discussion at sidebar and out of the hearing of the

19   jury:)

03:32 20             THE COURT:  I think we're going to have this constant

21   problem of things that might under some circumstances be

22   offered for the truth of the proposition, okay?

23             MR. O'CONNOR:  Yes.

24             THE COURT:  And might under other circumstances be

25   admissible for something other than the truth of the

1    proposition.

2              MR. O'CONNOR:  Yes.

3              THE COURT:  This is an example of it.  I don't think

4    there's enough of a foundation for this as admissible

5    hearsay -- I mean, it could be.  But I think a generalized,

6    "What did he hear from the sales force" is not enough to

7    qualify the out-of-court declarant as somebody authorized, for

8    example, as an agent for the company.  I don't know enough.

9    It's just too vague.  But I don't know if that's why you want

03:32 10   it.  This is my point.  I don't know if there's some

11   non-hearsay purpose to some of this.  And this is going to

12   happen with documents as well.

13             MR. O'CONNOR:  Um-hum.

14             THE COURT:  And I'm going to end up explaining that to

15   the jury multiple times, I expect, that this is a limited

16   offer; it's not for the truth but for the fact that it occurred

17   as a statement in a document, so on and so forth.

18             MR. STERNBERG:  Many of the statements in many of the

19   documents are part of the admissions.  They're statements by

03:33 20   agents, sales representatives.

21             THE COURT:  If you had a field report from a sales rep

22   who said, These are my sales, I'm selling 1.3 per person, or

23   whatever it is, that would be a more solid basis for concluding

24   that it's admissible.  But a generalized, sort of, out of the

25   cloud of the sales force, I don't think it's enough.

1          MR. STERNBERG:  The reason -- and there are documents

2     that the sales analytics team prepared and distributed them,

3     whether intentionally or otherwise, to steer clear of any

4     impingement on the false statement and other issues that have

5     been severed.  I'm happy to go back and work with those.

6          But there are specific statements from some employees

7     of Stryker Biotech and some specific conversations he had with

8     employees of Stryker Biotech about these units -- or these

9     issues where he was told -- it was told that it was far less

03:34 10     than two units per patient used, which are part of the

11     admissions.

12          MR. GURNEY:  Well, they're not admissions against any

13     of the individual defendants unless those statements were made

14     by them.

15          THE COURT:  Well, it could be under the conspiracy

16     theory.  So...

17          MR. O'CONNOR:  Your Honor, are you going to let

18     801(d)(2)(E), or whatever it is, the provisional?  You are?

19     Okay.

03:34 20          (Court reporter interruption.)

21          MR. O'CONNOR:  801(d)(2)(E) is the rule of evidence, I

22     believe, on the *Petrozziello* coconspirator statement.

23          Your Honor, you know, one thing I would like --

24          THE COURT:  Let me just say I guess I expect to.  I'm

25     not sure, based on -- I guess based on the openings, what I've

1    learned from the openings -- that's not evidence yet -- I kind

2    of assume that the government can get to the threshold of the

3    *Petrozziello* provisional admission level.  I assume that.

4    There's not a genuine contest about that.  Whether it gets --

5    keeps them in at the end of the case, another story.  That's --

6            MR. GURNEY:  Even on that basis, we're not even -- not

7    anywhere near that yet based on the questions that have been

8    asked.

9            THE COURT:  I would agree as to the body of evidence.

03:35 10         MR. O'CONNOR:  Your Honor, one other objection that I

11   think is important here is, you know, foundation.  If this is a

12   conversation with a person, that's good.  If there's --

13           THE COURT:  Well, I think that's my point.

14           MR. O'CONNOR:  It's like, you know -- I think it's

15   just a general pronouncement.

16           MR. LIBBY:  In fact, your Honor, that was my concern

17   in addition to the other concerns expressed here.  I think

18   Mr. O'Connor just put his finger on it.  It's just -- we're at

19   the point where this is critical testimony.  If we can do this

03:36 20  in a nonleading way, what we're saying is there comes a time

21   when acts happen.  In addition to the purpose for which it's

22   being offered, it's a real concern for me.  You know, we're

23   just lobbing softballs into the witness.

24           MR. STERNBERG:  There are specific conversations that

25   he's, I expect, going to remember with people.  There's also

1  things that he learns that he may not be able to tie with a

2  particular person at Stryker Biotech.

3          THE COURT:  Depends on how he learns it.

4          MR. O'CONNOR:  That's my --

5          THE COURT:  Learning it alone isn't enough.  I mean,

6  if he learned it through review of figures, if it's something

7  he did, that's different.  If it's -- but if it's just vague, I

8  picked it up somewhere, that's not...

9          (In open court:)

03:37 10  BY MR. STERNBERG:

11  Q.   Mr. Houghton, while you worked at Stryker Biotech, did you

12  work with someone named Chris Boyer?

13  A.   Yes.

14  Q.   Who was Mr. Boyer?

15  A.   At that time, Mr. Boyer was a member of the marketing

16  team.  I don't recall his official title, but he was the

17  product manager for spine.

18  Q.   What kind of regular interactions did you have with

19  Mr. Boyer?

03:37 20  A.   Daily.

21  Q.   Was his office near yours?

22  A.   It was, yes.

23  Q.   What kinds of things did you interact with him about?

24  A.   Strategic planning, clinical trials, you know, marketing,

25  sales force discussions.

1    Q.   What kinds of interactions did you have with him about how

2    many units of OP-1 Putty were being used per surgery?

3    A.   I recall Mr. Boyer had undertaken an analysis and had

4    arrived at a number that he believed was the number of units

5    being used.

6    Q.   What did Mr. Boyer communicate to you about the number of

7    units being used?

