UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


)
UNITED STATES OF AMERICA, )
)
          Plaintiff,      )
)                Criminal Action
v.                        )                No. 09-10330-GAO
)
STRYKER BIOTECH, LLC,     )
et al.,                   )
)
          Defendants.     )
)


BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE


**DAY FIVE**
**JURY TRIAL**

**EXCERPT - OPENING STATEMENTS**


John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Friday, January 13, 2012
9:07 a.m.


Marcia G. Patrisso, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728


Mechanical Steno - Computer-Aided Transcript

```
 1    APPEARANCES:

 2         OFFICE OF THE UNITED STATES ATTORNEY
           By: Jeremy M. Sternberg, Susan B. Winkler, and
 3              Gregory F. Noonan, Assistant U.S. Attorneys
           John Joseph Moakley Federal Courthouse
 4         Suite 9200
           Boston, Massachusetts  02210
 5         On Behalf of the Government

 6         ROPES & GRAY
           By: Brien T. O'Connor, Esq.
 7             Joshua S. Levy, Esq.
               Aaron M. Katz, Esq.
 8             Cori A. Lable, Esq.
           Prudential Tower
 9         800 Boylston Street
           Boston, Massachusetts  02199-3600
10         On Behalf of the Defendant Stryker Biotech, LLC

11         NUTTER, McCLENNEN & FISH, LLP
           By: Robert L. Ullmann, Esq.
12             Maya L. Sethi, Esq.
           Seaport West
13         155 Seaport Boulevard
           Boston, Massachusetts  02210-2604
14         On Behalf of the Defendant William Heppner

15         WILMER CUTLER PICKERING HALE & DORR, LLP
           By: Brent J. Gurney, Esq.
16             Miranda Hooker, Esq.
           1875 Pennsylvania Avenue
17         Washington, D.C.  20006
           On Behalf of the Defendant David Ard
18
           LIBBY HOOPES, P.C.
19         By: Frank A. Libby, Jr.
               Alathea E. Porter, Esq.
20         175 Federal Street
           Boston, Massachusetts  02110
21         On Behalf of the Defendant Jeffrey Whitaker

22

23

24

25
```

1       MR. LIBBY:  May it please the Court, counsel, and may

2    it please you, ladies and gentlemen of the jury.  Once again,

3    my name's Frank Libby, and together with my colleague, Althea

4    Porter, we're proud to represent Jeff Whitaker.

5       You've been very patient yesterday and again this

6    morning.  You've heard a great deal already.  A lot of

7    material.  Several hours of presentation by some very

8    experienced counsel on a matter that's very likely unfamiliar

9    to you.  And I was planning on asking you to hang in there just

10   a little bit longer, telling you that it was just one more

11   opening statement, but that wouldn't do justice to this moment

12   because it doesn't come near capturing what's really unfolding

13   before you right now.

14      I'm standing before you on behalf of a good and decent

15   man.  His entire life he cared deeply about how he carries

16   himself, how he behaves, how others view him.  He cares deeply

17   about his family, his friends, his colleagues at Stryker and in

18   the relatively small surgical community, surgeons and the like,

19   what they think about, what they say about him.  Simply put:

20   Jeff Whitaker is eager to be both exonerated in this criminal

21   matter and to clear his good name, the name that he has built

22   up his entire life.

23      He wants to do that very much in the course of this

24   proceeding with you, and he wants to get this

25   process -- everybody wants to get this process underway, with

1    you all as the judges of the facts.  You and you alone find the

2    facts in this case.  And that begins with testimony which

3    commences virtually immediately after I'm done.  But I make no

4    apology for taking this time with you.

5        So Jeff Whitaker:  He's a family man.  Married Linda

6    about 20 years ago.  Two young children:  Jacob and Hannah.

7    She's home taking care of them.  Jeff grew up and attended high

8    school in Maryland and South Carolina, and graduated college in

9    1985.  He bounced around at a couple of entry-level positions

10   after graduating college and then had the great fortune to join

11   the medical-device industry.

12       His first job in the medical-device field had to do

13   with legs, anti-coagulation devices and the like.  Prevents

14   deep vein thrombosis.  So why is that important to mention?

15   Because it was his first opportunity to deal with a very select

16   customer base:  doctors, surgeons.  He called on them.  He

17   found it was an exciting new world.  These are busy people with

18   serious work.  And he came to appreciate what they're able to

19   do and how they go about their work.

20       He came to know and respect individual surgeons not in

21   the role of a patient like you or I would typically, but to

22   present himself as a potential asset, a resource to that

23   surgeon, to that doctor.  And after some time Jeff concluded,

24   Do you know what?  This is pretty good.  This is a great way to

25   make a living.  This is meaningful and this is what I want to

1    do.

2         So after some time he moved on from legs to knees.  He

3    worked for a company that sold surgical instruments for

4    arthroscopic surgery and the like, provided stability to the

5    knees.  And then moved up to the shoulders.  Started with legs,

6    knees, now shoulders, rotator-cuff surgery-type instruments,

7    and so on, suture anchors, to stabilize the shoulder.

8         In 2002 Jeff had the great fortune to join Stryker

9    Biotech.  And what an opportunity.  He moves from

10   instrumentation-type devices to the cutting-edge world of

11   biologics.  His initial experience was with OP-1 Implant.