8         MR. GURNEY:  Objection, your Honor.

9         MR. O'CONNOR:  Mr. Boyer is not in the field, your

03:38 10  Honor.  Double level -- It's a real hearsay problem.

11        THE COURT:  Overruled.  I'll allow it.

12        THE WITNESS:  Sorry.  Say it again.

13   BY MR. STERNBERG:

14   Q.   What did Mr. Boyer communicate to you about how many units

15   were being used per patient in surgeries of OP-1 Putty?

16   A.   The number he communicated to me was 1.35.

17   Q.   While you were at Stryker Biotech, what, if any,

18   communications did you have with anyone else at Stryker

19   Biotech -- Mr. Boyer or anyone else -- that provided you with

03:39 20  any different number?

21   A.   There were, I recall, two other individuals that had been

22   working on this analysis prior to me joining Stryker Biotech:

23   Mr. Barnett, Mr. Michael Barnett; and Ms. Sandy Eltringham.

24   And so they had brought to me the conclusions of the analysis

25   that the three of them had been working on.

1    Q.   In what range or cluster did their conclusions form into?

2              MR. ULLMANN:   Objection.

3              THE WITNESS:   The only number I'm recalling --

4              THE COURT:   Overruled.   Go ahead.

5              THE WITNESS:   The only number I'm recalling at this

6    point in time is 1.35.

7    BY MR. STERNBERG:

8    Q.   What conversations did you have with them or any other

9    Stryker Biotech employees about why the number was less than

03:39 10   two?

11             MR. O'CONNOR:   Objection.

12             MR. LIBBY:   Objection, your Honor.

13             THE COURT:   Sustained to the form of the question

14   anyway.

15   BY MR. STERNBERG:

16   Q.   What, if any, conversations did you have with anyone --

17   with -- let me start with, with Mr. Boyer, with Ms. Eltringham,

18   or with Mr. Barnett about why the number was other than two?

19             MR. O'CONNOR:   Objection, your Honor.   Compound,

03:40 20   hearsay, no foundation.   On those three --

21             THE COURT:   No.

22             You may answer it, if you're able to.

23             THE WITNESS:   I recall they had formed a presentation,

24   which they brought to me and we walked through the presentation

25   on how they had arrived at the number.   And also some of the

1    reasons why the number was what it was.

2    BY MR. STERNBERG:

3    Q.   What, if any, reasons did they provide you -- and "they"

4    being Ms. Eltringham, Mr. Barnett, or Mr. Boyer -- as to why

5    the usage wasn't two units per patient?

6           MR. LIBBY:  Objection to form, your Honor, as to why.

7           THE COURT:  Well, I'm not sure that's...

8           Objection sustained.

9    BY MR. STERNBERG:

03:41 10    Q.   What reasons did Mr. Barnett, Ms. Eltringham, and

11   Mr. Boyer give you as to why their analysis came in around 1.35

12   units per patient?

13          MR. O'CONNOR:  Objection.

14          THE COURT:  I'll have to see you again.

15          (Discussion at sidebar and out of the hearing of the

16   jury:)

17          THE COURT:  I think that there's an inadequate

18   foundation if the why is anything other than that's the way the

19   numbers computed.  In other words, if they did a computation,

03:41 20   they took sales figures and they divided by units, or whatever,

21   if it's just math, then they can say why.  But if it's because

22   surgeons were doing something or sales reps were doing

23   something, I don't know that we have -- maybe he has a

24   foundation, but we don't have that yet.

25          MR. O'CONNOR:  These are not people in the field.

```
 1              THE COURT:  That's sort of my point.
 2              MR. O'CONNOR:  These are not people in the field.
 3       They're in headquarters and they work for Mr. Houghton at
 4       headquarters.  They're not out in the field.
 5              MR. GURNEY:  None of these individuals are alleged to
 6       be coconspirators, so no coconspirator exception would apply to
 7       allow -- this is all hearsay -- to come in.
 8              THE COURT:  Well...
 9              MR. STERNBERG:  The company's relationships --
03:42 10        THE COURT:  Right.  I think it's because it's an
11       authorized statement by the company.
12              MR. GURNEY:  But it wouldn't make it admissible
13       against the individuals.
14              THE COURT:  Maybe.
15              MR. STERNBERG:  I understand, your Honor, your ruling.
16       We'll take it up with sales.
17              (In open court:)
18       BY MR. STERNBERG:
19       Q.   Mr. Houghton, how did you communicate the sales
03:43 20  budget/sales quotas to the field sales force?
21       A.   We -- Through their sales managers.  I'd say the process
22       was one of top down, working with them and then working with
23       them to communicate that to the sales team.  Sorry.  Could I
24       just specify.  You're referring to the 2006 sales --
25       Q.   Correct.  Exhibit 226, the sales quotas that are in the
```

```
 1    2006 --

 2    A.    Yes.

 3    Q.    -- Exhibit 226, rather.

 4    A.    From what I recall, the sales managers discussed this with

 5    the representatives, which gave time for feedback so then we

 6    could make any adjustments to that.  But ultimately, the

 7    January sales conference was the time when that was the -- they

 8    were sort of set in stone.

 9    Q.    The January sales conference?  What is that?

10    A.    That's when we would come together as a company, all

11    the -- the U.S. sales team and U.S. marketing team with

12    representatives from head office to talk about the year ahead

13    and what the strategy and plans were for the year.

14    Q.    Where was that 2006 national sales meeting?

15    A.    From what I recall, it was in Phoenix, Arizona.

16    Q.    What was your role at that meeting?

17    A.    I understood it to be my meeting.

18    Q.    What does that mean?

19    A.    It was my meeting.

20    Q.    What was going to happen at the meeting that made it your

21    meeting?

22    A.    I had set the agenda, obviously with input from my team.

23    We had invited some surgeons to give a presentation.  We'd

24    invited the CEO of Stryker to give a presentation as well.  And

25    also representatives from head office other than myself would
```

1    also make presentations on the stage.