12   Mr. O'Connor told you a little bit of history about OP-1

13   Implant with the long-bone nonunion product.  A year or so

14   later Implant was joined on the market by OP-1 Putty.  You

15   heard a great deal about that already.  That's the bone

16   morphogenetic protein.

17        Now, here some of the most demanding customers on the

18   planet, neurosurgeons, orthopedic surgeons, he's dealing with

19   them on a routine basis.  It's a demanding task, but if you

20   know your stuff and you're good at what you do and you know

21   people -- and sales is all about people.  It's all about trust

22   and confidence -- you can build solid working and professional

23   relationships and you have a shot at growing a loyal customer

24   base, customers who will not only come to know you and respect

25   you and trust you, but give your name to other surgeons.

1    That's how you make a good living and you carve out a career

2    for yourself, a future for yourself and your family.

3         Now, you heard from Ms. Winkler, Jeff was a regional

4    sales manager for Stryker.  He was proud to be a regional sales

5    manager for Stryker.  In '05 he became the southeast sales

6    manager, and then in late '07 he became the eastern region

7    sales manager.  Now, it's not a manager in the executive sense

8    of the word.  He worked out of his home, North Carolina.  He

9    doesn't hire or fire.  He doesn't make salary decisions or

10   design training in any way.  That's all handled elsewhere in

11   the company.  But he's an experienced sales motivator, a

12   communicator and a facilitator for the ten or so reps that he

13   covers in his territory.

14        And that includes traveling throughout his region,

15   supporting his reps, looking after their well-being, and going

16   on things you'll hear called ride-alongs.  A territory

17   manager -- or, rather, a sales manager, a regional manager,

18   will go and see a rep and go on some rides, pay visits to

19   surgeons in their offices, see how his reps are handling

20   themselves in the field.

21        So from years of experience in the surgeons' offices,

22   in and around hospitals and surgical clinics, Jeff helped his

23   sales reps learn the ropes, learn -- he learned the ropes, and

24   he would teach his reps how best to prepare to help the surgeon

25   and actually be helpful to that surgeon.  You'll see and learn

1   how his own people uniformly thought very highly of him; valued

2   his energy, his willingness to step up and to help with

3   whatever they needed.

4        So let's fast-forward to the present.  Jeff's day in

5   court begins right now -- right here, right now.  And this is

6   my opportunity on behalf of Jeff to tell you what I believe

7   this case is fundamentally all about.  Now, I'm not going to

8   intentionally go into plowing the ground that these lawyers did

9   yesterday.  I'm not going to try to do that.  I'm going to try

10  to avoid that.  There may be some overlap, but I'll see if I

11  can avoid it.  Rather, I'm going to suggest to you two, and

12  only two, guideposts to keep in mind as you listen to the

13  testimony, you see the evidence, you hear the people from the

14  witness stand.

15       And those two points -- each of those two points have

16  to do with one thing, and that's being free to do your job.

17  Being free to do your job.  One -- Mr. O'Connor briefly

18  mentioned this yesterday and I want to underscore it -- the FDA

19  may not interfere in the practice of medicine.  The FDA may not

20  interfere in the practice of medicine.  That means doctors,

21  surgeons, are free to call the shots -- all of them, because

22  it's their obligation to call the shots -- regarding the care

23  and treatment of their respective patients.

24       The FDA's role as a regulator is, of course,

25  important, but at the end of the day -- at the end of the

1    day -- it's the surgeon's decision.  And the surgeon's decision

2    regarding his patient trumps the FDA, something you didn't hear

3    from Ms. Winkler yesterday.  That's one.

4           Two:  When a surgeon asks for help or poses a question

5    to a manufacturer's rep, a sales rep, regarding the care or

6    treatment of that surgeon's patient, the rep -- such as Jeff is

7    a rep, now he's a regional manager -- they're completely free

8    to respond -- completely free to respond -- to that request for

9    help, or that question.  Another item not included in

10   Ms. Winkler's comments.

11          Now, doctors know this.  They know they're free to

12   practice medicine, and so do those in the medical-device

13   community, including Jeff.  He knows it too.  You'll see from

14   the evidence that Jeff acted in good faith, that whatever the

15   circumstances were, he believed he should be prepared to

16   respond and that it was perfectly permissible to respond to

17   that request for help.

18          Now, why do I single out these two points up-front

19   first?  Because the government has charged Jeffrey Whitaker

20   with fraud; that is, lying and cheating surgeons.  Lying and

21   cheating surgeons.  Make no mistake.  That's the

22   charges -- those are the charges in this case.  And to convict,

23   they have to prove to you, ladies and gentlemen, among other

24   things, and beyond a reasonable doubt, that Jeff -- this man,

25   Jeffrey Whitaker, had criminal intent.  And not just any kind

1    of intent -- any kind of criminal intent -- specific intent.

2    Specifically intended to defraud a surgeon, to lie, to cheat a

3    surgeon.  And here's the home-run point:  Good faith is

4    completely inconsistent with an intent to defraud.  Completely

5    inconsistent with an intent to defraud.