2    Q.    How many days was the meeting?

3    A.    From what I recall, two and a half -- from what I recall,

4    two and a half, three days.

5    Q.    And what was the mix between business and pleasure?

6    A.    It was -- The mix was mainly business in the daytime.  And

7    then in the evenings we would have dinner.  So there was some

8    entertainment in that context.

9    Q.    While you were there, what kind of presentations did you

03:45 10    give?

11    A.    I recall giving a presentation of where we had come from

12    as a company since I joined.  And so back in the February

13    2005 -- you know, what has changed, what has happened, what

14    have we implemented.  And I put up slides showing my -- the new

15    structure of the organization because we'd brought in a lot of

16    people to support the marketing and sales of our products.

17    Q.    Who else from senior management in Hopkinton attended the

18    meeting?

19    A.    Again, from what I recall, Mark Philip, the president and

03:46 20    CEO of Stryker Biotech, was in attendance.  David Renker, the

21    vice president of human resources.  Bernadette Alford, the vice

22    president of regulatory.  And Judith Sernatinger, the vice

23    president of quality.

24    Q.    What project did you and Bernadette Alford collaborate on

25    at that conference?

1    A.    We decided on the -- Sunday morning, I believe, to have

2    a -- the regional meetings.  They were -- you know, each of the

3    regional managers were having their own internal meetings.  So

4    there were four regional meetings ongoing.  We decided to walk

5    around each of those meetings and gain an understanding from

6    the representatives of how things were going in the field.

7    Q.    What kinds of things did you learn from the

8    representatives?

9    A.    It was specifically targeted --

03:47 10            MR. GURNEY:  Objection, your Honor.

11            THE COURT:  No.  You may have that question.

12            What kinds of things did you learn?

13            THE WITNESS:  It was specifically targeted to gain

14    feedback on some adverse event reporting that we had received

15    in Hopkinton in the, I believe remembering, the September

16    timeframe.

17    BY MR. STERNBERG:

18    Q.    You say "adverse event reporting."  What do you mean?

19    A.    I recall that regulatory had received a report that

03:47 20    somebody had had an adverse event with one of our products.  In

21    other words, the product had caused something to go wrong in

22    the patient other than what the product should have been used

23    for.

24    Q.    And how did you and Bernadette Alford go to these

25    different regional -- what did you do at these different

1  regional breakout sessions to try to find out more information?

2  A.   We listened.  We --

3       MR. O'CONNOR:  Objection, your Honor.  Could we see

4  you very briefly at sidebar?

5       THE COURT:  All right.

6       (Discussion at sidebar and out of the hearing of the

7  jury:)

8       MR. O'CONNOR:  Your Honor, the government has conceded

9  that there's no causation of any adverse events.  Mr. Houghton,

03:48 10  I don't know what the prep was -- what just -- said that the

11  company had -- that a product had caused an adverse event.

12  I think it was probably just a slip-up.

13       But I would ask the Court to instruct the jury

14  consistent with how the government's filings have been.  That

15  the government is not contending that it can prove or it can't

16  prove that any adverse event was caused by one of these

17  devices.

18       MR. STERNBERG:  We're not seeking causation evidence

19  from him.

03:49 20       THE COURT:  Well, I think the evidence is later going

21  to contain what the definition of an adverse event is.  Perhaps

22  rather than me do it, maybe you can track him back on that.

23       MR. STERNBERG:  I'm not sure he knows.

24       THE COURT:  Well, I think that may be true.  He

25  doesn't know.

1          MR. O'CONNOR:  Well --

2          THE COURT:  But I don't think at the end of the case

3     the jury will have a misimpression about it.  No.

4          (In open court:)

5     BY MR. STERNBERG:

6     Q.   Mr. Houghton, you mentioned a series of regional breakout

7     sessions at the 2006 national sales meeting?

8     A.   Yes.

9     Q.   How many of the regional breakout sessions did you go to?

03:50 10    A.   I recall going to at least two of the meetings.

11    Q.   After you -- and who accompanied you to each of those

12    breakout sessions?

13    A.   My assistant was with me.  And also when I arrived at the

14    meeting rooms, you know, Bernadette Alford was in some of those

15    meetings.  In other ones, it was the marketing team.  It

16    varied.

17    Q.   Let me show you what we've marked for identification as

18    Exhibit 107.  What's Exhibit 107 for identification,

19    Mr. Houghton?

03:51 20    A.   This is a summary of the comments that were received from

21    the regional sales managers and the representatives at the

22    national sales meeting during those walk-around meetings on

23    that Sunday morning.

24    Q.   Who prepared Exhibit 107 for identification?

25    A.   Bernadette Alford.

```
 1   Q.   What draft or preliminary memo did she provide to you?

 2   A.   I recall this in a draft form being sent to me.

 3   Q.   What -- Did you have an opportunity to comment on it?

 4   A.   Yes.

 5            MR. STERNBERG:  I offer Exhibit 107 for

 6   identification.

 7            MR. ULLMANN:  Objection.

 8            THE COURT:  Overruled.

 9            MR. ULLMANN:  Hearsay.  Not beyond the identity of who

03:52 10  prepared it is a large amount of the hearsay.

11            THE COURT:  Well, okay.  There's two levels, actually.

12   And I agree as to the second level.  I'll admit the document,

13   which the jurors haven't seen yet, as it reflects what was

14   said.  In other words, it's a statement by Ms. Alford or

15   whoever else prepared it that the following comments were made,

16   the fact of the making of the comment.

17            It is not evidence that whatever the comments were

18   were true.  And under that limitation, I will admit it and

19   expose it to the jury.

03:53 20            (Government Exhibit No. 107 admitted into evidence.)

21   BY MR. STERNBERG:

22   Q.   Mr. Houghton, at the 2006 -- excuse me -- national sales

23   meeting, you had a chance to talk directly with some of the

24   sales representatives?

25   A.   Yes.
```

1   Q.   At that time, what did you know about whether Stryker

2   Biotech had conducted any clinical trials of a mixture of OP-1

3   and Calstrux?