6         You will conclude that after all is said and done and

7    all the evidence is in in this case, contrary to believing that

8    any of his actions were criminal, Jeff had every good reason to

9    believe and, in fact, believed genuinely that he was acting in

10   good faith.  He was doing good.  Helping a surgeon, in turn,

11   help that surgeon's patient.

12        So here let me be a little more visual and offer a

13   scenario where both of those things are in play.

14        If I may, your Honor?

15        THE COURT:  Go ahead.

16        MR. LIBBY:  It's going to be to your back, but this is

17   what we have here.  Can everybody see this okay?

18        Now, these two principles I'm talking about are

19   actually at play in what you see here in this photograph.  And

20   they're at play with -- everybody in this room has to be on his

21   or her own toes.  And that takes place every day in every

22   operating room in this nation.

23        One way or another, virtually everything you hear and

24   see in this case is going to come down to this.  All of it.

25   All the evidence in this case.  Everything you need to decide

 1    about the government's charges can be found right here.  It's

 2    personified in what you see here.

 3            This is the operating suite, the operating room.

 4    You're going to learn from the evidence in this case, ladies

 5    and gentlemen, how the surgeon, this gentleman right here with

 6    his back to you, bent over as tasked, calls all the shots in

 7    the operating room to include who's in the room, what takes

 8    place, at what stage, in what manner, and for what purpose.

 9    Everything.  The surgeon.

10            So it's a little tight quarters here and it doesn't

11    capture everybody in the room, but just so we're clear we have

12    a patient you can't see.  The surgeon is bent over him.  We've

13    got the scrub nurse, the surgical assistant; we've got the

14    neurology, radiology folks.  Why do we have radiology?  We're

15    dealing with spines, bones, constantly taking X-rays.  That's

16    why we're wearing lead vests.

17            We have a circulating nurse -- not in the photograph

18    here, but every one of these procedures -- you'll learn about

19    the surgical procedure, including who's in a room, what

20    happens.  A circulating nurse is not in the sterile field.

21    That's the area immediately above the incision.  Nothing can go

22    in there unless it's sterile.  It's called the sterile field.

23    The circulating nurse gets whatever product, boxes, opens the

24    boxes, makes sure the instruments from the back table are made

25    available to the scrub nurse and so forth.  So it goes

1  circulating nurse to scrub nurse to the assistant, and

2  ultimately, the surgeon.

3        And that circulating nurse is documenting in real time

4  everything that is being used in that surgery.  Everything.

5  Documenting it so there's a record, a real-time record so

6  you'll know -- and you can see.  And you'll see documents in

7  this case -- what happened in that room, two- or three-hour

8  procedure.  A complete record.  What was used, who was there,

9  who did what, when.

10        Now, I haven't talked about this fellow right here in

11  the red vest.  This might surprise you, but that's the

12  medical-device representative.  Why's he there?  Well, we'll

13  tell you later.  You'll learn why he's there.  He's there often

14  at the request, and most often at the insistence, of this man,

15  the surgeon.  He's not barging in.  He's expected to be there

16  under the complete direction and control of the surgeon.

17        Now, here he's using a laser pen.  You'll see here,

18  you'll learn that because the rep is not in the sterile field

19  and he's not scrubbed in and he's not, in fact, involved in any

20  way physically with the surgery, he needs to point out

21  products, boxes and so forth, and talk to the circulating nurse

22  and make sure that people are getting what needs to be gotten.

23        He never opens a box or moves or touches an

24  instrument, but -- and you'll hear about this too -- he can be

25  helpful in telling the surgical team, maybe unfamiliar with the

1    vials -- and you've seen a couple of the vials of OP-1 and

2    Calstrux in this case -- how to open it.  It's not easy.  It's

3    got serrated edges; it's got rubber stoppers.  They want to

4    make sure that people open this properly when it's time.  And

5    this gentleman here says when it's time.

6            Now, he doesn't simply show up.  These are calendared.

7    These procedures -- as you might imagine, it's a fairly

8    complex, significant procedure for everybody involved.  There's

9    a game plan.  It's scheduled.  Need to know who's on the team,

10   who's going to be there, how much product is necessary.  It's

11   all played out ahead of time.  It's too late once this

12   procedure gets underway to try to figure out how much product

13   is necessary for whatever the procedure is.  So the bottom-line

14   dynamic, you'll find -- you'll find in the course of this

15   trial -- is that this person's purpose is to do all he or she

16   can to help this person do all he or she can to help the

17   patient.  That's it.  That's what this case is all about.

18           Now, the patient -- a word about the patient you don't

19   see here in this photo.  At this stage in this kind of

20   surgery -- leading up to the surgery, rather, there's just only

21   one word for this patient's life, and that's miserable.

22   Whoever that person is has been dealing with spinal instability

23   for years.  After years of pain management and physical therapy

24   and so forth and so on, this person has been effectively

25   deprived of all daily functions of life and enjoyment of life.

1    They consider themselves out of the mainstream of family life

2    and business life.  They can't move.  They can't bend over.

3    They can't lift.  They can't sleep.  They can't walk.  They're

4    at the end of their rope.