4   A.   I was not aware of any trials being conducted.

5   Q.   Let me back up for a second.  Will you explain to us, what

6   is a clinical trial?

7   A.   Could I clarify.

8   Q.   Please.

9   A.   In a clinical trial for registration purposes or a

03:53 10   clinical trial that a physician decides to do under his own

11   IRB?

12   Q.   Let's start with the former: clinical trial for what you

13   call registration purposes.

14   A.   In order to gain approval via the FDA to have your product

15   label adjusted, depending on what indication you are seeking,

16   then you have to go through a statistically approved clinical

17   trial that the FDA has to approve.  If that's approved and the

18   trial is successful -- of course, the product has to achieve

19   the results you set out to achieve -- then the FDA would allow

03:54 20   you to change your label and that would become your new

21   indication for that product.

22   Q.   What, if any, role did you have in planning, conducting,

23   overseeing any clinical trials at Stryker Biotech of a mixture

24   of OP-1 and Calstrux?

25   A.   No role.  We didn't do a clinical trial of those two.

1   Q.   What did you learn from the sales -- from the regional

2   sales breakout sessions at the 2006 national sales meetings

3   that prompted you to ask anyone any questions about the company

4   doing a trial?

5          MR. O'CONNOR:  Objection.

6          THE COURT:  Sustained.

7   BY MR. STERNBERG:

8   Q.   What did you learn at the 2006 national sales meeting from

9   your walk-arounds to the regions about the way OP-1 and

03:55 10   Calstrux were being used in the field?

11          MR. O'CONNOR:  Objection.

12          THE COURT:  Sustained.

13   BY MR. STERNBERG:

14   Q.   Did you have particular conversations, Mr. Houghton, with

15   sales representatives about the way OP-1 and Calstrux were

16   being used in the field?

17   A.   I'm not recalling any specific or particular discussions

18   with the sales representatives themselves.

19   Q.   Did you have any with the sales managers?

03:55 20   A.   Yes.

21   Q.   Which sales managers?

22   A.   Collectively all of the sales management team: Bill -- I'm

23   sorry -- Mr. Heppner and the four regional managers.

24   Q.   Mr. Ard, Mr. Whitaker, Mr. Denney, and Mr. Murphy?

25   A.   Correct.  Yes.

```
 1   Q.   In discussions with those five individuals, what did you
 2   learn about the way that Calstrux and OP-1 were being used in
 3   the field?
 4            MR. O'CONNOR:  Form.  Compound.
 5            THE COURT:  Overruled.
 6            THE WITNESS:  I'm answering it?
 7            I learned that physicians were choosing to use OP-1
 8   with Calstrux.
 9   BY MR. STERNBERG:
10   Q.   What did you learn from those five individuals about what
11   role the sales representatives had in discussing the mixture of
12   OP-1 and Calstrux with those physicians?
13            MR. LIBBY:  Objection, your Honor.
14            THE COURT:  Overruled.
15            THE WITNESS:  My understanding from the sales
16   management team is that the reps did not play a role in that.
17   That was the surgeon's decision to decide if he or she wanted
18   to use those two products together.
19   BY MR. STERNBERG:
20   Q.   Who is Chris Ring?
21   A.   A sales representative.
22   Q.   For Stryker Biotech?
23   A.   Yes.  Sorry, yes.
24   Q.   Mr. Houghton, let me show you what we've marked as
25   Exhibit 12 for identification.  What is Exhibit 12 for
```

1    identification?

2    A.    This is Exhibit 111.

3    Q.    Excuse me.  What is Exhibit 12 for identification?

4    A.    This is an email from me to Chris Ring.  "Many thanks for

5    the suggestions.  I agree with you.  I believe" --

6    Q.    Before you read it, it's actually two emails, one from

7    Chris Ring to you and then one from you back?

8    A.    Yes.  There's an original email from Chris Ring to me and

9    then one -- one back from me.

03:58 10   Q.    The one back from you is dated what?

11   A.    February the 26th.  And the one from him is February the

12   15th.

13             MR. STERNBERG:  I offer Exhibit 12.

14             MR. O'CONNOR:  No objection.

15             THE COURT:  Okay.  All right.  12 is admitted and

16   displayed.

17             (Government Exhibit No. 12 admitted into evidence.)

18   BY MR. STERNBERG:

19   Q.    In the context of the 2006 national sales meeting,

03:58 20   Mr. Houghton --

21   A.    Um-hum.

22   Q.    -- how soon after that national sales meeting is the email

23   from Chris Ring to you, dated February 15, 2006?

24   A.    Approximately two months.

25   Q.    Two months?

A.   Yes.  I recall the conference was early January, this

is -- Oh, sorry.  From him.  Month and a half.  Yes.  Month,

month and a half.

Q.   And Chris Ring tells you that he wants to touch base with

you regarding TCP/Calstrux?  Those are the same -- that's the

same product, right?

A.   Yes.

Q.   He tells you, "I think we need training on how to properly

implant this product.  Like any product, if we have 30-plus

people doing something different with regards to mixing,

dosing, et cetera, we are going to see different results."

     What was your reaction when you saw that?

A.   I was concerned.

Q.   Why?

A.   We had previously, in September, some issues with Calstrux

and the reconstitution of the product.  And we'd had some

adverse reports that there had been some migration of that

product.