5            Now, 20 years or so ago all that was available to help

6    folks like that -- some folks like that -- was the procedure

7    that Mr. O'Connor laid out for you yesterday, and that's the

8    iliac crest graft surgery.  Brutally painful.  Even with

9    anesthesia, brutally painful.  Patients will tell you they

10   don't want to go through that.  They could feel the hollow

11   piece from their hip.  It's where they go in, they crack open

12   the hip with a hammer and chisel and pull out that soft bone.

13   They need the person's own bone to try to make a fusion in the

14   spine, basically.

15           But for some they can't even -- years ago they

16   couldn't even submit to that procedure.  They were just flat

17   out of luck.  They weren't good candidates for it.  And, again,

18   Mr. O'Connor mentioned briefly some of those folks weren't good

19   candidates because they didn't -- they had poor bone quality,

20   if they had any bone available at all for that type of

21   procedure, iliac crest graft.  These are people who were

22   elderly, smokers, diabetic, osteoporosis, had a prior failed

23   surgery.  There wasn't any bone left to go back and get.  So

24   their misery continued, no options.

25           Then along came bone morphogenic protein, a brand-new

1    day for spine surgery.  A brand-new day for spine surgeons.

2    And that's why, ladies and gentlemen, this man joined Stryker.

3    He saw it for what it was:  a great development.  Patients were

4    no longer shut out of the operating room by poor bone.  It's a

5    huge leap forward.

6            You heard Mr. O'Connor talk about Stryker's research

7    and development story.  This is the kind of -- this is the kind

8    of product, this OP-1 -- it's like a radio signal.  Very strong

9    radio signal.  A hundred, even a thousand times stronger than

10   your own bone.  Tells the body:  Grow bone.  Fill in, give me

11   stability in my spine.  Surgeons don't have to go and tell

12   their patient, You've got to undergo this crest graft, this

13   hip -- we're going to crack open your hip.  He doesn't have to

14   say that anymore.  So most of all, with the advent of BMPs,

15   surgeons can say yes to these people that were previously out

16   of luck.

17           So in the course of this trial you're going to learn

18   surgeons obviously wanted to avoid exposing their patients to

19   this unnecessary pain, and not for nothing, additional surgical

20   procedure concerning the risk of anesthesia and so on and so

21   forth.  Two procedures.  They understood the benefit of BMPs.

22           A little bit of relevant history.  Just a little.  The

23   first on the market was not OP-1.  It was a thing called

24   InFuse -- a product called InFuse -- from Medtronic.  First on

25   the market.  The surgeons became familiar with InFuse, and then

1    they began combining InFuse with other materials to give it

2    volume and handling, okay?

3          And the scaffolding.  The scaffolding -- you heard the

4    term "scaffolding" already.  It's something to grow on.  When

5    the active ingredient sends that signal to grow bone, it's got

6    to grow on something, to provide scaffolding.  So doctors were

7    already mixing before OP-1 came on the market.  And all that

8    was widely known in the spine surgery community and the

9    medical-device community, known to Jeff.  OP-1 later came on

10   the market as an approved product.  Now that's available to

11   surgeons as well.  And sometime later Stryker launched

12   Calstrux, the TCP product, that tricalcium phosphate which

13   occurs in things such as you see in this Gerber baby food.

14         You'll also hear a constant reframe, and the evidence

15   in this case, and that is this:  Surgeons ask each other and

16   reps all the time about mixing, combining products.  All the

17   time.  Mixing was the standard of care throughout this whole

18   time.  Surgeons believe that combining an active ingredient and

19   inert materials such as TCP was beneficial.  It was the best of

20   both worlds.  It provided the bone growth signal and the

21   scaffolding on which to grow the bone.  You're going to learn

22   again that all of that was widely known in the medical-device

23   community, to folks including Jeff.

24         Surgeons, their surgical teams and the sales reps

25   providing the latest, greatest advancement all believed -- all

1    of them believed -- they were playing a genuine role towards

2    greater prospects for successful surgical procedures.  And

3    you'll see and hear in this case, in this courtroom, the very

4    same thing Jeff and his colleagues saw and heard:  that OP-1

5    provided a second chance, wonderful opportunities for a vastly

6    improved life.  Get these people back to their near-normal

7    daily function.  No more pain.  I can sleep.  I can walk.  I

8    can lift.  And in some cases with trauma patients, I don't have

9    to lose a limb.  I don't have to lose a limb.

10        These are wonderful opportunities for surgeons.  These

11   are folks -- the gentleman here an example among them --

12   they're wired to move.  They're active people.  They want to

13   help.  They want to achieve things.  They want to accomplish.

14   They want to use everything that's available to them to

15   maximize their ability to get a good result for their patients.

16        So why's this important to go into this with you here?

17   Well, in addition to the wonderful results themselves, far from

18   any criminal intent of any kind, these results add to Jeff's

19   store of understanding, knowledge and appreciation of the

20   wonders that OP-1 brings to patients.  Jeff and his colleagues

21   are personally and professionally motivated by these success

22   stories.  They give them pride in what they do, in their work,

23   and why they can offer surgeons a way out.