Q.   What concerned you about Mr. Ring's statement that if

there are "30-plus people doing something different with

regards to mixing, dosing, et cetera, we are going to see

different results"?  Why were you concerned, if you were

concerned, about 30-plus people doing it differently?

A.   I think we wanted to ensure that the physicians and the

surgeons were reconstituting this product as per the label.

1    Q.    How many ways does the label suggest to reconstitute the

2    product?

3    A.    One way.

4    Q.    Your response to Mr. Ring is, "Many thanks for the

5    suggestions.  I agree with you.  I believe we need to retrain

6    the sales team on how to use Calstrux appropriately.  We will

7    be aiming to get something out next week."

8    A.    Yes.

9    Q.    What -- At this point, February 26, 2006, what training

04:00 10   effort were you undertaking?

11   A.    It was still under discussion as to how we were going to

12   do that, given this would be a reminder.  Because all the

13   representatives had received training on it, I didn't feel the

14   need to bring the sales team into the head office.  So I

15   believe we decided to do it through a teleconference.

16   Q.    Do what --

17   A.    Do the training through a teleconference.

18   Q.    Were you already planning training before you got the

19   email from Mr. Ring?

04:01 20   A.    I don't recall that.

21   Q.    What -- In this February 2006 timeframe, why were you

22   contemplating doing a sales force training?

23   A.    Because as I indicated, we had prior had reports in

24   September and sent a letter in September reminding physicians

25   and surgeons how to reconstitute Calstrux.

```
 1              MR. O'CONNOR:  No objection, your Honor.  I withdraw.
 2   BY MR. STERNBERG:
 3   Q.    If you'd already sent a letter in September, why were you
 4   contemplating something new?
 5   A.    The letter went to surgeons, and we felt now to remind the
 6   representatives as well again so they can pass that information
 7   on to the surgeons when they're in the field.
 8   Q.    Who worked with you on preparing the training that you
 9   provided to the sales representatives in the February/March
10   timeframe?
11   A.    In the normal circumstances, the leadership team would
12   comment on all aspects.  I recall in this particular aspect,
13   the marketing team that reported to me, but also Bernadette
14   Alford, VP of regulatory; Judith Sernatinger, the VP of QA.
15   And I recall Dean Falb, the VP of R&D was also involved, as
16   well as Dr. Mike Silverman, who was a consultant to the
17   company, acting chief medical officer or VP of medical.
18   Q.    What was Dr. Silverman's role?
19   A.    He was the acting vice president of clinical.
20   Q.    And in terms of preparing the overall presentation --
21   A.    Yes.
22   Q.    -- who prepared the documents?
23   A.    From what I recall, I prepared the documents, but with
24   everybody's input to those documents.
25   Q.    You mentioned in September of 2005, there had been a
```

1    letter sent out to surgeons?

2    A.   Yes.

3    Q.   In connection with this training, what, if any, letter was

4    contemplated to be sent to surgeons?

5    A.   In connection to this training, it was contemplated that

6    we send another letter to the surgeons reminding them of the

7    reconstitution element, but also the -- reminding them not to

8    use it with OP-1.

9    Q.   Let me show you now what we've marked now as Exhibit 111

04:03 10   for identification.  Do you see Exhibit 111, Mr. Houghton?

11   A.   I can't see the number, but this is the letter I think you

12   put up previously.  Yes.

13   Q.   What's Exhibit 111?

14   A.   This is a draft of the letter that was being proposed to

15   be sent to the surgeons following the training that we were

16   contemplating in the March...

17          MR. STERNBERG:  I offer Exhibit 111.

18          MR. O'CONNOR:  No objection, your Honor.

19          THE COURT:  All right.  111 is admitted.

04:04 20          (Government Exhibit No. 111 admitted into evidence.)

21   BY MR. STERNBERG:

22   Q.   Mr. Houghton, you mentioned a letter that was sent in

23   February -- excuse me -- in September of 2005 --

24   A.   Yes.

25   Q.   -- was a letter about Calstrux?

1    A.    Yes.

2    Q.    And how is this letter, Exhibit 111 in evidence, different

3    in terms of the products it identified?

4    A.    This letter talks about using Calstrux in combination with

5    OP-1 Implant.

6    Q.    This letter uses the words "OP-1 Implant"?

7    A.    It does, yes.

8    Q.    Who is Nebila Idris?

9    A.    Nebila Idris was the product manager, I recall, at the

04:04 10   time for Calstrux.

11   Q.    How, if at all, was she working on the training and the

12   issues with this letter?

13   A.    She would help put together training slides if

14   representatives -- you know, if representatives came into the

15   office for training.  She would help with the marketing -- it

16   was her responsibility for the marketing materials that we used

17   in the field.  She was the marketing support for Calstrux.

18   Q.    In this timeframe, February of 2006, did you ask her to

19   send a draft of this letter out to the sales force to get their

04:05 20   comments?

21   A.    I don't believe I did.  I don't recall that.

22   Q.    Let me show you what we're going to mark -- what is marked

23   as Exhibit 115 for identification, Mr. Houghton.  Let's start

24   at the back and work our way forward.  Do you know what RSMs

25   are, Mr. Houghton?

```
 1    A.    Yes.  Regional sales managers.

 2    Q.    Does Exhibit 115 for identification refresh your memory

 3    that in -- on February 14, 2006 or thereabouts, you asked

 4    Ms. Idris to send out the draft Dear Doctor letter to the

 5    regional sales managers and Mr. Heppner to gain their comments?

 6    A.    I don't recall the letter being sent to the RSMs.  I

 7    believe what this is asking the RSMs and Bill for is input to a

 8    letter that is anticipated to be sent.  The letter that you

 9    showed on Exhibit 111, I don't recall that actually being sent

10    to the RSMs.  I don't think Nebi had that letter.

11    Q.    So you were asking for comments on the concept of a letter

12    rather than an actual letter?

13    A.    That's what I believe that this was inferring, yes.

14    Q.    And is Exhibit 115 -- does Exhibit 115 for identification

15    contain some comments that you and Ms. Idris got back on the

16    concept of that letter?

17          MR. LIBBY:  Objection, your Honor.

18          THE COURT:  Well, first is just a question of whether

19    the document includes that.

20          You may answer that.

21          THE WITNESS:  Sorry, Mr. Sternberg.  Could you say

22    that again.

23    BY MR. STERNBERG:

24    Q.    Does Exhibit 115 for identification --

25    A.    Yes.
```

1    Q.   -- contain comments that you got back from some of the

2    regional sales managers on the concept of a Dear Doctor letter?