24        Now, surgeons.  Very briefly.  You're going to see and

25   hear from several of them.  These are the folks who deal with

1    the spine.  Orthopedic surgeons and neurosurgeons, they both

2    cover the human spine.  Needless to say, they're highly

3    educated, skilled and trained.  I would consider them the

4    fighter pilots of the surgical community, the very best of the

5    best.  They're busy people.  You'll hear about their

6    time -- their tight time clock and time management day in and

7    day out.  They have special surgery days.  They do rounds.

8    They have time set aside for new patients.  They're not very

9    casual in their workplace, as you might imagine.  And they

10   can't and don't tolerate folks on their team who don't show up,

11   don't perform and don't come prepared for business and aren't

12   prepared when the surgeon poses a question or asks for help.

13        Sales reps, the entire medical-device community, know

14   this, including Jeff.  This is a relatively small tight-knit

15   surgical community, you'll learn from the witnesses on the

16   witness stand.  They stay up on the latest advancements and

17   techniques in this kind of surgery.  They talk to each other

18   all the time.  What better source than your colleagues, who are

19   also your competitors for the surgical business?  They go to

20   the same lectures, they read the same literature, they attend

21   the same conferences, and they're all on the internet.  They

22   want to be the best at what they do.  And that's where it comes

23   from, that information, all those sources.

24        Sales reps know this too.  And you're going to -- in

25   the operating room -- in the operating room -- this man's word

1    is law.  He's got the first word, he's got the last word, and

2    every word in between.  That man.  You're going to hear from

3    some of them yourself.  You'll see them on the witness stand.

4    You can size them up all yourself.  And you're going to see --

5    what you're going to see and hear is that they call the shots.

6    All of them.  The who, what, when, where, how.  All of it.  And

7    why?  Ultimately, because they're accountable.  They're

8    responsible for that patient and the patient's family.  They're

9    the ones who walk out of the operating room and talk to the

10   family.  They're accountable at the end of the day.

11          So for that reason, among others -- and as I pointed

12   out in the beginning of my comments but it bears repeating

13   here -- you're going to learn that a surgeon is free to

14   practice medicine without interference from the FDA.  He's

15   accountable.  He's free to practice medicine.  Surgeons will

16   tell you that while there's a lot of science involved, once

17   that surgical procedure begins, the incision is made, that's

18   when the surgeon sees the landscape, actually sees what he's

19   dealing with in that spine.  And he sees where he's got room to

20   act, what it is that he needs to do now that he couldn't see

21   before.

22          And he'll tell you there's far more art than science

23   involved in this.  Now I've got a decision to make.  How do I

24   help this patient right here, right now?  Each patient is

25   different.  No surprise there.  Each procedure is

1    correspondingly different.

2            So you're going to hear a lot about things such as the

3    space to be filled in the gutters.  You'll hear about gutters,

4    the space to be filled.  The volume that I need -- the

5    consistency.  The handling -- the surgeon needs to deal with

6    this now in the course of the procedure.  The surgeon then

7    believes in those.  "I have to have everything available to me,

8    all the tools and resources, everything.  My training -- I

9    bring to bear my training, my education, my experience, my

10   expertise, and my independent exercise of medical judgment."

11           Now, the surgeon, as with any doctor, is completely

12   free to make his or her own decisions, to elect, to prescribe

13   or use for any purpose any drug or device lawfully on the

14   market.  He can reach anything that's lawfully on the market in

15   the exercise of his independent medical judgment.  That

16   includes devices such as OP-1, Calstrux, or any other inert

17   substrate, as we call it.  That's the mixing material.  And any

18   combination of the two.  Any combination of the two.

19   Completely free to reach and use those things as he or she sees

20   fit in the course of the surgical procedure.

21           Now, I expect that you'll see instances in this case,

22   primarily emails, of Jeff's discussing with his colleagues

23   various ways that spine surgeons in their discretion might --

24   given the history of mixing and combining generally, how they

25   might consider and ultimately decide, the doctors -- rather,

1    the surgeon calling the shots -- they might decide to combine

2    these products.  Their call.  That's their shot.

3          And in doing so, you'll see that Jeff, as a

4    knowledgeable device representative and regional sales manager,

5    is genuinely trying to be helpful both to his sales reps and,

6    in turn, to the surgeon in every case.  That's all there is to

7    this case, ladies and gentlemen.  He's not hiding a thing.

8    It's completely out in the open.  He's acting completely in

9    good faith rather than criminal, as the government charges

10   here.

11         Now, you're going to learn that the medical-device

12   community, including Jeff, all knew and understood these

13   critical points:  One, again, that the FDA may not interfere

14   with a physician's judgment in the practice of medicine; and,

15   two, that that judgment encompasses everything about the care

16   and treatment of the patient including the use of medical

17   devices, again, such as OP-1 and bone void fillers such as

18   Calstrux, and that surgeon's judgment includes such decisions

19   as to whether to use any device on-label or off-label.

20         Now, you heard a great deal from counsel yesterday

21   about those terms, on-label, off-label.  There's nothing bad

22   about off-label.  There's nothing bad at all.  You'll hear that

23   too from the physician.  Oftentimes off-label is the standard

24   of care.  It's way ahead of the FDA.  And I told you I wouldn't

25   plow old ground, and I'm going to do my best to keep that

1    promise and move this along.  But please bear this in mind when

2    you listen to the evidence -- please bear these three points in

3    mind:  One, the FDA rules and regulations, the administrative

4    rules and regulations, can be and often are complex, vague and

5    inconsistently conveyed and interpreted.  And that's when

6    they're conveyed at all, which will be an issue in this case.