3           MR. LIBBY:  That's my objection, your Honor.

4           THE COURT:  Whether it does?

5           MR. LIBBY:  His characterization of a document not in

6    evidence.

7           THE COURT:  Overruled.

8           THE WITNESS:  The email contains questions that we

9    would want to ask surgeons to understand what was happening,

04:08 10   and as is highlighted from Mr. Whitaker to the team.

11   BY MR. STERNBERG:

12   Q.   In other words, Mr. Houghton, you and Ms. Idris wanted to

13   know what kinds of reactions there would be from surgeons in

14   response to a Dear Doctor letter?

15          MR. LIBBY:  Objection, your Honor.

16          THE COURT:  Sustained to that.

17          THE WITNESS:  The intent of this --

18          THE COURT:  No.  The objection was sustained.  We need

19   another question.

04:08 20   BY MR. STERNBERG:

21   Q.   What kinds of information were you looking for from the

22   regional sales managers?

23          MR. LIBBY:  I object, your Honor.

24          THE COURT:  Overruled.

25          THE WITNESS:  We were trying to understand what the

1    issues were in greater detail and how we could then present

2    that to physicians so they could understand, this is what we're

3    seeing and this is what we're proposing.

4    BY MR. STERNBERG:

5    Q.    In Exhibit 115 for identification, did you get responses

6    that you were seeking from the regional sales managers?

7    A.    The response was from Ryan Denney and also from Jeffrey --

8              MR. LIBBY:  Objection, your Honor.

9              THE COURT:  Overruled.

04:09 10              MR. STERNBERG:  I offer Exhibit 115.

11              MR. LIBBY:  Object.

12              THE COURT:  Overruled.  I'll admit it.

13              (Government Exhibit No. 115 admitted into evidence.)

14    BY MR. STERNBERG:

15    Q.    So let's start with, on February 14, 2006, Ms. Idris

16    copying Mr. Denney, Mr. Ard, Mr. Murphy, Mr. Whitaker,

17    Mr. Heppner, and then you and some others, asked the RSMs --

18    you told us RSMs is regional sales managers --

19    A.    Yes.

04:10 20    Q.    -- and Mr. Heppner for their "thoughts and ideas on the

21    type of questions we should anticipate from surgeons and our

22    own sales representatives" --

23    A.    Um-hum.  Yes.

24    Q.    -- from a Dear Doctor letter?

25    A.    Yes.

```
 1    Q.   And the first response was from Mr. Whitaker.  Do you see

 2    that?

 3    A.   Yes.

 4    Q.   February 14, 2006 at 9:34 p.m.?

 5    A.   Yes.

 6    Q.   And he provides some potential surgeon questions and some

 7    rep questions?

 8    A.   Yes.

 9    Q.   Mr. Houghton, would you please tell us, what were the

04:10 10    potential surgeon questions that Mr. Whitaker provided to you

11    and Ms. Idris and others that he thought would be raised in

12    response to a Dear Doctor letter?

13              MR. O'CONNOR:  Objection.  It reads --

14              THE COURT:  Well, he can read the document.

15              MR. O'CONNOR:  He can read it.  Okay.  I didn't know

16    what was --

17              THE COURT:  I think that's what the question was

18    asking, that he --

19              MR. STERNBERG:  Yes, your Honor.

04:11 20              THE WITNESS:  "What were the adverse events?  How did

21    it (Calstrux) perform in your preclinical/clinical trials?  If

22    it's migrating or causing increased inflammation, why should I

23    ever use it with" -- alone "or without OP-1?  Is this all the

24    product I get (upon seeing the volume of just OP-1 Putty

25    alone)?"
```

BY MR. STERNBERG:

Q.   Can you pause there for a second, Mr. Houghton.  At that point, what, if any, comments had you heard about the volume of OP-1?

MR. GURNEY:  Objection, your Honor.

THE COURT:  Overruled.

THE WITNESS:  OP-1 Implant or OP-1 Putty or generally OP-1?

BY MR. STERNBERG:

04:12 10   Q.   Well, if the answers are different, tell us.

A.   I don't recall -- I mean, there is a comment here.  I don't recall there being any specific comments about the volume of -- of the product.

Q.   The next question says, "Why should I use OP-1 now that you don't have a big advantage in handling?"  What does "handling" refer to?

MR. LIBBY:  Objection, your Honor.

THE COURT:  You may answer.

THE WITNESS:  My understanding is when -- in a spine 04:12 20   surgery, when the surgeon is placing the putty down each side of the spine, obviously having something that's a very -- can handle well and is very -- like putty, can be very nicely smoothed and put down the side of each spine and remains there, then that's what we're referring to here as the handling, as opposed to it falling apart in their hand or being too hard so

     1    they can't do anything with it, not malleable enough.

     2    BY MR. STERNBERG:

     3    Q.   In the next series of questions there's one that says,

     4    "This stuff is like wet sand.  What can I mix it with (if

     5    Implant)?"  Do you see that?

     6    A.   Sorry.  I'm not seeing it.  Oh.  There I see it.  Yes.

     7    Q.   Before February 14 of 2006, had you heard that kind of

     8    description of OP-1?