7    I'm not going to get into the details of that last point, when

8    they're conveyed at all, but pay particular attention -- I

9    would ask you to pay particular attention to the evidence

10   showing the disconnect between what John Houghton, the

11   government's first witness, believes he achieved during his

12   conference call with the sales force -- you're going to hear

13   about that very shortly -- and what the members of the sales

14   force actually took away from that call.  You'll find two very

15   different things, ladies and gentlemen.  That's one:  the FDA

16   rules and regs.  Complex, vague and inconsistently conveyed.

17          Two:  Jeff genuinely believed and had every good-faith

18   reason to believe that he and his reps not only could but

19   should be prepared to respond to a surgeon's question or

20   request for help and to, in fact, respond to that question or

21   request.  And that includes -- that encompasses any surgeon's

22   question regarding mixing or combining two or more devices, if

23   you will, such as OP-1 and Calstrux.  He had every good-faith

24   reason to believe that he could respond to a surgeon's request

25   when it came to that, combining products, because the doctor is

1  completely free to do that.

2  Third and last:  This is not a regulatory case.  This

3  has nothing -- this is not a diminished regulatory case.  There

4  are no administrative or regulatory charges against Jeff or any

5  of these men or the company in this case.  The Court's going to

6  give you the law at the end of this case, but for now, please

7  bear in mind this is a criminal case.  There is far more at

8  stake here.

9  And for this reason, the question for you as jurors

10  will not be whether Jeff, or any particular sales rep or

11  defendant, actually stayed inside or stumbled or strayed

12  outside the white lines of any agency regs or standards or

13  policies regarding promotion or anything having to do with the

14  interaction with surgeons.  That's not this case.  It's not

15  about staying within the white lines or stumbling or straying

16  outside the lines.

17  Even if Jeff or a sales rep might later be found or

18  thought to have run afoul of those rules or regs, the actions

19  at issue, and you're going to hear about them in this case,

20  were completely motivated by a genuine good-faith impulse to be

21  of help, to actually help.  And that's the polar opposite of

22  criminal.

23  Now, very briefly, Ms. Winkler made a few comments on

24  this conspiracy -- this conspiracy to defraud the FDA and to

25  defraud surgeons.  And a couple of points very quickly.  First,

1    to defraud the FDA.  There's not going to be any evidence,

2    ladies and gentlemen, of Jeff targeting, entering into any kind

3    of unlawful agreement to target or otherwise conspiring to

4    defraud the FDA.  He had no dealings with the FDA.  There's no

5    evidence of any dealings with the FDA.  You will not see it.

6    He couldn't find the FDA with a map.  So that's not an issue in

7    this case, respectfully.

8           Defraud surgeons.  Ms. Winkler made a couple of points

9    yesterday about Jeff and defrauding surgeons.  And it takes two

10   forms.  The first is some comment about how surgeons are handed

11   a ball of Calstrux, and Jeff allegedly trained a rep to say

12   something like, "This is what OP-1 is going to feel like."

13   That's in the course of a ride-along, where he goes into the

14   various territories and he rides along with the sales rep.

15          Well, you'll learn that, actually, that's true.

16   Surgeons will tell you, yes, that's what it does feel like.

17   That's what it does feel like when it's combined.  Again,

18   they're looking for handling characteristics, volume.  You'll

19   hear these words:  consistency, malleability.  Will it work

20   when I'm in a surgical operating room?  You'll recall that

21   mixing is a given; it's a standard of care at the time all of

22   this is happening.  Even before OP-1 came on the market.

23          Now, a surgeon's interested in the BMP, the bone

24   morphogenic protein.  And here that's the active ingredient.

25   In our case it's the OP-1.  The surgeon's interested in the

1    bone-growth qualities and properties of OP-1.  But every

2    surgeon that you're going to hear from, I expect, both

3    government and defense, is going to tell you the surgeon is

4    seriously interested in, again, the opportunity for

5    scaffolding, for volume, the handling characteristics, and that

6    comes only in a combined form, not just the active ingredient

7    alone.  No surgeon, ladies and gentlemen, in this case -- the

8    evidence in this case -- sees this ball and thinks it's all

9    OP-1.

10         Now, second, Ms. Winkler read to you yesterday an

11   email, a message by Jeff in response to a question from

12   headquarters about what kind of questions can you expect,

13   anticipate in connection with a proposed letter going out.

14   "What do you think the sales rep's going to say, what do you

15   think the surgeon's going to say when they see this letter?"

16   And in response, as she read, pointed out, identified,

17   highlighted, one part of that email said, "Some doctors are

18   handed the product prior to implantation and think it's all

19   OP-1."  Think it's all OP-1.  The government wants to suggest

20   to you that this is evidence of Jeff's knowledge of a

21   successfully orchestrated fraud.  Great.  We got the doctors to

22   think it's all OP-1.

23         Nothing could be further from the truth.  First,

24   Jeff's a sales guy.  He's actually being frank and candid with

25   the people back at headquarters.  You send this letter out,

1    here's my views.  Here's the things you're going to hear from

2    the reps and from the surgeons.  That's one.  Not terribly

3    artful, but he's been asked his opinion on the potential

4    downsides of this controversial letter and he gives his views.