     9    A.   I had, yes.

04:13 10    Q.   From whom?

    11    A.   From the sales team.

    12    Q.   Can you give us any particular names?

    13    A.   I don't recall any particular names.  Just from the

    14    regular meetings we had and the general discussions around the

    15    regional meetings.

    16    Q.   What, if any, conversations did you have about whether

    17    Calstrux could improve the wet sand feeling?

    18    A.   That was our hope, long term.  As a company, the intention

    19    was that we wanted Calstrux to become that, you know, matrix

04:14 20    for OP-1 Implant.

    21    Q.   What did Stryker Biotech have to do in order to realize

    22    that dream?

    23    A.   An FDA-approved clinical trial.

    24    Q.   More specifically, a clinical trial of what?

    25    A.   A clinical trial of the two mixed together and used in the

1  particular indication that we were targeting.

2  Q.   In February of 2006 or thereafter --

3  A.   Yes.

4  Q.   -- what, if any, discussions did you have within Stryker

5  Biotech about doing such a clinical trial?

6  A.   We'd had many discussions.  Strategically we were trying

7  to decide the best path forward here.  As I'm sure everybody's

8  aware, clinical trials are expensive, so we needed the budget

9  to do that.

04:15 10       We'd already -- there had been a trial done previously

11  with OP-1, which we were reanalyzing some of those results.

12  But to do another study, we were deciding whether to do a spine

13  study or whether to do a trauma study, how many studies.  Do we

14  do it globally, do we just do it in the U.S.  All those

15  questions were being discussed at senior management level.

16  Q.   At this point, February 2006, what concern did you have

17  that there's no study even planned --

18            MR. GURNEY:  Objection, your Honor, to the leading.

19            THE COURT:  Sustained.

04:15 20  BY MR. STERNBERG:

21  Q.   What concern did you have in February 2006 about the state

22  of any study of OP-1 and Calstrux together?

23            MR. GURNEY:  Same objection, your Honor.

24            THE COURT:  You may have that.

25            THE WITNESS:  No more concern than we needed to do a

         1    study.  And that's what we required to get a full approval so

         2    we could promote the products appropriately.

         3    BY MR. STERNBERG:

         4    Q.    Going on here in Exhibit 115, there are a series of rep

         5    questions.  Do you see that?

         6    A.    I do, yes.

         7    Q.    "Rep" stands for sales representative; is that right?

         8    A.    It does, yes.

         9    Q.    Can you start, Mr. Houghton, in this section by -- with

04:16   10    the second question, "Do you know what this is?"  And read to

        11    us the next few questions.

        12    A.    "Do you know what this is going to do to our OP-1 sales?

        13    Do you know what this is going to do to our Calstrux sales?

        14    All my big users mix OP-1 with Calstrux and that's why they use

        15    OP-1.  How do I keep their business?  If I'm in a case tomorrow

        16    (with a new user or current user), do I need to tell the

        17    surgeon not to mix OP-1 with Calstrux?"

        18    Q.    Pausing there for a moment, Mr. Houghton --

        19    A.    Yes.

04:16   20    Q.    -- at this point had you heard the term "carrier" with

        21    respect to Calstrux?

        22    A.    Yes.

        23    Q.    What does "carrier" mean in that context?

        24    A.    In that context, it was explained to me that there are

        25    three legs of a stool essentially for bone growth in this

 1    particular area.  You need, you know, stem cells.  You need

 2    something that will signal those stem cells to become bone as

 3    opposed to any other type of cell.  And you also need some kind

 4    of matrix or carrier or -- it had various other names -- that

 5    would knit it all together.  So that's what I understood the

 6    term "carrier" coming from.  And you know, Calstrux could be

 7    that carrier.

 8    Q.   Well, based on what you saw in the February 15 --

 9    February 14, rather, 2006 email from Mr. Whitaker that's

04:17 10    Exhibit 115 --

11    A.   Yes.

12    Q.   -- did you come to a view that some of the sales force

13    already viewed Calstrux as a carrier?

14         MR. O'CONNOR:  Objection, your Honor.  It's leading.

15         THE COURT:  Overruled.

16         THE WITNESS:  As I indicated, to my understanding of

17    the term "carrier," Calstrux is a carrier.  It's a bone void

18    filler, as are some of the other competitors to Calstrux.  It

19    just wasn't approved to be the carrier for OP-1.

04:18 20         MR. LIBBY:  Objection, your Honor.  Move to strike.

21         THE COURT:  No.  It may stand.

22    BY MR. STERNBERG:

23    Q.   Going on down in the rep questions, Mr. Houghton, there's

24    one that says, "Have we determined what another ideal carrier

25    for OP-1 is out there?"  Do you see that one?

```
 1    A.    Yes.
 2    Q.    What efforts did you undertake to find carriers for OP-1?
 3    A.    Through the business development function, we were looking
 4    at other products.  I don't recall specifically targeting
 5    looking for another carrier at that point in time.  We were
 6    looking at other products.
 7    Q.    In your view, was Calstrux a carrier for OP-1 at this
 8    time?
 9    A.    We hoped it to be, yes.
10    Q.    You hoped it to be in the future?
11    A.    As an approved carrier, yes.
12              MR. LIBBY:  Objection, your Honor.
13              THE COURT:  Overruled.
14              MR. LIBBY:  Leading.
15              THE COURT:  Overruled.
16    BY MR. STERNBERG:
17    Q.    What had to happen in order for Calstrux to be the carrier
18    of OP-1?
19    A.    An FDA-approved clinical trial with statistically proved
20    results had to be undertaken.
21    Q.    On the next page of Exhibit 115, Mr. Whitaker tells you
22    and other colleagues, "Unfortunately, there is nothing out
23    there that handles like Calstrux, and we're going to have to
24    recommend a product from another company."
25              What did you know before February 14, 2006 about the sales
```

 1    force at Stryker Biotech recommending products to be mixed with

 2    OP-1?

 3            MR. LIBBY:  Objection, your Honor.

 4            THE COURT:  Sustained.

 5    BY MR. STERNBERG:

 6    Q.   Before February 14, 2006, Mr. Houghton --

 7    A.   Yes.

 8    Q.   -- what did you know about the manner in which OP-1 and

 9    any other product -- whether it's Calstrux, Vitoss Flow, Isotis

04:20 10   OrthoBlast, or any other product -- were being promoted

11    together?