5    He's completely straightforward to the folks back at

6    headquarters.

7            Now, Jeff, as all medical-device reps, knows that all

8    surgeons mix, but they aren't focused on the particulars of the

9    scaffolding material; that is, the inert part.  There's several

10   dozens of those in the market.  And you're going to hear

11   about -- you'll hear and learn the identities of those on the

12   market.  And, in fact, Ms. Winkler told you yesterday Calstrux

13   is nothing but a bone void filler.  It's like spackle.  No

14   argument here.  You won't get any argument from the surgeons

15   who used it either.  They'll tell you as much in this

16   courtroom.  It's the same substance that's found in this baby

17   food.

18           Jeff knows this and that's what he's saying in his

19   email.  He knows this, the doctors are focusing in on the

20   active ingredient.  He knows it because the sales reps and the

21   surgeons game plan every surgery.  They discuss and identify

22   the products to be used.  And when the patient is ready for

23   implantation of the combined OP-1 and Calstrux, the combination

24   is no surprise to anybody in the room.  No surprise.  It's been

25   played out, planned well beforehand.  So it's completely

1    understandable, reasonable, predictable to believe that

2    surgeons all think of it and call for it by name.  "I'm ready

3    for the OP-1."  "I'm ready for the OP-1."  That's the main

4    player here.  That's not proof of any conspiracy.

5          So what other basis can I say in response to this,

6    they think it's all OP-1?  Well, even aside from on its face,

7    it's a statement of observation; it's a remark about how

8    doctors behave and view things, about the busy lives and the

9    shorthand way that surgeons refer to the active ingredient

10   here.  It's not a statement of intent.  We want the doctors to

11   think it's all OP-1.  He's not saying that at all.  That's one.

12         Two:  The internal contributions -- you'll see it in

13   the email -- it's two-faced.  It's completely contradictory.

14   The government's theory here.  We got a two-pronged conspiracy.

15   The first is:  We're going to defraud doctors by handing them

16   something immediately before surgery and tell them it's all

17   OP-1.  That's the first group.  The second is:  We're going to

18   defraud them by sending them mixing instructions where there

19   are two things involved.  So one is:  You hand them one thing,

20   they'll think it's just one product; the other part of the

21   conspiracy is we're going to defraud them by showing them how

22   to mix.

23         Well, that's a pretty tall order, ladies and

24   gentlemen, for a conspiracy.  It calls for some pretty tightly

25   coordinated action between and among the coconspirators, it

1    seems to me.  So you'd better have a color-coded wall chart,

2    make sure that you get your surgeons in the right group.  We'll

3    have a red group.  These are the surgeons with it's all OP-1.

4    And then we'll have a blue group, make sure we see that these

5    surgeons are all in the mixing instruction part of the fraud.

6    We want to make sure we don't blow our cover by putting

7    Dr. Jones, who is at all OP-1, in the part of the mixing

8    instruction part of the fraud.  We don't want to do that; it

9    will blow our cover.

10          Even aside from those points, there's the fundamental

11   reality of this.  It's open.  It's obvious.  It's completely

12   transparent.  Understand what the government's claiming here.

13   This gentleman's coming in here and he wants to defraud the

14   surgeon in the course of this procedure.  Well, look at all the

15   witnesses.  They're all on top of each other here, one; two,

16   and I mentioned the pre-game plan.  We've gone over this

17   beforehand.  There is nothing surprising happening here at all.

18   It's all according to plan; and, three, the accompanying

19   documentation would choke a horse.

20          Among them you've got the informed consent, you've got

21   booking forms, you've got circulating nurse notes, you've got

22   operative notes, you've got delivered goods receipts.

23   Ms. Winkler talked about it yesterday, the little stickers you

24   pull off of the boxes from the products you actually use?

25   Well, you're going to learn they go on the invoices and they

1    get faxed back to the company.  That shows what product was

2    used in the course of the surgery.  That's how the company gets

3    paid.  The company wants to get paid.  The hospital wants to

4    know and the doctor wants to know for records what was used in

5    that room.  That's a strange way to carry out a conspiracy, it

6    seems to me, to have all that documentation showing in real

7    time who's doing what, using what, in what fashion, completely

8    transparently.  You're going to learn that all that

9    documentation -- all of it -- is standard in the surgical

10   community, and that, ladies and gentlemen, is all widely known

11   to the members of the medical-device community, including Jeff.

12          So bottom line, with all that in mind, the

13   government's pitch is this:  This sales rep is going to try to

14   wind up and blow a curveball past this gentleman, try to pass

15   off two products as one in this room.  He's going to put his

16   career, his future, his family's future, his livelihood,

17   everything on the line.  He's going to pull off a federal

18   felony within one of the most orchestrated, tightly controlled

19   environments, second only maybe to Houston Control, in the

20   world.  And he thinks he could get past these highly skilled

21   medical professionals with all that documentation, and he

22   thinks he can get away with it time and again.