12            MR. LIBBY:  Same objection, your Honor.  Foundation.

13            THE COURT:  Sustained.

14    BY MR. STERNBERG:

15    Q.   When you got this email --

16    A.   Yes.

17    Q.   -- Exhibit 115, what was your reaction to Mr. Whitaker's

18    statement that, "Unfortunately, there is nothing out there that

19    handles like Calstrux, and we're going to have to recommend a

04:21 20   product from another company such as Vitoss Flow or Isotis

21    OrthoBlast II, as OP-1 by itself has too little volume and

22    doesn't handle well on its own"?

23            MR. O'CONNOR:  Your Honor, just ambiguous on reaction.

24    What did he do?

25            THE COURT:  Overruled.  You may answer.

1          THE WITNESS:  Well, we wanted to ensure that Calstrux

2    stand-alone and OP-1 reputation stood as it was.  They both had

3    good reputations as products as stand-alone.  And I was more

4    concerned about the damage that could be had by surgeons using

5    these two products together and having these adverse events,

6    that it could damage either or both of the products'

7    reputations as a stand-alone.

8          MR. LIBBY:  Move to strike, your Honor.

9          THE COURT:  Overruled -- or denied.  It may stand.

04:22 10  BY MR. STERNBERG:

11   Q.   Why were you concerned that the combination use of OP-1

12   and other products might damage the reputation of OP-1?

13   A.   Well, until we'd done the correct trial and the correct

14   research to understand what the correct combination should be

15   of the two, you know, and then were able to put that on the

16   label so that the surgeons knew precisely how to do it, there

17   was too much variation; if surgeons chose to do it, they

18   were -- you know, the surgeon could do it in various different

19   ways.  And so that could be -- you know, who knows what was

04:22 20  causing the problem.

21         MR. LIBBY:  Move to strike, your Honor.

22         THE COURT:  It may stand.

23   BY MR. STERNBERG:

24   Q.   The next sentence says, "And to Pete's point, many

25   surgeons are just handed the product prior to implantation and

 1    think it's all OP-1."

 2         When you saw that, Mr. Houghton, what did you think?

 3              MR. LIBBY:  Objection, your Honor.

 4              THE COURT:  Sustained.

 5    BY MR. STERNBERG:

 6    Q.   What concern did you have about a statement saying that

 7    surgeons are handed something prior to implantation and think

 8    it's all OP-1?

 9              MR. LIBBY:  Same objection, your Honor.

04:23 10              THE COURT:  Sustained.

11    BY MR. STERNBERG:

12    Q.   What discussions did you have after seeing this statement

13    with Ms. Alford or other people on your senior staff?

14              MR. LIBBY:  Objection.

15              THE COURT:  I think you'll have to --

16              MR. O'CONNOR:  Foundation.

17              THE COURT:  Because of the objection, I think you'll

18    have to point it to a topic.

19    BY MR. STERNBERG:

04:23 20    Q.   Mr. Houghton, do you see the last sentence of the

21    paragraph we're looking at?

22    A.   Yes.

23    Q.   It says, "Many surgeons are just handed the product prior

24    to implantation and think it's all OP-1"?

25    A.   Yes.

1    Q.   On that specific point, the point that [as read] "many

2    surgeons are handed a product and think it's all OP-1," what,

3    if any, discussions did you have with your colleagues at

4    Stryker Biotech about that?

5    A.   I don't recall having discussions with them on that

6    specific point.  But we --

7                MR. O'CONNOR:  Objection.  End of answer, I think.

8                THE COURT:  I think that probably is the answer.

9                We're at 1:00 o'clock.  I think perhaps we should

04:24 10   pause at this point.

11               So jurors, we've begun the evidence.  We'll break for

12   the weekend.  It is a long weekend.  Monday is a holiday,

13   Martin Luther King Day, so we will not sit on that day.  So we

14   will resume on Tuesday morning at 9:00 a.m.

15               And again, please observe the direction to avoid any

16   discussion of the matter and the case.  Enjoy the weekend and

17   we'll see you on Tuesday.  We're in recess.

18               THE CLERK:  All rise for the Court and the jury.  The

19   Court will be in recess.

04:24 20               (The Court and jury exit the courtroom and there is a

21   recess in the proceedings at 1:02 p.m.)

22

23

24

25

```
 1              C E R T I F I C A T E

 2

 3         We, Marcia G. Patrisso, RMR, CRR, Official Reporter of

 4    the United States District Court, and Kimberly A. Smith, RDR,

 5    CRR, do hereby certify that the foregoing transcript

 6    constitutes, to the best of our skills and abilities, a true

 7    and accurate transcription of our stenotype notes taken in the

 8    matter of Criminal Action No. 09-10330-GAO, United States v.

 9    Stryker Biotech, et al.

10

11    /s/ Marcia G. Patrisso
      MARCIA G. PATRISSO, RMR, CRR
12    Official Court Reporter

13    /s/ Kimberly A. Smith
      KIMBERLY A. SMITH, RDR, CRR
14

15    Date:  January 13, 2012

16

17

18

19

20

21

22

23

24

25
```