23          For this theory to fly, the government has to be

24   suggesting -- and it has to prove to you, respectfully, ladies

25   and gentlemen -- that the circulating nurse, the scrub nurse,

1   the surgical assistant, the radiology tech, everybody is in on

2   this.  Everybody is in on this except the surgeon, the

3   so-called victim of the fraud.  It doesn't fly at all.  None of

4   it.

5           Sales reps:  You're going to be hearing from some

6   sales reps.  Basically, ladies and gentlemen, these are good

7   folks, specialized education and training, all excited, proud

8   to be working for a company known as an industry leader, and

9   working together with other medical-device professionals,

10  including folks back at headquarters known to have legal,

11  regulatory, compliance training qualifications and

12  responsibilities.  They all take their job seriously.  They all

13  know the serious purpose of their business.  They take great

14  care to know about their benefits and believe in their products

15  and the wonderful benefits that those products provide.

16          They stay current with the bone morphogenic protein

17  literature and developments in the field.  You see them, you'll

18  see them here, routinely working alongside surgeons and their

19  surgical teams.  They're trusted by and responsive to the

20  surgeons who are expert in their field, whom the surgeon

21  expects and, indeed, requires to be present in the operating

22  room, to be responsive to the surgeon's real-time needs.

23  That's when we get in there, we make that incision.  Now we see

24  what we're dealing with.  That surgeon's need for input and

25  knowledge of the product.

1          So one last time, back to the brass tacks of the

2     government's charges.  They charge fraud.  That's a broad term.

3     And they use terms such as craft, trickery and deceit,

4     dishonest means.  But in plain English, it's lying, it's

5     cheating and stealing.  Lying, cheating and stealing.  The

6     charges say that Jeff, these men, company, are frauds,

7     hucksters, charlatans.  And here's the MO, basically.  Spent

8     all that time, effort and energy developing this wonderful

9     product, and from the sales reps' -- regional managers'

10    perspective, learn all about of those products, how they work,

11    how the surgeon can use them to benefit a spine surgery

12    patient, but don't do that for the benefit of anyone else.  Do

13    it to get yourself in the surgeon's office.

14         You fly under false colors.  They think you're there

15    to help them, but you're not.  You're really there to make a

16    quick buck.  Do you remember Ms. Winkler's comments about it

17    was all about to put money in their pockets?  All of this to

18    put money in their pockets.  Gain their trust, gain their

19    confidence, get into the operating room, work the con, lie to

20    them, deceive them, pick their pockets and hustle out the door.

21    That's the government's case.

22         From what you're about to see and hear in this

23    courtroom, you will conclude that nothing about those charges

24    square with what you see in this photo or who this man is.

25    Nothing.  Not for a minute.  Rather, you're going to find

1   good-faith motivation at every turn, and that is good faith

2   is a belief -- and I believe the Court will instruct you at the

3   end of the case.  Take your instruction from him.  That is a

4   belief or opinion honestly held even if it's later shown to be

5   wrong.  That's completely inconsistent with the specific intent

6   to defraud, which the government must prove beyond a reasonable

7   doubt.

8          Now, in conclusion, a surgeon has a relationship with

9   the patient.  A surgeon has a relationship with the patient,

10  the sales rep has a relationship with the surgeon.  Jeff wished

11  to be responsive to the surgeon.  He knows what the

12  surgeon -- he understands.  He's been familiar.  He's been in

13  these operating rooms.  He's worked with surgeons before.  He

14  wants to be responsive to the surgeon and generally wished to

15  be helpful in that surgeon's efforts to find a solution to the

16  patient's condition and, most often, misery.  And that, ladies

17  and gentlemen, is how you carve out a long-term career in the

18  medical-device field.  And you make a good living at it, to

19  boot.  Nothing wrong with making a good living.

20         Now, the Court's going to tell you that no defendant,

21  none, has any burden here.  I don't have an obligation to make

22  this opening statement.  I don't have to question a witness,

23  offer any evidence, cross-examine anybody, lift a finger.

24  Nothing.  The government has every burden all the time in this

25  case to prove its case to you beyond a reasonable doubt.  And

1  that includes the obligation of proving absence of good faith.

2  I don't have to demonstrate to you good faith; they have to

3  prove absence of good faith beyond a reasonable doubt.

4          So at the close of all the evidence, ladies and

5  gentlemen, I will have an opportunity to come back before you a

6  final time and speak with you and lay out for you the many ways

7  that I believe the government has failed in its task to prove

8  any charge against Jeff beyond a reasonable doubt.  Rather, you

9  will find that he acted in genuine good faith throughout here.

10  And that's when I'll ask you formally that you clear Jeff's

11  good name and return your verdict of not guilty.

12          Thank you for your attention.

13                          * * *

14                  C E R T I F I C A T E

15

16          I, Marcia G. Patrisso, RMR, CRR, Official Reporter of

17  the United States District Court, do hereby certify that the

18  foregoing transcript constitutes, to the best of my skills and

19  abilities, a true and accurate transcription of my stenotype

20  notes taken in the matter of Criminal Action No. 09-10330-GAO,

21  United States v. Stryker Biotech, et al.

22

23  /s/ Marcia G. Patrisso
   MARCIA G. PATRISSO, RMR, CRR
24  Official Court Reporter

25  Date:  January 13, 2012